# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

ABBOTT LABORATORIES and
ABBOTT RESPIRATORY LLC,

     Plaintiffs,

     v.

LUPIN LIMITED and LUPIN
PHARMACEUTICALS, INC.,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 09-152-JJF-LPS

**REDACTED –**
**<u>PUBLIC VERSION</u>**

## LUPIN'S OPENING BRIEF CONCERNING CLAIM CONSTRUCTION

Of Counsel:

**FROMMER LAWRENCE & HAUG LLP**
Barry S. White
Steven M. Amundson
Kevin F. Murphy
Mary Ann G. Lemere
745 Fifth Avenue
New York, New York 10151
Telephone: (212) 588-0800

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
Karen L. Pascale (#2903)
Megan C. Haney (#5016)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 571-6600
kpascale@ycst.com
mhaney@ycst.com

*Attorneys for Defendants, Lupin Limited and*
*Lupin Pharmaceuticals, Inc.*

March 1, 2010
Redacted Version: March 3, 2010

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 1

    The Patents in Suit and the Asserted Claims ................................................................. 1

    The Relationship Among the Patents in Suit .................................................................. 2

    The Subject Matter of the Patents in Suit ...................................................................... 2

    The Allegations of Improved Safety Compared to Prior-Art SR Products ...................... 3

    Background Regarding Liver Enzymes,
    Uric Acid, and Bloodstream Glucose ........................................................................... 3

GENERAL CLAIM-CONSTRUCTION PRINCIPLES ........................................................ 5

ARGUMENT ...................................................................................................................... 5

I.    The Formulation and Dosage-Form Limitations ............................................................ 5

    A.    The Specifications Teach Only a
        Hydrophilic Matrix Delivery System ............................................................... 7

        1.    The '428 Patent's Specification .......................................................... 7

        2.    The Other Patents' Specifications ....................................................... 8

    B.    The Prosecution Histories Demonstrate that
        the Patentee Disclaimed Hydrophobic Materials ............................................... 9

        1.    The Prosecution-Disclaimer Doctrine ................................................. 9

        2.    The Construction of Identical or Nearly
            Identical Terms in Related Patents ..................................................... 10

        3.    The Court Should Adopt Lupin's Constructions of
            the Formulation and Dosage-Form Limitations .................................. 11

II.    The Treatment-Related Limitations in
    the '930, '967, '848, and '428 Patents .......................................................................... 15

    A.    The '930 and '967 Patents ............................................................................... 16

    B.    The '848 Patent .............................................................................................. 21

1. "significant increase in HDL cholesterol" ................................................22

2. "minimum liver damage, uric acid increases
   or elevations in fasting glucose levels".........................................24

C. The '428 Patent ....................................................................................27

III. The Biopharmaceutic Limitations in the '715, '229, '691, and '967 Patents ...................28

A. The Dose-Amount Limitations in the '229, '715, and '967 Patents .....................29

B. The Blood-Plasma-Concentration Limitations in the '229 Patent ........................34

1. Cmax Variability.........................................................................35

2. Tmax and AUC Variability..............................................................37

C. The Urinary-Metabolite-Profile Limitations in the '715 patent ...........................37

D. The Dissolution-Profile Limitations in the '691 and '967 Patents ........................39

E. The Fit Factor $F_2$ Limitation in the '691 and '967 Patents ....................................41

CONCLUSION...........................................................................................................43

# TABLE OF AUTHORITIES

## Cases

*ACS Hosp. Sys., Inc. v. Montefiore Hosp.*,
    732 F.2d 1572 (Fed. Cir. 1984).................................................................. 21

*Amgen, Inc. v. Chugai Pharm. Co.*,
    927 F.2d 1200 (Fed. Cir. 1991).................................................................. 29

*Chimie v. PPG Indus., Inc.*,
    402 F.3d 1371 (Fed. Cir. 2005).................................................................. 10

*Cohesive Techs., Inc. v. Waters Corp.*,
    543 F.3d 1351 (Fed. Cir. 2008).................................................... 30, 33, 38, 40

*Computer Docking Station Corp. v. Dell, Inc.*,
    519 F.3d 1366 (Fed. Cir. 2008).............................................................. 9, 10

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005).................................................................. 20

*Epcon Gas Sys. Inc. v. Bauer Compressors, Inc.*,
    279 F.3d 1022 (Fed. Cir. 2002).................................................................. 10

*Every Penny Counts, Inc. v. Am. Express Co.*,
    563 F.3d 1378 (Fed. Cir. 2009)............................................................ 20, 23

*Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*,
    389 F.3d 1370 (Fed. Cir. 2004).................................................................. 10

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,
    349 F.3d 1373 (Fed. Cir. 2003).................................................................. 20

*Halliburton Energy Servs., Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008)............................................................ 20, 24

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
    527 F.3d 1379 (Fed. Cir. 2008).................................................................. 26

*Howmedica Osteonics Corp. v. Wright Med. Tech. Inc.*,
    530 F.3d 1337 (Fed. Cir. 2008).................................................................. 30

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004)............................................................ 20, 37

*Jamesbury Corp. v. U.S.,*
    518 F.2d 1384 (Ct. Cl. 1975) ........................................................................... 14

*Kara Tech. Inc. v. Stamps.com Inc.,*
    582 F.3d 1341 (Fed. Cir. 2009) ........................................................................ 26

*Laitram Corp. v. Morehouse Indus., Inc.,*
    143 F.3d 1456 (Fed. Cir. 1998) ........................................................................ 14

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
    358 F.3d 898 (Fed. Cir. 2004) .......................................................................... 23

*MBO Labs., Inc. v. Becton, Dickinson & Co.,*
    474 F.3d 1323 (Fed. Cir. 2007) ........................................................................ 10

*McCarty v. Lehigh Valley R.R. Co.,*
    160 U.S. 110 (1895) .......................................................................................... 20

*Microsoft Corp. v. Multi-Tech Sys., Inc.,*
    357 F.3d 1340 (Fed. Cir. 2004) ........................................................................ 10

*Multiform Desiccants, Inc. v. Medzam, Ltd.,*
    133 F.3d 1473 (Fed. Cir. 1998) ................................................................. 23, 36

*NTP, Inc. v. Research in Motion, Ltd.,*
    418 F.3d 1282 (Fed. Cir. 2005) ................................................................. 10, 14

*Omega Eng'g, Inc. v. Raytek Corp.,*
    334 F.3d 1314 (Fed. Cir. 2003) ..................................................................... 9, 21

*Pall Corp. v. Micron Separations, Inc.,*
    66 F.3d 1211 (Fed. Cir. 1995) ................................................... 28, 29, 32, 35

*Paragon Solutions, LLC v. Timex Corp.,*
    566 F.3d 1075 (Fed. Cir. 2009) ........................................................................ 23

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) .................................... 9, 16, 25, 35

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,*
    Civ. No. 08-309-JJF-LPS,
    2009 U.S. Dist. LEXIS 118320 (D. Del. Dec. 18, 2009) .................................... 5

*San Huan New Materials High Tech., Inc. v. Int'l Trade Comm'n,*
    161 F.3d 1347 (Fed. Cir. 1998) ........................................................................ 42

*Southwall Techs., Inc. v. Cardinal IG Co.,*
    54 F.3d 1570 (Fed. Cir. 1995) ............................................................................ 9

*Tex. Instrs., Inc. v. U.S. Int'l Trade Comm'n,*
    988 F.2d 1165 (Fed. Cir. 1993)..................................................................................... 19

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.,*
    587 F.3d 1339 (Fed. Cir. 2009)..................................................................................... 33

*Verizon Servs. Corp. v. Vonage Holdings Corp.,*
    503 F.3d 1295 (Fed. Cir. 2007)..................................................................................... 10

*Viskase Corp. v. Am. Nat'l Can Co.,*
    261 F.3d 1316 (Fed. Cir. 2001)..................................................................................... 42

*Whittaker Corp. v. UNR Indus., Inc.,*
    911 F.2d 709 (Fed. Cir. 1990)..................................................................................... 21

## INTRODUCTION

Abbott makes and sells the lipid-lowering drug product Niaspan®, which is used to treat certain cardiovascular conditions.  (Compl. ¶ 29.)  The active ingredient in Niaspan® is nicotinic acid (niacin), a known lipid-lowering compound when administered in relatively high doses, such as 1000 mg to 3000 mg per day.  ('428 patent, JA000006, col. 1, ll. 24-30.)  Nicotinic acid also increases high density lipoprotein (HDL) cholesterol, which protects arteries from hardening, while simultaneously lowering low density lipoprotein (LDL) cholesterol, which is potentially harmful.  ('428 patent, JA000006, col. 1, ll. 24-30.)

## BACKGROUND

### The Patents in Suit and the Asserted Claims

Abbott alleges that Lupin infringes seven patents relating to Niaspan®, i.e., U.S. Patent Nos. 6,080,428 (the "'428 patent"), 6,129,930 (the "'930 patent"), 6,406,715 (the "'715 patent"), 6,676,967 (the "'967 patent"), 6,746,691 (the "'691 patent"), 6,818,229 (the "'229 patent"), and 7,011,848 (the "'848 patent") (collectively the "patents in suit").  (JA000001, JA000012, JA000029, JA000050, JA000076, JA000103, and JA000130.)  These patents name either David Bova or Eugenio Cefali (or both) as inventors.  ███████████████████████████████

████████████████████████

The table below identifies the particular patent claims that Abbott asserts against Lupin.

| Patent | Asserted Claims |
|---|---|
| 6,080,428 (JA000001-11.02) | 1, 3, 5-7 |
| 6,129,930 (JA000012-28) | 18-21, 24-28, 51-53, 115, 133-136, 139-143 |
| 6,406,715 (JA000029-49.04) | 1, 3, 5, 7, 9, 11 |
| 6,676,967 (JA000050-75.02) | 16, 18, 25-27 |
| 6,746,691 (JA000076-102) | 13, 15 |
| 6,818,229 (JA000103-29.03) | 17, 19, 25, 27 |
| 7,011,848 (JA000130-40.01) | 1, 3, 5-7 |

**The Relationship Among the Patents in Suit**

The patents in suit are all part of the same family.  Each refers to initial application 08/124,392 filed in 1993.  (JA000001, '428 patent; JA000012, '930 patent; JA000029, '715 patent; JA000050, '967 patent; JA000076, '691 patent; JA000103, '229 patent; JA000130, '848 patent.)  The patentee filed various continuation-in-part (CIP) and continuation applications in 1995, 1997, and 1999.

The chart below illustrates the relationship among the patents in suit.



**The Subject Matter of the Patents in Suit**

The patents in suit relate to compositions for and methods of treating hyperlipidemia using nicotinic acid in a sustained-release dosage form, such as a tablet, dosed once daily at night.  In general, nicotinic acid is administered to patients in either immediate-release (IR)

– 2 –

dosage forms or sustained-release (SR) dosage forms.  ('428 patent, JA000006, col. 1, ll. 31-65.)

IR products are usually administered several times daily but are associated with flushing at the

patient's skin.  ('428 patent, JA000006, col. 1, ll. 40-44.)  That is, the patient feels hot and

uncomfortable for a period of time.  Prior-art SR products—which slow the delivery of nicotinic

acid—ease this flushing side effect.  ('428 patent, JA000006, col. 1, ll. 58-60.)

**The Allegations of Improved Safety Compared to Prior-Art SR Products**

According to the patents, some prior-art SR products caused toxicity in the liver where

the nicotinic acid is broken down into its metabolites.  ('428 patent, JA000006, col. 2, ll. 13-32.)

The inventors theorized in the patents that the toxic effect does not occur with IR products

because the liver generally breaks down heavy infusions of nicotinic acid quickly.  ('229 patent,

JA000116, col. 3, l. 4-col. 4, l. 17.)  The liver is thus shielded from certain dangerous metabolites

(which the patents refer to as pathway 2 metabolites).  ('229 patent, JA000116, col. 3, l. 4-col. 4,

l. 17.)  Where the release rate is slower, however, more of the drug and therefore more pathway 2

metabolites become available.  ('229 patent, JA000116, col. 3, ll. 35-40, 55-63.)  An excess of

pathway 2 metabolites may cause liver damage.  ('229 patent, JA000116, col. 4, ll. 23-27, 36-44,

JA000122, col. 16, ll. 1-3.)

The inventors assert that Niaspan® when dosed once daily releases nicotinic acid fast

enough to avoid toxic effects but slow enough to achieve better efficacy than other SR products.

('229 patent, JA000116, col. 4, ll. 10-44.)  They also allege an improved safety profile for serum

levels of glucose and uric acid compared to prior-art SR products.  ('229 patent, JA000116, col.

4, ll. 42-44.)

**Background Regarding Liver Enzymes, Uric Acid, and Bloodstream Glucose**

Several of the asserted patent claims mention uric acid levels (related to gout), glucose

levels (related to diabetes), or hepatotoxicity (liver damage).  High serum levels of uric acid

increase the risk of gout, while high serum levels of glucose are associated with diabetes. (LA000673-74, Wharton Decl. ¶¶ 14-16.)

Physicians monitor the risk of liver damage, gout, and diabetes in patients on drug therapy by testing certain markers in the blood serum. (LA000673, Wharton Decl. ¶ 13.) As liver cells are injured, enzymes from such cells are released into the bloodstream. (LA000673, Wharton Decl. ¶ 14.) Three such enzymes warn the physician that the liver may be inflamed: alanine transaminase (ALT), aspartate aminotransferase (AST), and alkaline phosphatase (ALK). (*Id.*) Liver toxicity measures for each of the liver enzymes (ALT, AST, and ALK) generally do not differ by gender. (JA000009-10, '428 patent, cols. 7-9.)

Gout—an inflammation of the joints caused by the accumulation of uric acid—often correlates with the presence of high levels of uric acid in the bloodstream. (LA000673, Wharton Decl. ¶ 15.)

Diabetes is a condition of excessive bloodstream glucose. (LA000674, Wharton Decl. ¶ 16.) Physicians monitor patients at risk for diabetes by testing bloodstream glucose levels. (*Id.*)

Acceptable ranges for uric acid and glucose in the bloodstream differ between men and women, with the normal range for men somewhat higher than that for women. For example, the '428 patent describes the effects of Niaspan® on uric acid levels in 25 patients. (*See, e.g.*, JA000010, '428 patent, col. 9.) Two different reference ranges are noted, in particular, 4.0-8.5 mg/dL for males and 2.5-7.5 mg/dL for females. (JA000010, '428 patent, col. 9.) Two different reference ranges are used to assess glucose levels as well, in particular, 80-125 mg/dL for males and 70-115 mg/dL for females. (JA000010, '428 patent, col. 10.)

## GENERAL CLAIM-CONSTRUCTION PRINCIPLES

The Court's claim-construction decision in *Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*, Civ. No. 08-309-JJF-LPS, 2009 U.S. Dist. LEXIS 118320, at *12-17 (D. Del. Dec. 18, 2009), sets forth general claim-construction principles. Those general principles apply here.

## ARGUMENT

### I.     The Formulation and Dosage-Form Limitations

The claim-construction disputes concerning the formulation and dosage-form limitations all center on whether these limitations should be construed as having the negative limitation "not containing an internal hydrophobic component." Lupin maintains that the formulation and dosage-form limitations exclude any tablet or capsule with an internal hydrophobic component, i.e., a component having little or no affinity for water.[1] In contrast, a hydrophilic component has an affinity for water.[2]

The disputed formulation and dosage-form limitations appear in the table below along with Abbott's and Lupin's proposed constructions.

---

[1]   The word "hydrophobic" means "[r]epelling, tending not to combine with, or incapable of dissolving in water. *The American Heritage Dictionary of the English Language*, Fourth Edition. Houghton Mifflin Company, 2004. 26 Feb. 2010. <Dictionary.com http://dictionary.reference.com/browse/hydrophobic>. (LA000710.)

[2]   The word "hydrophilic" means "having an affinity for water; readily absorbing or dissolving in water." *The American Heritage Dictionary of the English Language*, Fourth Edition. Houghton Mifflin Company, 2004. 26 Feb. 2010. <Dictionary.com http://dictionary.reference.com/browse/hydrophilic>. (LA000711.)

| TERM/ PHRASE | PATENT(S) | CLAIMS | ABBOTT'S PROPOSED CONSTRUCTION | LUPIN'S CONSTRUCTION |
|---|---|---|---|---|
| "sustained release composition" | '930 | 18, 133 | a composition which when administered to a patient to be treated, the active ingredient will be released for absorption into the blood stream over a period of time which is slower than that of immediate release formulations | a composition not containing an internal hydrophobic component designed to release an active ingredient slower than an immediate release formulation |
| "oral sustained release solid dosage form" | '930 | 51, 115 | a drug product in a solid form to be administered by mouth and which when so administered to a patient to be treated, the active ingredient will be released for absorption into the blood stream over a period of time which is slower than that of immediate release formulations | a solid dosage form not containing an internal hydrophobic component designed for oral administration and designed to release an active ingredient slower than an immediate release formulation |
| "dosing" | '848 | 1 | administering a dose | administering a dosage form containing an active ingredient but not containing an internal hydrophobic component |
| "intermediate release nicotinic acid formulation" | '229 '715 '967 '691 | 17, 25 1, 3, 5, 7, 9, 11 16 13 | a nicotinic acid formulation which, when administered to a patient to be treated, the active ingredient will be released for absorption into the blood stream over a period of time which is slower than that of immediate release niacin formulations, but faster and different than other sustained release niacin formulations. | a dosage form not containing an internal hydrophobic component that releases an active ingredient, namely, nicotinic acid, in vitro or in vivo over a period of time which is greater than 1 hour but less than 24 hours |
| "oral solid dosage form" | '428 | 1 | a drug product in a solid form to be administered by mouth | a solid dosage form not containing an internal hydrophobic component designed for oral administration |

Both the specifications and the prosecution histories of the patents in suit dictate a

construction of the formulation and dosage-form limitations that includes the negative limitation

"not containing an internal hydrophobic component." For instance, the specifications all relate to the use of hydrophilic materials rather than hydrophobic materials to achieve the sustained release of nicotinic acid that supposedly distinguishes the alleged inventions from the prior art. The prosecution histories confirm that the alleged inventions concern the use of hydrophilic materials rather than hydrophobic materials to achieve the desired release in vitro and in vivo.

## A.   The Specifications Teach Only a Hydrophilic Matrix Delivery System

### 1.   The '428 Patent's Specification

The specification of the grandparent '428 patent explains that "[t]he specific sustained release **composition** according to the **present invention** employs an effective antihyperlipidemic amount of **nicotinic acid**." (JA000007, '428 patent, col. 3, ll. 56-58 (emphasis added).) The specification also explains that "[p]referably, there is also included in the sustained release **composition** according to the **present invention**, a **swelling agent** which is compounded with the nicotinic acid . . . ." (JA000007, '428 patent, col. 4, ll. 4-6 (emphasis added).) The swelling agent comes into contact with fluid in a patient's gastrointestinal tract and expands over time, thus providing a sustained release of nicotinic acid. (JA000007, '428 patent, col. 4, ll. 6-13.) The specification identifies hydroxypropyl methylcellulose (a well-known hydrophilic material) as the preferred swelling agent. (JA000007, '428 patent, col. 4, ll. 23-26.)

Although the specification uses the word "preferably" to describe the swelling agent's presence in the nicotinic acid formulation, it discloses no mechanism other than the use of a swelling agent to obtain a sustained release. (JA000007-11, '428 patent, col. 3, l. 30-col. 12, l. 15.) Consistent with this, the Summary of the Invention discusses a formulation containing only nicotinic acid and the hydrophilic swelling agent hydroxypropyl methylcellulose. (JA000007-11, '428 patent, col. 3, ll. 8-12.) The Summary of the Invention no doubt identifies the formulation's essential components, i.e., nicotinic acid and a hydrophilic material.

## 2.    The Other Patents' Specifications

The specification of the parent '930 patent and every later patent includes the following

additional disclosure regarding hydrophilic materials and their importance:

> The ingredients were compounded together to form a tablet.
> More specifically, Niaspan® once-daily tablets in accordance with
> the **present invention** utilize a **hydrophilic** matrix controlled drug
> delivery system.  This is a dynamic system composed of polymer
> wetting, polymer hydration and polymer disintegration-dissolution.
> The mechanism by which drug release is controlled depends on,
> for example, initial polymer wetting, expansion of the gel layer,
> tablet erosion and niacin solubility.  After initial wetting, the
> **hydrophilic** polymer starts to partially hydrate, forming a gel
> layer.  As water permeates into the tablet increasing the thickness
> of the gel layer, drug diffuses out of the gel layer.  As the outer
> layer of the tablet becomes fully hydrated it erodes.  It is believed
> that this erosion results in additional drug release.  The controlled
> release from this matrix delivery system can be modified
> depending on the type and molecular weight of **hydrophilic**
> polymer used.

(JA000018, '930 patent, col. 5, ll. 20-36; JA000043, '715 patent, col. 18, ll. 31-48; JA000068,

'967 patent, col. 18, ll. 30-46; JA000095, '691 patent, col. 17, l. 58-col. 18, l. 7; JA000123,

'229 patent, col. 17, l. 59-col. 18, l. 8; JA000134, '848 patent, col. 5, ll. 31-48 (emphasis added).)

Nowhere in any of the specifications is there a teaching or suggestion to use a

hydrophobic material internally in the dosage form.  To achieve the desired controlled-release

delivery system, as described in the above-quoted paragraph, it is clear that the inventors

intended to employ polymer "wetting," a phenomenon occurring with hydrophilic materials, not

hydrophobic materials.  Because hydrophobic materials have little or no affinity for water, the

desired "wetting" and expansion in vivo would not occur with hydrophobic materials.  The

repeated references in the specifications to "hydrophilic" when discussing the "present

invention" make clear that the claimed inventions concern the use of hydrophilic materials

together with nicotinic acid.  This is true whether the claims refer to a "sustained release

composition," an "oral sustained release solid dosage form," an "intermediate release nicotinic

– 8 –

acid formulation," an "oral solid dosage form," or "dosing" with nicotinic acid and

pharmaceutically acceptable carriers.

### B.     The Prosecution Histories Demonstrate that the Patentee Disclaimed Hydrophobic Materials

Due to the prosecution-disclaimer doctrine, the formulations and dosage forms recited in

the various asserted claims are properly construed as having a negative limitation, i.e., they

exclude nicotinic-acid compositions containing an internal hydrophobic component.  During the

'930 patent's prosecution, for instance, the patentee clearly disavowed from claim scope

formulations and dosage forms having an internal hydrophobic component, as demonstrated in

more detail below.  But Abbott's constructions make no reference to the negative limitation

resulting from prosecution disclaimer.

### 1.     The Prosecution-Disclaimer Doctrine

A patent's prosecution history is the record of the proceedings in the Patent and

Trademark Office ("PTO") that involved the patent's examination and ultimate issuance.  The

prosecution history provides evidence of how the PTO and the inventor understood the patent

and whether the inventor limited the claimed invention during prosecution, making claim scope

narrower than it would otherwise be.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir.

2005) (en banc).  The prosecution history can thus limit claim scope so as to exclude any subject

matter disclaimed during prosecution.  *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570,

1576 (Fed. Cir. 1995).

The prosecution-disclaimer doctrine "promotes the public notice function of the intrinsic

evidence and protects the public's reliance on definitive statements made during prosecution."

*Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1371 (Fed. Cir. 2007) (quoting

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003)).  The doctrine

"preclud[es] patentees from recapturing through claim interpretation specific meanings

disclaimed during prosecution." *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) (quoting *Omega Eng'g*, 334 F.3d at 1323-24).

Accordingly, claims that have been narrowed during prosecution to secure patent issuance by distinguishing over the prior art should not be construed to cover subject matter relinquished from claim coverage. *Computer Docking*, 519 F.3d at 1374, 1378-79. Thus, "where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005). To constitute a disclaimer, however, the disavowing statements must be so clear as to be unmistakable. *Computer Docking*, 519 F.3d at 1374. Moreover, a statement made by the patentee during prosecution of another patent in the same family as the patent in suit can operate as a disclaimer. *See, e.g., Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1306 (Fed. Cir. 2007).

**2.    The Construction of Identical or Nearly
        Identical Terms in Related Patents**

The law is well established that for a family of patents stemming from a common patent application and containing common disclosures, the claims must be interpreted consistently across all asserted patents, and distinctions are drawn between various patents only where necessary. *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005); *accord Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1377 (Fed. Cir. 2004) (citing *Epcon Gas Sys. Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1031 (Fed. Cir. 2002) ("The same term or phrase should be interpreted consistently where it appears in claims of common ancestry.")). Further, the prosecution histories of all of the relatives in the family are relevant to the claim-construction analysis for a shared term or phrase, including the prosecution histories of later issued patents in the family. *See Verizon Servs.*, 503 F.3d at 1306-07 (citing *Microsoft Corp. v.*

– 10 –

*Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349-50 (Fed. Cir. 2004)); *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1327 (Fed. Cir. 2007) (citing *Microsoft*, 357 F.3d at 1349-50).

As explained and illustrated above, all of the patents in suit are related to one another. Accordingly, common claim language should be construed consistently across these patents.

### 3.   The Court Should Adopt Lupin's Constructions of the Formulation and Dosage-Form Limitations

Here, the prosecution histories bear heavily on the proper construction of the formulation and dosage-form limitations because, during prosecution, the patent examiner rejected the claims based on U.S. Patent No. 5,268,181 ("O'Neill") and U.S. Patent No. 5,126,145 ("Evenstad"). As explained in more detail below, the patentee sought to overcome these rejections by repeatedly relying on the negative limitation "wherein said . . . [dosage form or tablet or preparation or composition] does not contain an internal hydrophobic component" to distinguish over the prior art. By doing so, the patentee clearly and unambiguously narrowed claim scope to exclude formulations and dosage forms having an internal hydrophobic component.

More particularly, in June 1995, the examiner rejected claims in the '428 patent application as "clearly anticipated" by O'Neill. (JA000191, '428 pros. hist., 6/30/95 Office Action at 3.) To overcome this rejection, the patentee represented to the examiner that O'Neill concerned a different invention because "the O'Neill formulation requires a 'hydrophobic component.'" (JA000280, '428 pros. hist., 8/5/96 Amendment and Response at 6.) Specifically, the patentee said:

> New claim 15 is directed to a method that includes components of a nicotinic acid composition. Specifically, the nicotinic acid composition of claim 15 "is an oral solid dosage form that consists essentially of nicotinic acid, hydroxypropylmethylcellulose, a binder and a lubricant." . . . .
>
> The compositions described in new claim 15 and in the O'Neill patent claims are distinct at least because the O'Neill formulation requires a "hydrophobic component." Applicant notes that the

> formulation of O'Neill *et al.* was based upon compositions described in the parent application of Evanstad [sic] *et al.*, which is incorporated by reference in the O'Neill patent. . . . Significantly, Evanstad [sic] *et al.* teach that the hydrophobic component is an "essential component of the invention." . . . .
>
> In contrast to Evanstad [sic] *et al.*, the present inventor did not find that a "hydrophobic component" was essential for the efficacy of his nicotinic acid composition.

(JA000280-81, '428 pros. hist., 8/5/96 Amendment and Response at 6-7.)

Subsequently, during an October 1997 interview, the patentee explained that "the O'Neill patent requires 'hydrophobic component' where as **in the instant claimed application there is no 'hydrophobic component'**." (JA000351, '428 pros. hist., 10/7/97 Interview Summary (emphasis added).)

Next, in response to the examiner's final rejection, the patentee argued that "the specification of the . . . ['428 patent does not] teach or suggest the 'hydrophobic component' as claimed in independent claim 1 of the O'Neill Patent." (JA000397, '428 pros. hist., 2/26/99 Response After Final at 9.)

The applicant's arguments apparently persuaded the examiner, as evidenced by the examiner's statement of reasons for allowance. There, the examiner said:

> Upon reconsideration, reading the claims in light of the ['428 patent's] specification, it is apparent that the composition employed in the methods of instant application are materially different than O'NEILL et al. Patent 5,268,181, specifically there is no requirement of added hydrophobic component to be mixed with Niacin prior to tablet formulation.

(JA000473, '428 pros. hist., Notice of Allowability at 2.)

Thus, during the '428 patent's prosecution, the patentee clearly and unequivocally disclaimed compositions or dosage forms that contain an internal hydrophobic component. Moreover, the patentee repeated this disclaimer during prosecution of the continuation-in-part

application that issued as the '930 patent by making the representations discussed below to secure claim allowance.

During an October 1998 interview, the patentee and the examiner agreed that the patentee would amend each independent claim and add claims from the parent application to include the limitation "wherein said (dosage form or tablet or preparation form [sic]) does not contain an internal hydrophobic component." (JA00000957, '930 pros. hist., 10/28/98 Interview Summary.)   The examiner's interview summary states:

> The patents '181 [O'Neill] and '145 [Evenstad] have an internal hydrophobic component which is essential whereas **in the instant ['930 patent] application there is no internal hydrophobic component** . . . .

(JA00000957, '930 pros. hist., 10/28/98 Interview Summary (emphasis added).)

Next, in a November 1998 amendment, the patentee divided the pending claims into four groups. According to the patentee, group I included the negative limitation "wherein said . . . [dosage form or tablet or preparation or composition] does not contain an internal hydrophobic component." (JA00001009, '930 pros. hist., 11/20/98 Amendment After 10/28/98 Interview at 38.) After further rejections by the examiner, the patentee chose to proceed with different claims. By making these assertions, however, the patentee clearly disavowed nicotinic-acid compositions containing an internal hydrophobic component.

Thus, the patentee narrowed claim scope first in the grandparent '428 patent and then in the parent '930 patent to distinguish the claimed formulations and dosage forms from those disclosed in O'Neill and Evenstad.   In particular, the patentee made clear point-of-novelty arguments to distinguish over these references by urging that the claimed inventions lacked an internal hydrophobic component.   With those arguments, the patentee unequivocally disavowed any "dosage form or tablet or preparation or composition" that contains an internal hydrophobic

component.  Accordingly, the prosecution-disclaimer doctrine applies to narrow the ordinary meaning of the claim language congruent with the scope of surrender and dictates that the disputed claim language includes the negative limitation "not containing an internal hydrophobic component."

Moreover, the patentee's disavowal of claim scope extends to the formulation and dosage-form limitations in the related patents in suit.  *See, e.g.*, *NTP*, 418 F.3d at 1289, 1293; *Laitram Corp. v. Morehouse Indus., Inc.*, 143 F.3d 1456, 1460 n.2 (Fed. Cir. 1998) (noting that a patent's prosecution history may include that of related applications and patents, and it is appropriate to construe the same limitation the same way in all patents in the same family).  Although the wording differs in these limitations, they all concern the same concept, namely, an object containing nicotinic acid as an active ingredient intended for use by individuals having hyperlipidemia.  Consequently, the prosecution disclaimer attaching to any of these limitations should attach to all.

The '428, '930, '715, '967, '691, and '229 patents include express formulation or dosage-form limitations, such as "sustained release composition" and "oral solid dosage form."  Although the '848 patent does not include this sort of express limitation, it does include an implied limitation, i.e., the term "dosing."  In particular, '848 claim 1 recites "[a] method of treating hyperlipidemia . . . comprising **dosing** the hyperlipidemic with an effective antihyperlipidemic amount of nicotinic acid . . . combined with pharmaceutically acceptable carriers . . . ."  (JA000139, '848 patent, col. 15, l. 66-col. 16, l. 37 (emphasis added).)  By reciting the term "dosing" followed by requirements for an active ingredient (nicotinic acid) and inactive ingredients (pharmaceutically acceptable carriers), claim 1 implicitly requires that "dosing" occur with a dosage form containing active and inactive ingredients.  Just as prosecution disclaimer attaches to the express formulation and dosage-form limitations, it should

– 14 –

also attach to this implicit dosage-form limitation. *See Jamesbury Corp. v. U.S.*, 518 F.2d 1384, 1397-98 (Ct. Cl. 1975).

The discussion above demonstrates that when confronted with the prior-art O'Neill and Evenstad patents during prosecution of the '428 grandparent patent, the patentee recognized that a distinction over this close prior art was that O'Neill and Evenstad required the use of hydrophobic components as opposed to hydrophilic components. The patentee seized on this distinction when making patentability arguments and more clearly describing the hydrophilic matrix delivery system in later patent applications. These actions establish that the disputed claim language, when properly construed, excludes formulations and dosage forms that contain an internal hydrophobic component.

## II.    The Treatment-Related Limitations in the '930, '967, '848, and '428 Patents

All of the patents in suit discuss clinical benefits associated with Niaspan® treatment. Apart from lipid reduction expected from any treatment with nicotinic acid, the patents tout three clinical benefits: "no treatment-limiting hepatoxicity" and "no treatment limiting elevations" or "abnormalities" in either bloodstream uric acid or glucose levels. The parties dispute these and related claim phrases, which appear in the '428, '930, '967, and '848 patents. (JA000011, '428 patent; JA000023-28, '930 patent; JA000073-75, '967 patent; JA000139-40, '848 patent.)

A.      The '930 and '967 Patents

| '930 CLAIMS | TERM/PHRASE | ABBOTT'S PROPOSED CONSTRUCTION | LUPIN'S PROPOSED CONSTRUCTION |
|---|---|---|---|
| 51, 115 | "abnormalities in either uric acid or glucose levels or both to an extent which would require said daily treatment to be discontinued by the patient" (claim 51)<br><br>"treatment-limiting . . . elevations in uric acid levels or glucose levels or both in the patient to a level which would require said treatment to be discontinued by the patient" (claim 115) | Repeated elevations in either uric acid levels, glucose levels or both to a level that is clinically significant and that requires discontinuation of current treatment | Repeated levels of either uric acid in the bloodstream beyond 7.5 mg/dL in women or 8.5 mg/dL in men or a level of glucose in the bloodstream beyond 115 mg/dL in women or 125 mg/dL in men |
| 115 | "treatment-limiting (i) hepatotoxicity...which would require said treatment to be discontinued by the patient" | Repeated elevations in liver enzymes (AST, ALT and/or alkaline phosphatase) to a level that is clinically significant and that requires discontinuation of current treatment | A bloodstream level beyond 150 mU/mL of aspartate aminotransferase, a level of beyond 165 mU/mL of alanine aminotransferase and/or a level beyond 420 mU/mL of alkaline phosphatase |

| '967 CLAIM | TERM/PHRASE | ABBOTT'S PROPOSED CONSTRUCTION | LUPIN'S PROPOSED CONSTRUCTION |
|---|---|---|---|
| 16 | "treatment-limiting hepatotoxicity...in the individual to a level which would require use of the intermediate nicotinic acid formulation by the individual to be discontinued" | Repeated elevations in liver enzymes (AST, ALT and/or alkaline phosphatase) to a level that is clinically significant and that requires discontinuation of current treatment | A bloodstream level beyond 150 mU/mL of aspartate aminotransferase, a level of beyond 165 mU/mL of alanine aminotransferase and/or a level beyond 420 mU/mL of alkaline phosphatase |

In contrast to Abbott's vague constructions, Lupin's constructions are supported by the '930 and '967 patents' specifications. The Federal Circuit has called a patent's specification "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1321. While these

– 16 –

terms are not expressly defined in the specification, their meaning would not be lost upon the skilled artisan.

According to the specifications, prior-art SR products caused liver damage and the disruption of glucose metabolism and uric acid levels in patients taking those products. (JA000016, '930 patent, col. 2, ll. 14-19; JA000060, '967 patent, col. 2, ll. 52-57.) Patients were forced to discontinue treatment "because liver function tests (LFTs) increased indicating potential liver damage." (JA000016, '930 patent, col. 2, ll. 29-31; JA000060, '967 patent, col. 2, l. 67-col. 3, l. 1.) In contrast to prior-art SR products, the claimed compositions supposedly have "an acceptable safety profile, especially as regards [to] liver toxicity and effects on glucose metabolism and uric acid levels." (JA000016, '930 patent, col. 2, ll. 48-50; JA000061, '967 patent, col. 4, ll. 41-43.) To support this better-safety-profile assertion, the patents rely on Tables III-VII, which show some effects of Niaspan® use. (JA000020-22, '930 patent, cols. 10-13; JA000071-72, '967 patent, cols. 23-26.)

Tables III-V detail the bloodstream concentrations in U/L of the liver enzymes AST (Table III), ALT (Table IV), and ALK (Table V). (JA000020-21, '930 patent, cols. 10-12; JA000071-72, '967 patent, cols. 23-25.) A reference range appears for each, with abnormally high liver-enzyme concentrations indicative of potential liver damage. (JA000016, '930 patent, col. 2, ll. 29-31; JA000060-61, '967 patent, col. 2, l. 65-col. 3, l. 1.) The reference range for AST runs from 0-50, while the reference range for ALT runs from 0-55. (JA000020-21, '930 patent cols. 10-11; JA000071, '967 patent cols. 23-24.) The reference range for ALK runs from 20-140. (JA000021, '930 patent col. 12; JA000071-72, '967 patent col. 24-25.)

Tables VI-VII show measurements of bloodstream concentrations in mg/dL for uric acid and glucose levels against normal reference ranges. (JA000021-22, '930 patent cols. 12-13; JA000072, '967 patent cols. 25-26.) Two reference ranges are provided for these levels,

– 17 –

corresponding to one range for men and another for women. In Table VI, for example, subject 1's uric acid levels during Niaspan® use were compared against a reference range of 4.0-8.5. (JA000021, '930 patent, col. 12; JA000072, '967 patent, col. 25.) Subject 2's uric acid levels were compared against a reference range of 2.5-7.5. (JA000021, '930 patent, col. 12; JA000072, '967 patent, col. 25.)

The skilled artisan would understand that normal levels of bloodstream uric acid are higher in men than in women. (LA000673, Wharton Decl. ¶ 15; LA000013, Stedman's Medical Dictionary, 25th ed. at 1778.) The same holds true for bloodstream levels of glucose recorded for subjects taking Niaspan®, the results of which appear in Table VII of the patents. (JA000022, '930 patent, col. 13; JA000072, '967 patent, col. 26.) Presumably, results for men are compared against a reference range of 80-125 mg/dL, while results for women are compared against a reference range of 70-115 mg/dL. (JA000022, '930 patent, col. 13; JA000072, '967 patent, col. 26.) Lupin's constructions, anchored in the tables showing clinical results from Niaspan® use, draw directly from the patents' specifications.

Lupin's constructions are also well supported in the extrinsic record, particularly by the testimony of inventor David Bova. With respect to '930 claim 51, Mr. Bova testified, "My understanding of treatment limiting abnormalities would be an elevation in this particular case it references uric acid and glucose levels that is caused by the dosage form" over the upper limit of normal. (JA000027, '930 patent, claim 15; LA000412-13, Bova Dep. 92:6-93:4.) With respect to '930 claim 115 and the phrase "treatment-limiting (i) hepatoxicity . . . which would require said treatment to be discontinued by the patient,"[3] Mr. Bova confirmed that moderate elevations in liver enzyme levels were insufficient to cause treatment to be discontinued.

---

[3] Much the same language appears in the '967 claim 16. (JA000074, '967 patent, claim 16.)

(LA000433, Bova Dep. 113:17-21.) In contrast to moderate elevations, patients in Niaspan®

clinical trials were discontinued when any liver enzyme reached three times the upper limit of

normal. (LA 000433, Bova Dep. 113:9-13.)

Thus, with respect to hepatotoxicity, Lupin proposes to define "treatment-limiting"

objectively, at three times the upper limit of the reference range for the particular liver enzymes

specified in Tables III-V of the '930 and '967 patents, i.e., above 150 U/L for AST, above

165 U/L of ALT and/or a level beyond 420 U/L of ALK[4]. Lower levels would not necessarily

cause a physician to discontinue treatment. According to Mr. Bova, levels around the upper limit

of normal for a given liver enzyme would merely "indicate to the physician that he needs to do

some more testing, watch the patient, do more diagnostic work, whatever he felt was

appropriate...." (LA000432, Bova Dep. 112:10-14.)

Abbott's construction suffers from at least three flaws[5]. First, the words "clinically

significant" it seeks to read into the claims cannot be found anywhere in the intrinsic record. The

specification provides only one basis for the skilled artisan to judge whether the claimed

compositions are treatment-limiting or not—the reference ranges provided in Tables III-VII.

(JA000020-22, '930 patent, cols. 10-13.) Abbott cannot now rewrite the plain language of the

claims to suit its interests. "[C]ourts can neither broaden nor narrow claims to give the patentee

something different than what he has set forth." *Tex. Instrs., Inc. v. U.S. Int'l Trade Comm'n*,

988 F.2d 1165, 1171 (Fed. Cir. 1993). As the Federal Circuit said in *Phillips*, "It is a 'bedrock

principle' of patent law that 'the claims of a patent define the invention to which the patentee is

---

[4]   As noted, the upper limit of the reference range in the specifications were as follows: 50 U/L
      for AST, 55 U/L for ALT, and 140 U/L for ALK. (JA000020-21, '930 patent, cols. 10-12;
      JA000071-72, '967 patent, cols. 23-25.)

[5]   Abbott's construction suffers from other flaws as well. For example, there is no reason
      offered in the intrinsic record why an abnormal liver enzyme level would need to be
      "repeated" for a physician to discontinue treatment.

entitled the right to exclude.'" 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)); *see also McCarty v. Lehigh Valley R.R. Co.*, 160 U.S. 110, 116 (1895) ("[I]f we once begin to include elements not mentioned in the claim in order to limit such claim . . . we should never know where to stop.").

Second, Abbott's construction leaves for another day the interpretation of "clinically significant." The Court's function at this juncture is "to ensure that questions of the scope of the patent claims" are not left to the fact-finder. *See Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009). Using the phrase "clinically significant" to define the disputed claim language would likely require a construction of "clinically significant" to determine the scope of the patent claims.

Third, adding the phrase "clinically significant" to the patent claims renders them ambiguous. *See, e.g., Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003) (rejecting proposed construction because artisan "would not know from one bacterium to the next whether a particular composition . . . [was] within the claim scope or not"). Claim construction is an objective exercise, intended to clearly delineate the boundaries of patent protection. "[T]he patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention, i.e., what subject matter is covered by the exclusive rights of the patent. Otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

What is "clinically significant" will differ from physician to physician and patient to patient. (LA000674, Wharton Decl. ¶ 18.) Claims that depend on someone's subjective judgment are invalid for indefiniteness. *See Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005) (affirming dismissal of claim for indefiniteness based on the term

"aesthestically pleasing").  Claims should be construed, when reasonably possible, so as to

sustain their validity.  *Whittaker Corp. v. UNR Indus., Inc.*, 911 F.2d 709, 711 (Fed. Cir. 1990);

*ACS Hosp. Sys., Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1577 (Fed. Cir. 1984) (construing

claim narrowly to preserve its validity over prior art); *see also Omega Eng'g*, 334 F.3d at

1335 n.6, 1336.

### B.    The '848 Patent

| '848 CLAIMS | TERM/PHRASE | ABBOTT'S PROPOSED CONSTRUCTION | LUPIN'S PROPOSED CONSTRUCTION |
|---|---|---|---|
| 1 | "significant increase in HDL cholesterol" | No construction necessary. To the extent a construction is necessary, the phrase means "substantial increase in the level of HDL cholesterol in the patient's blood." | A 20% increase or greater in a patient's HDL profile |
| 3 | "minimum liver damage, uric acid increases or elevations in fasting glucose levels" | No treatment-limiting hepatotoxicity or elevations in uric acid levels or glucose levels that would require treatment to be discontinued by the patient | An increase in the bloodstream liver enzyme levels, including aspartate aminotransferase, alanine aminotransferase and alkaline phosphatase, of no more than 9%, or repeated increases in bloodstream uric acid levels of no more than 8.4%, or an increase in bloodstream fasting glucose levels of no more than 7.5% |

Abbott's constructions of "significant increase in HDL cholesterol," "minimum liver

damage," and "minimum . . . increases or elevations" in certain levels are too vague to resolve

the claim-construction dispute concerning the scope of '848 claims 1 and 3.  What actually

constitutes a "significant increase" in HDL or "minimum liver damage" or "minimum . . .

increases or elevations" in uric acid or glucose levels?  The answers can be found in the data

– 21 –

provided in the '848 patent's specification, which data support Lupin's constructions rather than Abbott's constructions.

### 1.   "significant increase in HDL cholesterol"

The '848 patent's specification notes that nicotinic acid has long been used to treat hyperlipidemia by lowering unwanted LDL cholesterol and triglycerides and by raising desirable HDL cholesterol. (JA000132, '848 patent, col. 1, ll. 33-36.) But some SR products actually (and unfavorably) lowered HDL cholesterol by 5% as compared to IR products that raised HDL by 37%. (JA000132, '848 patent, col. 2, ll. 11-18.) According to the specification, dosing an SR product once a day in the evening or at night achieves a "significant" reduction in LDL cholesterol and triglycerides along with a "significant increase" in the desired HDL cholesterol. (JA000133, '848 patent, col. 3, ll. 35-40.)

What constitutes "significant" is set forth in the results of a Niaspan® clinical trial, which appear in Table II of the patent. (JA000136, '848 patent, col. 9.) Patients in the treatment groups demonstrated an increase of 23-25.3% in HDL cholesterol when taking Niaspan®. (JA000136, '848 patent, col. 9, ll. 1-57.) There were a total of twenty-five patients in the treatment groups. Only ten of those patients showed HDL increases under 20%. (JA000136, '848 patent, col. 9, ll. 1-57.) Thirteen of the twenty-five demonstrated results above 20%, with some well above that level. (JA000136, '848 patent, col. 9, ll. 1-57.) The specification notes that dosing at night for these patients produced "significant" "increases" in HDL cholesterol. (JA000136, '848 patent, col. 9, ll. 59-60.)

Notably, Lupin proposes the objective measure of at least a 20% increase in HDL cholesterol as "significant" even though the increases in the supporting study referred to in the specification were higher, i.e., 23% and 25.3%. (JA000136, '848 patent, col. 9, ll. 54-57.) Lupin's objective measure is reasonable because patentees generally draft claims that are broader

– 22 –

than the preferred embodiment disclosed in the patent, here, Niaspan®. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 907-08 (Fed. Cir. 2004) (declining to limit invention to disclosed embodiments).

A definition of "significant" based on a 20% number comports with the specification's comparison of the favorable increases of 37% in HDL profiles associated with IR products as compared with the unfavorable result of -5% for SR products. (JA000132, '848 patent, col. 2, ll. 15-18.) Lupin's proposed 20% number closely approximates the 21% average (the difference between +37% and -5% divided by 2) from the study discussed in the patent's Background section. (JA000132, '848 patent, col. 2, ll. 5-18.) Lupin's construction of "a 20% increase or greater in a patient's HDL profile" fulfills the alleged need discussed in the specification regarding improved SR products that would provide a "balanced lipid alteration" between prior-art IR and SR products. (JA000132, '848 patent, col. 2, ll. 51-52.)

As for Abbott's construction, it again avoids the issues by simply swapping the term "significant" appearing many times in the intrinsic record with the synonym "substantial" that does not. The purpose of claim construction is not to rearrange deck chairs but to explain and define claim language without ambiguity or incompleteness. *See Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998). A definition too vague to assist the fact-finder when resolving the issues is not favored. *See Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075, 1092 (Fed. Cir. 2009) (rejecting district court's construction of "real time" because it failed to shed light on the issue of how long a delay was permissible under the claims). As with Abbott's addition of the nebulous term "clinically significant," construing "significant" to mean "substantial" inappropriately leaves for another day the issue of the term's actual meaning and the claim's actual scope. *See Every Penny*, 563 F.3d at 1383.

Nor does the claim, if construed as Abbott proposes, inform the public of the bounds of the invention as required to serve the notice function of claims. *See Halliburton*, 514 F.3d at 1249. What constitutes a "substantial increase" will differ depending on the subjective judgment of a physician. (LA000674, Wharton Decl. ¶ 18.)

### 2. "minimum liver damage, uric acid increases or elevations in fasting glucose levels"

Lupin proposes that the phrase "minimum liver damage, uric acid increases or elevations in fasting glucose levels" be construed as follows: An increase in the bloodstream liver enzyme levels, including aspartate aminotransferase, alanine aminotransferase and alkaline phosphatase, of no more than 9%, or repeated increases in bloodstream uric acid levels of no more than 8.4%, or an increase in bloodstream fasting glucose levels of no more than 7.5%. These objective measures are well grounded in the '848 patent's specification.

As in the '930 patent, Tables III-V in the '848 patent contain data from Niaspan® clinical trials purportedly demonstrating improved safety over prior-art SR products. (JA000136-37, '848 patent, cols. 10-12.) In each instance, the bloodstream levels of patients taking 1500 mg of Niaspan® once daily were tested for the presence of the liver enzymes AST, ALT, and ALK after two, four, and eight weeks. (JA000136-137, '848 patent, col. 9, ll. 61-67; cols. 10-12.) As noted above, the presence of these enzymes in the bloodstream indicates potential liver damage. According to the '848 patent's specification, liver damage can be ruled out if there is no elevation in liver function tests, which occurred in one Niaspan® study referenced in Table VIII. (JA000139, '848 patent, col. 15, ll. 40-42.) However, Tables III-V demonstrate elevations for patients taking Niaspan® of up to 6.6% for AST (Table III), up to 9% for ALT (Table IV), and up to .005% for ALK. (JA000136-137, '848 patent, cols. 10-12.) As the presence of any one of these liver enzymes in the bloodstream equates to potential liver damage, "minimum liver

damage" according to the '848 patent should correspond to no more than a 9% increase from baseline levels.

Similarly, the phrase "minimum . . . uric acid increases or elevations in fasting glucose levels" in '848 claim 3 should be construed with reference to the specification to allow for "repeated increases in bloodstream uric acid levels of no more than 8.4%, or an increase in bloodstream fasting glucose levels of no more than 7.5%." The same patients using Niaspan® who were tested for liver enzymes were also tested for increases in uric acid and glucose. (JA000137-138, '848 patent, cols. 12-14.) Tables VI and VII of the '848 patent report these results, demonstrating elevations in uric acid of up to 8.4% and 7.5% for glucose. (JA000137-138, '848 patent, cols. 12-14.)

Abbott's assertion that "minimum liver damage" means "no treatment-limiting hepatotoxicity" does not hold up under basic claim-construction principles. First, nothing in the intrinsic record supports the notion that "minimum" equates to "no treatment-limiting." The term "minimum" is nowhere defined in the '848 patent's specification or prosecution history to have a meaning different from its conventional meaning.

Second, Abbott treats the claim phrases "minimum liver damage" and "minimum . . . uric acid increases or elevations in fasting glucose levels" in much the same way it construes the claim phrases "treatment-limiting hepatotoxicity" and "treatment-limiting elevations" in uric acid and glucose in '930 claims 51 and 115. Under its primary definition, however, "minimum" means "the least possible amount, number or degree." (LA000019, *New Webster's Dictionary* (1993) at 636; LA000023, *Webster's 10th Collegiate Dictionary* (1998) at 739.) "Minimum" neither denotes nor connotes "no treatment-limiting." In contrast to phrase "no treatment-limiting," the term "minimum" denotes a toxicity tolerable to the patient yet insufficient to warrant discontinuation of treatment. As the Federal Circuit noted in *Phillips*, "Differences

among claims can also be a useful guide in understanding the meaning of particular claim terms." 415 F.3d at 1314.

That principle should apply here. The '848 patent, filed in 1999, is a continuation of the '930 patent, filed in 1997. In the '848 patent, the patentee could have but chose not to use the phrase "treatment-limiting," which appears in the '930 patent's claims, to describe hepatotoxicity or uric acid and glucose increases. Instead, the patentee used the term "minimum" in the '848 patent's claims, presumably to broaden claim scope. "[D]ifferent claim terms are presumed to have different meanings." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008).

Where there are significant differences in claim language in the same family of patents, the Federal Circuit has given effect to those differences. In *Kara Technology Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1347 (Fed. Cir. 2009), for example, the Federal Circuit construed claim language in a patent relating to authentication technology and took careful note of the claim language in a related patent. It said, "Here, when the inventor wanted to restrict the claims to require the use of a[n encryption] key, he did so explicitly. None of the claims at issue on appeal recite the term 'key.'" *Id.* Deciding that the district court misconstrued the claims, the Federal Circuit vacated the noninfringement finding based on the erroneous claim construction. *Id.* at 1348. As in *Kara Technology*, Abbott cannot now walk away from the language the patentee chose when applying for and obtaining the '848 patent. The claim phrases "minimum liver damage" and "minimum . . . uric acid increases or elevations in fasting glucose levels" should be construed in accordance with the clinical results reported in the specification, just as Lupin proposes.

## C.    The '428 Patent

| '428 CLAIM | TERM/PHRASE | ABBOTT'S PROPOSED CONSTRUCTION | LUPIN'S PROPOSED CONSTRUCTION |
|---|---|---|---|
| 3 | "little or no serious liver damage" | No treatment-limiting hepatotoxicity that would require treatment to be discontinued by the patient | An increase in the bloodstream liver enzyme levels, including aspartate aminotransferase, alanine aminotransferase and alkaline phosphatase, of no more than 9% |

Lupin's construction of "little or no serious liver damage" in '428 claim 3 is substantially similar to its construction of "minimum liver damage" in '848 claim 3.  Nothing in the claims, the specification, or the prosecution history demonstrates that this claim language should be treated any differently than the language "minimum liver damage."  In fact, during the '848 patent's prosecution, the examiner suggested that the patentee replace the phrase "little or no serious" with the term "minimum" because the examiner believed that all damage to the liver is serious.  (JA002926, '848 pros. hist., 10/03/00 Office Action at 2.)  The patentee amended '848 claim 3 accordingly.  (JA002921, '848 pros. hist., 4/06/01 Amendment at 2.)

Abbott agrees with Lupin that "little or no serious liver damage" should have the same meaning as "minimum liver damage."  But the parties dispute the construction that should apply to this claim language.

Moreover, inventor David Bova testified that "little liver damage" referred to "elevations in the liver function tests."  (LA000447, Bova Dep. 127:12-14.)  Tables III-V of the '428 patent reflect those elevations.  (JA000009-10, '428 patent, cols. 7-9.)  The maximum elevation of 9% occurred in ALT bloodstream levels.  (JA000009, '428 patent, col. 8, l. 29.)  As the presence of any one of these liver enzymes in the bloodstream equates to potential liver damage, the "little or no serious liver damage" tolerated by the patient should be a 9% increase from baseline, as Lupin proposes.

### III.   The Biopharmaceutic Limitations in the '715, '229, '691, and '967 Patents

In October 1997, the patentee filed four continuation-in-part applications. These

applications issued as the '715, '229, '691, and '967 patents. (JA000029, JA000103, JA000076,

and JA000050.) Generally, these patents relate to how the dosage forms claimed in the '428 and

'930 patents, e.g., Niaspan®, act in vivo or in vitro, which the patents refer to as

"biopharmaceutic characteristics." (JA000037, '715 patent, col. 5, ll. 27-42; JA000117, '229

patent, col. 5, ll. 25-39; JA000089, '691 patent, col. 5, ll. 27-41; JA000062, '967 patent, col. 5,

ll. 23-37.)

By its title, the '715 patent relates to the "unique urinary metabolite profiles" of certain

dosage forms. (JA000029, '715 patent.) For purposes of the claims asserted here, the

'229 patent concerns the concentrations of a nicotinic acid metabolite called nicotinuric acid

measured in terms of certain pharmacokinetic parameters. (JA000029, '715 patent.) Finally, the

'691 and '967 patents relate to the similarity of dissolution profiles for dosage forms tested in

vitro. If the dissolution profile of a test dosage form is sufficiently similar to a target or

reference profile, the tested dosage from is expected to behave similarly in vivo as the reference

dosage form. (JA000092, '691 patent, col. 11, ll. 12-62; JA000050, '967 patent, col. 11, ll. 30-

63.)

Nearly all of the claims at issue recite numerical ranges or other limitations modified by

the term "about." As the Federal Circuit has explained, "[T]he word 'about' does not have a

universal meaning in patent claims, and that the meaning depends on the technological facts of

the particular case." *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1217 (Fed. Cir.

1995). Nowhere in the four patents does the patentee attempt to define "about" as used in the

claims. Where "about" is not defined in the specification and modifies a range, the scope of

"about" and the range's breadth "must be interpreted in its technologic and stylistic context." *Id.*

The '715, '229, '691, and '967 patents concern the fields of pharmaceutics (creating an appropriate dosage form for a drug) and biopharmaceutics. (JA000118, '229 patent, col. 7, l. 50-col. 16, l. 27.) In these fields, absolute precision in measuring active ingredient weights and concentrations in blood plasma and urine is not possible. But that does not mean the boundaries of weights and in vivo concentrations cannot be set. (LA000683-84, Taft Decl. ¶¶ 10-11.) If that were true, nothing would distinguish the claimed dosage forms from prior-art SR dosage forms. Indeed, using the word "about" to modify a claimed range may render an otherwise valid claim indefinite if the "about" modifier fails to distinguish the claimed range from the prior art. *See Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1218 (Fed. Cir. 1991) (affirming conclusion of indefiniteness where the "about" modifier gave "no hint" as to which values between the prior-art's upper limit and the claimed range's lower limit constituted infringement).

In the fields of pharmaceutics and biopharmaceutics, the use of the word "about" to modify a numerical range is understood to refer to a deviation acceptable around a particular data point. (LA000683-84, Taft Decl. ¶¶ 10-12.) The Federal Circuit reached much the same conclusion in the *Pall* case, when it construed the phrase "about 5:1 to about 7:1." 66 F.3d at 1217-19. There, it affirmed the district court's claim construction based on the patent's specification and inventor testimony, holding that "about 5:1 to about 7:1" did not extend beyond an upper bound of 8:1 and a lower bound of 4:1. *Id.* at 1218. Just as in *Pall*, Lupin's constructions set limits based on variations customarily encountered in the pertinent fields.

### A.    The Dose-Amount Limitations in the '229, '715, and '967 Patents

| '229 CLAIMS | TERM/PHRASE | ABBOTT'S PROPOSED CONSTRUCTION | LUPIN'S PROPOSED CONSTRUCTION |
|---|---|---|---|
| 17 | "at least about 750 mg" | no less than approximately 750 mg | No less than 637.5 mg |
| 25 | "at least about 1000 mg" | no less than approximately 1000 mg | No less than 850 mg |

– 29 –

| '715 CLAIMS | TERM/PHRASE | ABBOTT'S PROPOSED CONSTRUCTION | LUPIN'S PROPOSED CONSTRUCTION |
|---|---|---|---|
| 1 | "about 1000 mg" | approximately 1000 mg | No less than 850 mg and no more than 1150 mg |
| 3 | "about 500 mg" | approximately 500 mg | No less than 425 mg and no more than 575 mg |
| 5 | "about 1500 mg" | approximately 1500 mg | No less than 1275 mg and no more than 1725 mg |
| 7 | "about 750 mg" | approximately 750 mg | No less than 637.5 mg and no more than 862.5 mg |
| 9 | "about 2000 mg" | approximately 2000 mg | No less than 1700 mg and no more than 2300 mg |

| '967 CLAIM | TERM/PHRASE | ABBOTT'S PROPOSED CONSTRUCTION | LUPIN'S PROPOSED CONSTRUCTION |
|---|---|---|---|
| 16 | "about 1000 mg" | approximately 1000 mg | No less than 850 mg and no more than 1150 mg |

The claims in dispute in the '229, '715, and '967 patents all use the term "about" followed by a weight or dose-amount range. (JA000128-129, '229 patent, claims; JA000048-49, '715 patent, claims; JA000074-75, '967 patent, claims.) The '229 patent weight limitations in claims 17 and 25 are preceded by the phrase "at least," which sets a floor on the claimed range. *See Howmedica Osteonics Corp. v. Wright Med. Tech. Inc.*, 530 F.3d 1337, 1344 (Fed. Cir. 2008) (affirming construction of "at least one" as "one or more" based on plain meaning). None of the remainder of the claims in dispute include the phrase "at least" with respect to the limitations on weight or dose amount, suggesting that, for those claims, "about" means within a range on either side of the numerical limitation. *See Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1369 (Fed. Cir. 2008) (defining "about" 30 μm to mean between 25.434 μm and 34.566 μm).

The Court should construe "about" when it modifies dose amounts to mean the recited amount with a 15% variance because ordinarily skilled artisans would use 15% as a variance

based on a public standard.  As background, the United States Pharmacopeia is the official public standards-setting authority for all prescription and over-the-counter medicines, dietary supplements, and other healthcare products manufactured and sold in the United States.[6] (LA000683-84, Taft Decl. ¶ 11.)  Prescription and over-the-counter medicines available in the United States must, by federal law, meet these public standards, where such standards exist.[7] The *United States Pharmacopeia-National Formulary* ("*USP*"), which is a book of public pharmacopeial standards.[8]  This book contains standards for medicines, dosage forms, drug substances (active ingredients), excipients (inactive ingredients), medical devices, and dietary supplements.[9]  The *USP* is updated periodically.  The *USP* includes standards for dose or content uniformity.  (LA000005, *USP XXII* 1618; LA00009.01-10, *USP XXIII* at 1838-39.)

Due to the patent application filing dates in 1993, 1995, and 1997, two *USP* versions reflect ordinary and customary meaning at the time of invention: *USP XXII*, published in 1989, and *USP XXIII*, published in 1994.[10]  *See Phillips*, 415 F.3d at 1313 ("ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of invention").

*USP XXII*'s standard for content uniformity permits the amount of an active ingredient to be 85% to 115% of the label claim (i.e., ± 15%).  (LA000005, *USP XXII* at 1618.)  *USP XXIII* provides the same range.  (LA000010, *USP XXIII* at 1839.)  In light of the content uniformity variation permitted by these standards, an ordinarily skilled artisan would understand "about" to mean the recited dose ± 15%.  (LA000005, *USP XXII* 1618; LA000010, *USP XXIII* at 1839.)

---

[6]   http://www.usp.org/aboutUSP.

[7]   *Id.*

[8]   *Id.*

[9]   *Id.*

[10]   *USP XXIV* was published in 1999.

The inventors were both familiar with the *USP*. (LA000456, Bova Dep. 136:2-5; LA000165, Cefali Dep. 142:14-19.) Indeed, the specifications of the '715, '229, '691, and '967 patents, which the inventors must by law review before filing, all cite *USP XXII* or *USP XXIII* when describing an apparatus for dissolution testing. (JA000119, '229 patent, col. 9, ll. 13-30; JA000039, '715 patent, col. 9, ll. 36-54; JA000064, '967 patent, col. 9, ll. 38-55; JA000091, '691 patent, col. 9, ll. 18-35; JA002586-87; JA001378-1379; JA001624-25.) The '691 and '967 patents' claims expressly reference *USP XXII*. (JA000073-75, '967 patent, claims 1 and 16; JA000100-02, '691 patent, claims 1 and 13.)

Thus, using a ± 15% variance according to *USP XXII* and *USP XXIII*, the phrase "at least about 750 mg" in '229 claim 17 means "no less than 637.5 mg," while the phrase "at least about 1000 mg" in '229 claim 25 means "no less than 850 mg."

In contrast to the language "at least about" in the '229 claims, the '715 and '967 claims recite "about" and specify a dose amount without using the words "at least," and thus contemplate upper and lower bounds on the specified dose amount. *See Pall*, 66 F.3d at 1218-19. The phrase "about 1000 mg" in '715 claim 1 and '967 claim 16 should be construed as "no less than 850 mg and no more than 1150 mg." Claim 3 of the '715 patent recites a dose amount for each tablet of "about 500 mg." (JA000049.) A 15% variance in the dose amount per tablet according to the *USP* yields a construction of "no less than 425 mg and no more than 575 mg." Claim 7 of the '715 patent recites a dose amount of "about 750 mg," which yields a construction of "no less than 637.5 mg and no more than 862.5 mg." (JA000049.)

Claims 5 and 9 of the '715 patent also recite dose amounts. In particular, claim 5 specifies a dose of "about 1500 mg," while claim 9 specifies a dose of "about 2000 mg." (JA000049). These limitations should also be construed with a 15% variance for the upper and lower bounds. Thus, claim 5's dose limitation should be construed as "no less than 1275 mg and

no more than 1725 mg," while claim 9's dose limitation should be construed as "no less than 1700 mg and no more than 2300 mg."

With respect to each of these ranges, Abbott contends "about" means "approximately." But construing "about" in that imprecise manner simply puts off for another day the determination of claim scope and conflicts with the specification. *See Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1347-48 (Fed. Cir. 2009) (reversing claim construction inconsistent with how the claim term was used in the specification). The boundaries of a range modified by "about" should be delineated. *See Cohesive Techs.*, 543 F.3d at 1369. "In determining how far beyond the claimed range the term 'about' extends the claim, 'we must focus . . . on the criticality of the [numerical limitation] to the invention." *Id.* at 1368.

Here, the '229 patent's specification asserts that Niaspan® has a "unique" absorption compared to prior-art SR products, as measured by the sampling of blood plasma levels over time. (JA000118-119, JA000121, '229 patent, cols. 8-9, col. 13, l. 53.) According to the specification, the initial absorption "allows for the initial obtainment of therapeutic levels of nicotinic acid and the second absorption period, phase B, optimizes therapeutic levels thereafter." (JA000119, '229 patent, col. 9, ll. 9-12.) Abbott can hardly deny that the rate of absorption is critical to achieving the clinical benefits touted in the '229 patent. Nor can Abbott deny that the amount of nicotinic acid in the formulation or dosed to the patient materially affects the rate of absorption. (LA000684, Taft Decl. ¶ 13.)

Finally, Abbott's construction disregards the skilled artisan's reliance on the *USP* as a resource as well as the patents' explicit references to the *USP* in the specifications and claims. (JA000119, '229 patent, col. 9, ll. 13-16; JA000039, '715 patent, col. 9, ll. 36-40; JA000064, '967 patent, col. 9, ll. 38-41; JA000073-75, '967 patent, claims 1 and 16; JA000091, '691 patent, col. 9, ll. 18-21, JA000101-02, '691 patent, claims 1 and 13.) Moreover, Abbott's position here

conflicts with its reliance on the *USP* for other constructions that it advances. For example, with respect to the '691 and '967 patents, Abbott proposes a construction for the phrases "about __ hour" using a tolerance "of ± 2%." (LA000703; LA000706, Chart A and B constructions at 7, 10.) This tolerance comes directly from the *USP*. (LA000004, *USP XXII* at 1579; LA000009, *USP XXIII* at 1792.)

### B.   The Blood-Plasma-Concentration Limitations in the '229 Patent

As noted above, the inventors assert that the rate at which nicotinic acid (and its metabolite nicotinuric acid) is made available in the body is responsible for the improved safety of Niaspan® compared to prior-art SR products. The levels at which nicotinic acid and nicotinuric acid are found in the bloodstream over time indicate the rate of delivery or "bioavailability" of the drug. (JA000118, '229 patent, col. 7, l. 45-col. 9, l. 12.) Three measures are generally used for assessing this, i.e., Cmax, Tmax, and AUC (area under the curve).[11] Independent claims 17 and 25 of the '229 patent recite differing ranges for nicotinuric acid Cmax, Tmax, and AUC for different dosage strengths, i.e., "at least about 750 mg" (claim 17) and "at least about 1000 mg" (claim 25). (JA000129, '229 patent, claims 17, 25.)

| '229 CLAIMS | TERM/PHRASE | ABBOTT'S PROPOSED CONSTRUCTION | LUPIN'S PROPOSED CONSTRUCTION |
|---|---|---|---|
| 17, 25 | "about 3 µg/mL" | approximately 3 µg/mL | No less than 2.7 µg/mL |
| 17, 25 | "about 5.6 hours" | approximately 5.6 hours | No less than 5.04 hours |
| 17, 25 | "about 6 hours" | approximately 6 hours | No more than 6.6 hours |
| 17 | "about 11 µghr/ml" | approximately 11 µghr/ml | No less than 9.9 µghr/ml |

---

[11] The parties agreed to the construction of the terms Cmax, Tmax, and AUC. Cmax refers to the peak or maximum concentration of nicotinuric acid achieved in the plasma following ingestion of a certain dose of a niacin formulation. Tmax refer to the time that Cmax occurs following ingestion. AUC refers to the area under a plasma concentration curve of nicotinuric acid where the concentration of the nicotinuric acid in the bloodstream is charted over time.

| '229 CLAIMS | TERM/PHRASE | ABBOTT'S PROPOSED CONSTRUCTION | LUPIN'S PROPOSED CONSTRUCTION |
|---|---|---|---|
| 17 | "about 13 µghr/ml" | approximately 13 µghr/ml | No more than 14.3 µghr/ml |
| 25 | "about 12 µghr/ml" | approximately 12 µghr/ml | No less than 10.8 µghr/ml |
| 25 | "about 19 µghr/ml" | approximately 19 µghr/ml | No more than 20.9 µghr/ml |

### 1.    Cmax Variability

The claims use the word "about" to modify the minimum Cmax amount, the minimum and maximum points in the Tmax range, and the minimum and maximum points in the AUC range. (JA000129, '229 patent, claims 17 and 25.) As with the dose and weight limitations in the '229 patent (as well as the '715 and '967 patents), the patentee made no attempt in the specification or prosecution history to define "about" relating to the absorption of nicotinuric acid in the bloodstream. A skilled artisan would therefore understand the term in the context of the '229 patent to relate to the typically accepted deviation for volume and weight measurements in the field, i.e., 10% according to the *USP*. (LA000003, *USP XXII* at 6; LA000008, *USP XXIII* at 8; LA000684, Taft Decl. ¶ 12.) *See Pall*, 66 F.3d at 1218-19.

Indeed, *USP XXII* defines "about" with respect to any quantity assayed as follows: "In stating the appropriate quantities to be taken for assays and tests, the use of the word 'about' indicates a quantity within 10 percent of the specified weight or volume." (LA000003, *USP XXII* at 6). And *USP XXIII* uses the same language. (LA000008, *USP XXIII* at 8).

As the Federal Circuit observed in *Phillips*, "[T]he court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" 415 F.3d at 1314. The *USP* is just such a source. The minimum Cmax recited in '229 claims 17 and 25 of "about 3 µg/mL" should be construed as "no less than 2.7 µg/mL."

"To begin with, the context in which a term is used in the asserted claim can be highly instructive." *Phillips*, 415 F.3d at 1314. The claim language supports Lupin's construction. In particular, claim 17 covers an intermediate release formulation containing at least about 750 mg of nicotinic acid and recites a lower Cmax of "about 3 µg/mL." But claim 17 recites a specific upper Cmax limit of "3.2 µg/mL." The word "about" conspicuously does **not** modify the upper Cmax limit. (JA000129, '229 patent, claim 17.) The same convention appears in claim 25, which recites a lower Cmax of "about 3 µg/mL" and an upper Cmax of "5 µg/mL" for a formulation containing at least about 1,000 mg of nicotinic acid. (JA000129, '229 patent, claim 25.) While a slightly lower concentration in the bloodstream than recited may lower lipids, a concentration beyond the upper limit would not demonstrate the improved safety alleged in the patent. (*See, e.g.*, JA000122, '229 patent, col. 15, l. 65-col. 16, l. 7.) For instance, the patent notes that Niaspan® "is administered less frequently [than prior-art formulations] allowing sufficient time for clearance of metabolites keeping their accumulation below the toxic threshold." (*Id.*)

The '229 patent's specification supports Lupin's construction. It explains that Cmax occurs "at about the time when the niacin in the formulation has been almost completely absorbed therefromrl [sic], and it too is based upon the rate and extent of the absorption of niacin following ingestion of a certain dose of a niacin formulation." (JA000121, col. 14, ll. 47-51.) If dosed once daily at night, these concentrations supposedly result in "minimal risk of drug-induced hepatoxicity relative to SR niacin, and its efficacy in hyperlipidemia." (JA000122, col. 16, ll. 15-18.) Viewed in conjunction with the *USP*—a reference familiar to the inventors and skilled artisans—a Cmax of 2.7 µg/mL or more would be effective to lower lipids with minimal risk of side effects.

Abbott maintains that "about" means "approximately," which does nothing to "explain[]" and define[] [terms] used in the claims." *See Multiform Desiccants*, 133 F.3d at 1478. The word "approximately" can mean different things to different people. Abbott's construction converts claim construction from an objective exercise into one that is inappropriately subjective. *See Innova/Pure Water, Inc. v. Safari Water Filtrations Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004). The term "about" has real meaning in this context, as evidenced by the *USP*'s clear guidance.

### 2.    Tmax and AUC Variability

The same variance of 10% that Lupin proposes for Cmax should also apply to the Tmax and AUC ranges recited in the '229 patent. The *USP* supports Lupin's constructions, noting that even where weight and volume measurements are not involved, a 10% variance is acceptable for "specified dimensions." (LA000003, *USP XXII* at 6; LA000008, *USP XXIII* at 8; LA000684, Taft Decl. ¶ 12.) One such dimension is time, particularly as here where the measurement of interest in bioavailability includes plasma concentration over time. According to the 1993 *Webster's 9th Collegiate Dictionary*, a primary definition of "dimension" is "one of three coordinates . . . determining a position in space and time." (LA000016, *Webster's 9th Collegiate Dictionary* at 355.) The 1998 *Webster's 10th Collegiate Dictionary* provides the same definition. (LA000022, *Webster's 10th Collegiate Dictionary* at 324.)

### C.    The Urinary-Metabolite-Profile Limitations in the '715 patent

| '715 CLAIMS | TERM/PHRASE | ABBOTT'S PROPOSED CONSTRUCTION | LUPIN'S PROPOSED CONSTRUCTION |
|---|---|---|---|
| 1 | "about 4.0% to about 26%" (NA & NUA) | approximately 4.0% to approximately 26% | no less than 3.6% to no more than 28.6% |
|  | "about 74% to about 95%" (pathway 2) | approximately 74% to approximately 95% | no less than 66.6% to no more than 104.5% |

| '715 CLAIMS | TERM/PHRASE | ABBOTT'S PROPOSED CONSTRUCTION | LUPIN'S PROPOSED CONSTRUCTION |
|---|---|---|---|
| 5 | "about 11.0% to about 45%" (NA & NUA) | approximately 11% to approximately 45% | no less than 9.9% to no more than 49.5% |
| | "about 55% to about 89%" (pathway 2) | approximately 55% to approximately 89% | no less than 49.5% to no more than 97.9% |
| 9 | "about 22.0% to about 48%" (NA & NUA) | approximately 22% to approximately 48% | no less than 19.8% to no more than 52.8% |
| | "about 52% to about 78%" (pathway 2) | approximately 52% to approximately 78% | no less than 46.8% to no more than 85.8% |

Claims 1, 5, and 9 of the '715 patent specify limitations on the percentages of nicotinic acid and nicotinuric acid recovered from urine.  (JA000048-49, '715 patent claims 1, 5, 9.)  Each claim also specifies limitations on the percentages of certain metabolites recovered in the urine, called pathway 2 metabolites.  (JA000048-49, '715 patent claims 1, 5, 9.)  The term "about" modifies each percentage.  (JA000048-49, '715 patent claims 1, 5, 9.)  ███████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████  As noted above, the '715 patent nowhere defines the word "about."

According to the '715 patent's specification, "the unique absorption rate of Niaspan® is believed to result in a urine metabolite profile that balances the extremes of . . . [the IR and SR] metabolic profiles."  (JA000041, '715 patent, col. 14, ll. 22-24.)  For a patient, that means "minimizing the risk of drug-induced hepatotoxicity at the expense of possibly causing some flush."  (JA000041, '715 patent, col. 14, ll. 26-28.)  As the amounts and types of urinary metabolites recovered are material to the alleged clinical benefits, "about" should be construed with specificity.  *See Cohesive Techs.*, 543 F.3d at 1369.

USP XXII defines "about" when used with certain parameters to indicate a "quantity within 10 percent of the specified weight or volume." (LA000003, *USP XXII* at 6). *USP XXIII* uses the same language. (LA000008, *USP XXIII* at 8). An ordinarily skilled artisan would use a deviation of 10 percent for blood plasma and urinary metabolite parameters. (LA000684, Taft Decl. ¶ 12.) Thus, the ranges recited in the claims should reflect the same deviation of 10 percent in the specified minimum and maximum percentages, as reflected in Lupin's construction of "about" for the in vivo characteristics recited in the '229 patent's claims.

Accordingly, the recitation in '715 claim 1 of an amount of nicotinic acid and nicotinuric acid present in the urine from "about 4.0% to about 26%" should be construed as no less than 3.6% to no more than 28.6%. The same analysis with a 10% variance should apply to other in vivo characteristics recited in claim 1 as well as those recited in claims 5 and 9.

### D.     The Dissolution-Profile Limitations in the '691 and '967 Patents

| '691 CLAIM | TERM/PHRASE | ABBOTT'S PROPOSED CONSTRUCTION | LUPIN'S PROPOSED CONSTRUCTION |
|---|---|---|---|
| 13 | "about 15%" | approximately 15% | at least 13.5% |
| | "about 15% and about 30%" | approximately 15% and approximately 30% | between 13.5% and 33% |
| | "about 30% and about 45%" | approximately 30% and approximately 45% | between 27% and 49.5% |
| | "about 40% and about 60%" | approximately 40% and approximately 60% | between 36% and 66% |
| | "about 50% and about 75%" | approximately 50% and approximately 75% | between 45% and 82.5% |
| | "about 75%" | approximately 75% | not above 82.5% |

| '967 CLAIM | TERM/PHRASE | ABBOTT'S PROPOSED CONSTRUCTION | LUPIN'S PROPOSED CONSTRUCTION |
|---|---|---|---|
| 16 | "about 15%" | approximately 15% | at least 13.5% |
| | "about 15% and about 30%" | approximately 15% and approximately 30% | between 13.5% and 33% |
| | "about 30% and about 45%" | approximately 30% and approximately 45% | between 27% and 49.5% |
| | "about 40% and about 60%" | approximately 40% and approximately 60% | between 36% and 66% |
| | "about 50% and about 75%" | approximately 50% and approximately 75% | between 45% and 82.5% |
| | "about 75%" | approximately 75% | not above 82.5% |

Just as the parties dispute the meaning of "about" for urinary-metabolite profiles according to the '229 patent's claims, they dispute the meaning of "about" for dissolution profiles according to the '691 and '967 patents' claims. Because these patents allege a unique dissolution profile, any construction should specify the boundaries of that profile. *Cohesive Techs.*, 543 F.3d at 1369. Abbott's construction fails to do so and should be rejected. Consistent with the *USP*'s allowance of a 10% variance in any given volume (LA000003, *USP XXII* at 6; LA000008, *USP XXIII* at 8), Lupin proposes a construction of each of the recited ranges with a 10% variance.

The '691 and '967 patents relate to the rate at which a dosage form dissolves in deionized water using a particular dissolution apparatus according to *USP XXII.* (JA000091-92, JA000100-02, '691 patent, Tables 5A-5B, Tables 6-7, and claims; JA000065-66, JA000073-75, '967 patent, Tables 5A-5B, Tables 6-7, and claims.) Claim 13 of the '691 patent and claim 16 of the '967 patent both recite ranges for dissolution in percent at various times over a 20-hour period. The claimed ranges are modified at both the upper and lower points of the range by the

term "about." According to the patents' specifications, these dissolution ranges at the various

intervals are no less critical than the absorption rate of nicotinuric acid in the bloodstream and

the recovery of the particular urinary metabolites in achieving advantages over prior-art

formulations. The specifications explain:

> It is believed that the nicotinic acid formulations of the present
> invention are responsible for a controlled absorption profile that is
> intermediate to that of the IR and SR nicotinic acid formulations
> currently commercially available. . . . [T]he dissolution profile of
> the nicotinic acid formulations of the present invention, i.e.,
> Niaspan®, is slower than that of IR niacin, but different than that
> of SR niacin commercially available products. The uniqueness of
> the dissolution profile for the nicotinic acid formulations of the
> present inventions is shown in FIG. 4 and Tables 3, 4, 5A and 5B.

(JA000091, '691 patent, col. 10, ll. 16-27; JA000064, '967 patent, col. 10, ll. 35-48.)

Figure 4 in each patent shows Niaspan®'s dissolution profile vis-à-vis other products'

dissolution profiles. Tables 5A and 5B compare the dissolution rates of these products over

time, measured at the same points recited in the claims. The specifications describe dissolution

rates down to 1/10 of a percent. (JA000091-92, '691 patent, cols. 9-12; JA000064-65, '967

patent, cols. 9-12.)

Abbott's position that the term "about" with respect to the dissolution ranges recited in

the '691 and '967 patents simply means "approximately" is wholly inconsistent with the

treatment of these dissolution rates in the specification and should be rejected. *See Ultimax*,

587 F.3d at 1347 (reversing claim construction inconsistent with the specification's use of the

claim term).

### E.    The Fit Factor $F_2$ Limitation in the '691 and '967 Patents

In addition to reciting particular dissolution profiles, the asserted '691 and '967 claims

also require a particular "fit factor $F_2$" for comparing a test dissolution profile to a reference

dissolution profile. (JA000101, '691 patent, claim 13; JA000074, '967 patent, claim 16.) Where

– 41 –

the fit factor $F_2$ equals 100, the dissolution profiles are identical.  As the fit factor $F_2$ decreases

from 100, the test and reference dissolution profiles become increasingly different, resulting in a

reduced likelihood of similar in vivo performance.  (JA000092, '691 patent, col. 11, ll. 12-61;

JA000065, '967 patent, col. 11, ll. 30-62.)  As the patents explain, "the smaller the fit factor $F_2$,

the farther apart the products are from one another."  (JA000092, '691 patent, col. 11, ll. 57-60;

JA000065, '967 patent, col. 11, ll. 58-60.)

The asserted claims specify a "fit factor $F_2$" of "at least about 44."  (JA000101, '691

patent, claim 13; JA000074, '967 patent, claim 16.)  Lupin proposes that "at least about 44" be

construed to mean "no less than 43.5" because numbers between 43.5 and 43.9 round to the

nearest whole number, i.e., 44.  *See San Huan New Materials High Tech., Inc. v. Int'l Trade

Comm'n*, 161 F.3d 1347, 1361 (Fed. Cir. 1998) (upholding enforcement of patent claim based on

rounding to nearest whole number).  Nothing in the '691 and '967 patents' specifications and

prosecution histories provides a reason for departing from this standard scientific convention.

*See Viskase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316, 1320-21 (Fed. Cir. 2001).

Moreover, Lupin's construction is well grounded in an analysis of the claims and the

'691 and '967 patents' specifications.  In Table 6, the specifications identify the fit factors

allegedly needed to obtain bioequivalence to Niaspan® products by using a greater-than-or-

equals sign followed by a value with one significant decimal digit.  (JA000092, '691 patent, col.

12, Table 6; JA000065, '967 patent, col. 12, Table 6.)  In particular, Table 6 specifies a fit factor

$F_2$ "$\geq$79.0" for 250-mg, 325-mg, 500-mg, and 750-mg products and a fit factor $F_2$ "$\geq$44.0" for

1000-mg products.  (*Id.*)  Thus, the specification contemplates as suitable numbers equal to or

above 79 and 44, respectively.

The values "79.0" and "44.0" from the specification were transferred to the claims as the

integers "79" (claim 1 of the '967 and '691 patents) and "44" (claim 16 of the '967 patent and

claim 13 of the '691 patent). Since numbers between 43.5 and 43.9 round to the nearest whole number, i.e., 44, Lupin's construction comports with the teaching in the specifications regarding the suitability of a fit factor equal to or above 44 for 1000-mg products. Lupin's construction also comports with the '691 patent's Abstract, which notes that "1000 mg nicotinic acid tablets of the present invention have a dissolution curve similarity fit factor $F_2$ of at least 44." (JA000076.)

Abbott again proposes to define "about" as "approximately." Abbott's construction for the fit factor $F_2$ suffers from the same deficiencies as its other proposals to simply replace one word allowing an unspecified variance with another word allowing an unspecified variance. The Court should reject Abbott's attempt to define "about" as simply its synonym "approximately."

## CONCLUSION

Abbott proposes improperly broad constructions, e.g., due to its disregard of prosecution disclaimer, or improperly ambiguous constructions for the disputed claim language. Lupin, on the other hand, proposes constructions consistent with the ordinary meaning of the disputed claim language and the intrinsic evidence. Consequently, the Court should adopt Lupin's constructions.

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Karen L. Pascale*

March 1, 2010

Karen L. Pascale (# 2903) *[kpascale@ycst.com]*
Megan C. Haney (#4489) *[mhaney@ycst.com]*
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600

*Attorneys for Defendants, Lupin Limited and Lupin Pharmaceuticals, Inc.*

*Of Counsel:*

Barry S. White
Steven M. Amundson
Kevin F. Murphy
Mary Ann G. Lemere
**FROMMER LAWRENCE & HAUG LLP**
745 Fifth Avenue
New York, New York 10151
Telephone: (212) 588-0800

## CERTIFICATE OF SERVICE

I, Karen L. Pascale, Esquire, hereby certify that on March 3, 2010, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Mary B. Graham [mgraham@mnat.com]
> MORRIS, NICHOLS, ARSHT & TUNNEL LLP
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE 19801

I further certify that on March 3, 2010, I caused a copy of the foregoing document to be served by e-mail on the above-listed counsel and on the following non-registered participants in the manner indicated:

> ### *By E-Mail*
>
> William F. Lee [william.lee@wilmerhale.com]
> Vinita Ferrera [vinita.ferrera@wilmerhale.com]
> Christopher R. Noyes [cristopher.noyes@wilmerhale.com]
> Wyley S. Proctor [wyley.proctor@wilmerhale.com]
> WILMER CUTLER PICKERING HALE AND DORR LLP
> 60 State Street
> Boston, MA  02109

> YOUNG CONAWAY STARGATT & TAYLOR LLP
>
> */s/ Karen L. Pascale*
> _____
> Karen L. Pascale (#2903) *[kpascale@ycst.com]*
> Megan C. Haney (#5016) *[mhaney@ycst.com]*
> The Brandywine Building
> 1000 West St., 17th Floor
> P.O. Box 391
> Wilmington, Delaware 19899-0391
> Telephone:  (302) 571-6600
>
> *Attorneys for Defendants, Lupin Limited and*
> *Lupin Pharmaceuticals, Inc.*