# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT LABORATORIES and ABBOTT RESPIRATORY LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 09-152-JJF-LPS |
| LUPIN LIMITED and LUPIN PHARMACEUTICALS, INC., | ) ) ) | **REDACTED - <u>PUBLIC VERSION</u>** |
| Defendants. | ) | |

## LUPIN'S ANSWERING BRIEF CONCERNING CLAIM CONSTRUCTION

OF COUNSEL:

**FROMMER LAWRENCE & HAUG LLP**
Barry S. White
Steven M. Amundson
Kevin F. Murphy
Mary Ann G. Lemere
745 Fifth Avenue
New York, New York 10151
Telephone: (212) 588-0800

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
Karen L. Pascale (#2903)
Megan C. Haney (#5016)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 571-6600
kpascale@ycst.com
mhaney@ycst.com

*Attorneys for Defendants, Lupin Limited and Lupin Pharmaceuticals, Inc.*

March 29, 2010

Redacted Version: April 5, 2010

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

ARGUMENT ..............................................................................................................2

I.  The Formulation and Dosage-Form Limitations ..............................................2

    A.  The Limitations in the '428 and '930 Patents ...........................................2

        1.  The Significance of "Internal" in the Negative Limitation
            "Not Containing an Internal Hydrophobic Component" .....................2

        2.  The Patentee Narrowed Claim Scope During
            Prosecution by Disclaiming Dosage Forms
            with an Internal Hydrophobic Component .........................................3

        3.  Abbott Misplaces Its Reliance on the Ordinary
            Meaning of the Disputed Claim Language ......................................10

        4.  Abbott Misplaces Its Reliance on the Intrinsic Evidence ...........10

        5.  The Court Should Decline to Consider Abbott's Improper
            Expert Evidence Concerning Prosecution Disclaimer ...................13

    B.  The Phrase "Intermediate Release Nicotinic Acid
       Formulation" in the '715, '967, '691, and '229 Claims ..........................14

         1.  Prosecution Disclaimer Should Apply ..........................................14

        2.  The Meaning of "Intermediate Release" .......................................16

    C.  The Term "Dosing" in '848 Claim 1 ......................................................19

II.  The Treatment-Related Limitations in
    the '930, '967, '848, and '428 Patents ............................................................21

    A.  The '930 and '967 Patents .....................................................................21

    B.  The '848 Patent ......................................................................................25

        1.  "significant increase in HDL cholesterol" ....................................25

        2.  "minimum liver damage, uric acid increases
            or elevations in fasting glucose levels" ..........................................29

    C.  The '428 Patent ......................................................................................30

III.  The Biopharmaceutic Limitations in the '715, '229, '691, and '967 Patents ....32

A.   The Dose-Amount Limitations in the '229, '715, and '967 Patents ......................34

B.   The Blood-Plasma-Concentration Limitations in the '229 Patent .........................36

C.   The Urinary-Metabolite-Profile Limitations in the '715 Patent ...........................37

D.   The Dissolution-Profile Limitations in the '691 and '967 Patents ........................38

E.   The Fit Factor $F_2$ Limitation in the '691 and '967 Patents ....................................39

IV.   The Attributes of a Person Having Ordinary Skill in the Art ...........................................39

CONCLUSION.................................................................................................................................40

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Agilent Techs., Inc. v. Affymetrix, Inc.,*
    567 F.3d 1366 (Fed. Cir. 2009)..................................................................................... 6

*Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.,*
    340 F.3d 1298 (Fed. Cir. 2003)................................................................................... 28

*Ariad Pharms., Inc. v. Eli Lilly & Co.,*
    No. 2008-1248, 2010 WL 1007369 (Fed. Cir. Mar. 22, 2010) (en banc)........................... 6

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.,*
    262 F.3d 1258 (Fed. Cir. 2001)................................................................................... 20

*Bosies v. Benedict,*
    27 F.3d 539 (Fed. Cir. 1994)........................................................................................ 4

*Carnegie Mellon Univ. v. Hoffman-La Roche Inc.,*
    541 F.3d 1115 (Fed. Cir. 2008)..................................................................................... 6

*Cohesive Techs., Inc. v. Waters Corp.,*
    543 F.3d 1351 (Fed. Cir. 2008).............................................................................. 24, 33

*Comark Commc'ns, Inc. v. Harris Corp.,*
    156 F.3d 1182 (Fed. Cir. 1998)................................................................................... 23

*Dow Chemical Co. v. Nova Chemical Corp.,*
    629 F. Supp. 2d 397 (D. Del. 2009)............................................................................ 23

*Ecolab, Inc. v. FMC Corp.,*
    569 F.3d 1335 (Fed. Cir. 2009)................................................................................... 13

*E-Pass Techs., Inc. v. 3Com Corp.,*
    343 F.3d 1364 (Fed. Cir. 2003)................................................................................... 23

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.,*
    93 F.3d 1572 (Fed. Cir. 1996)...................................................................................... 4

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC,*
    349 F.3d 1373 (Fed. Cir. 2003).............................................................................. 17, 24

*Gentry Gallery, Inc. v. Berkline Corp.,*
    134 F.3d 1473 (Fed. Cir. 1998)................................................................................... 15

*Halliburton Energy Servs., Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008)...................................................................... 30

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*,
    540 F. Supp. 2d 1233 (M.D. Fla. 2008) ........................................................ 28

*Jonsson v. Stanley Works*,
    903 F.2d 812 (Fed. Cir. 1990)........................................................................ 15

*Kos Pharms., Inc. v. Barr Labs., Inc.*,
    242 F. Supp. 2d 311 (S.D.N.Y. 2003)............................................................ 20

*Lucas Aerospace, Ltd. v. Unison Indus., L.P.*,
    Civ. No. 93-525-JJF, 2008 WL 5868690 (D. Del. Sept. 30, 2008) .............. 14

*Markman v. Westview Instrs., Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) (en banc),
    *aff'd*, 517 U.S. 370 (1996) ............................................................................ 40

*Mars, Inc. v. Coin Acceptors, Inc.*,
    Civ. No. 90-49-JCL, 1996 WL 34385065 (D.N.J. June 27, 1996) ................ 14

*Merck & Co. v. Teva Pharms. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005)...................................................................... 33

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
    133 F.3d 1473 (Fed. Cir. 1998)...................................................................... 25

*N. Am. Container, Inc. v. Plastipak Packaging, Inc.*,
    415 F.3d 1335 (Fed. Cir. 2005)...................................................................... 12

*Noelle v. Lederman*,
    355 F.3d 1343 (Fed. Cir. 2004)........................................................................ 4

*O'Reilly v. Morse*,
    56 U.S. (15 How.) 62 (1853) ........................................................................... 6

*Ormco Corp. v. Align Tech., Inc.*,
    498 F.3d 1307 (Fed. Cir. 2007)................................................................. 15, 19

*Pall Corp. v. Micron Separations, Inc.*,
    66 F.3d 1211 (Fed. Cir. 1995)........................................................................ 32

*Pall Corp. v. PTI Techs. Inc.*,
    259 F.3d 1383 (Fed. Cir. 2001)................................................................. 10, 16

*Phillips Petroleum Co. v. Huntsman Polymers Corp.*,
    157 F.3d 866 (Fed. Cir. 1998).......................................................................... 4

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc)................................................... passim

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
  400 F.3d 901 (Fed. Cir. 2005)........................................................ 27, 28

*Poly-Am., L.P. v. GSE Lining Tech., Inc.*,
  383 F.3d 1303 (Fed. Cir. 2004)............................................................... 20

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
  522 F.3d 1299 (Fed. Cir. 2008)................................................................. 6

*Proctor & Gamble Co. v. Teva Pharms. USA, Inc.*,
  Civ. No. 04-940-JJF, 2006 WL 2241018 (D. Del. Aug. 4, 2006) ..................... 14

*Regents of the Univ. of Cal. v. Dakocytomation Cal., Inc.*,
  517 F.3d 1364 (Fed. Cir. 2008)............................................................... 11

*Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms. Inc*,
  Civ. No. 07-CV-5855, 2010 WL 715402 (D.N.J. Feb. 19, 2010) ..................... 40

*Sentry Prot. Prods., Inc. v. Eagle Mfg. Co.*,
  400 F.3d 910 (Fed. Cir. 2005)............................................................... 12

*Sinorgchem Co. v. Int'l Trade Comm'n*,
  511 F.3d 1132 (Fed. Cir. 2007)............................................................... 17

*Source Search Techs., LLC v. LendingTree, LLC*,
  588 F.3d 1063 (Fed. Cir. 2009)............................................................... 40

*Specht v. Jensen*,
  853 F.2d 805 (10th Cir. 1988) ............................................................... 14

*Spectrum Int'l, Inc. v. Sterilite Corp.*,
  164 F.3d 1372 (Fed. Cir. 1998)........................................................... 3, 40

*Springs Window Fashions LP v. Novo Indus., L.P.*,
  323 F.3d 989 (Fed. Cir. 2003)............................................................. 3, 13

*Symantec Corp. v. Computer Assocs. Int'l, Inc.*,
  522 F.3d 1279 (Fed. Cir. 2008)............................................................... 27

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002)............................................................... 23

*Turbocare Div. v. Gen. Elec. Co.*,
  264 F.3d 1111 (Fed. Cir. 2001)............................................................... 19

*UCB, Inc. v. KV Pharm. Co.,*
    Civ. No. 08-223, 2009 U.S. Dist. LEXIS 72764 (D. Del. Aug. 18, 2009) ................. 33, 34

*Unigene Labs., Inc. v. Apotex, Inc.,*
    Civ. No. 06-CV-5571, 2008 WL 3992294 (S.D.N.Y. Aug. 28, 2008) ...................... 33, 34

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) .......................................................................... 21

*Wang Labs., Inc. v. Am. Online, Inc.,*
    197 F.3d 1377 (Fed. Cir. 1999) ....................................................................... 15

## Statutes

35 U.S.C. § 102 ................................................................................................ 3, 4, 8

35 U.S.C. § 103 ................................................................................................... 3, 4

35 U.S.C. § 112 ...................................................................................................... 6

## Regulations

37 C.F.R. § 1.131(a)(1) .......................................................................................... 4

## INTRODUCTION

For the formulation and dosage-form limitations, such as "sustained release composition," Abbott attempts to distance itself from the narrowing of claim scope that occurred during prosecution. The patentee's representations during prosecution prevent the claims from covering products with an **internal** hydrophobic component. The patentee clearly and unambiguously disclaimed such products by, among other things, repeatedly asserting that the '428 and '930 patents lack support for products containing an internal hydrophobic component.

To support its position, Abbott wrongly relies on the ordinary meaning of the disputed claim language because prosecution disclaimer operates despite ordinary meaning. Abbott wrongly relies on certain dependent claims reciting hydrophobic materials because those claims concern lubricants used as processing aids, i.e., **external** hydrophobic components. Abbott wrongly relies on certain parts of the specifications because the patentee included those parts long before the examiner's rejections based on the O'Neill patent and long before the patentee's narrowing of claim scope to avoid O'Neill. Abbott wrongly relies on certain portions of the prosecution histories because it cites statements that did not result in a disclaimer while disregarding statements that did.

When the patentee filed later applications, such as those that issued as the '715, '967, '691, and '229 patents, the patentee did not include in those applications new material that would support an internal hydrophobic component. Thus, the patentee's prosecution statements apply to the other asserted patents as well as the '428 and '930 patents.

For much of the other disputed claim language, such as "about" and "treatment-limiting," Abbott's constructions provide no objective standard for measuring infringement or validity. With Abbott's constructions, the fact-finder would encounter uncertainty when deciding whether the claims cover the accused products or products anticipating the claims under § 102.

— 1 —

**ARGUMENT**

I.    **The Formulation and Dosage-Form Limitations**

      A.    **The Limitations in the '428 and '930 Patents**

            1.    **The Significance of "Internal" in the Negative Limitation "Not Containing an Internal Hydrophobic Component"**

To better understand the back and forth between the patentee and the examiner during prosecution of the '428 and '930 patents—and the resulting prosecution disclaimer—the Court should appreciate the significance of the word "internal" in the negative limitation "not containing an internal hydrophobic component." This word refers to a hydrophobic component intimately mixed with niacin in the dosage form, e.g., intimately mixed with niacin in granules later compressed into tablets.

For example, Niaspan tablets result from a mixture of niacin, the swelling agent Methocel (one type of hydroxypropyl methylcellulose (HPMC)), and the granulating/binding agent povidone. (JA000019, '930 patent, col. 7, ll. 20-48.) These three ingredients are mixed in a granulator. (JA000019, col. 7, ll. 30-60.) Water is sprayed onto the powder mix and granulation occurs. (JA000019, col. 7, ll. 60-65.) The granulated material is then dried and milled. (JA000019, col. 8, ll. 1-24.) To make Niaspan tablets, the granules are blended with additional Methocel and the lubricating agent Hystrene (a type of stearic acid). (JA000019, col. 8, ll. 25-32.) The blended material is compressed into tablets. (JA000018-19, col. 6, l. 56-col. 7, l. 10.) The lubricating agent helps prevent the tablets from sticking to the tabletting equipment.

The Methocel mixed with niacin to form the granules is called "intragranular," whereas the Methocel used with the lubricating agent is called "extragranular." (JA000018, '930 patent, col. 6, ll. 1-18 (Table IB), col. 6, ll. 34-65.) The lubricating agent is described as "external." (JA000018, col. 5, l. 57.) For instance, the '930 patent states, "Hystrene 5016 is utilized as an external lubricant in the Niaspan® formulation." (JA000018, col. 5, ll. 56-58.) The patentee

– 2 –

explained this during prosecution: "[T]he attorney of record . . . explained [in an interview] that the patents '181 [O'Neill] and '145 [Evenstad] have internal hydrophobic component which can be wax or fatty acids, where as in the instant application 'stearic acid' is used externally as a lubricant." (JA001118, '930 pros. hist., 3/15/99 Office Action at 2.)

In its opening claim construction brief (D.I. 55) ("Pls.' Br."), Abbott notes that some dependent claims recite hydrophobic lubricating agents, e.g., stearic acid and magnesium stearate. (Pls.' Br. 12.) But these are "external" to the niacin instead of "internal" with the niacin, i.e., intimately mixed with niacin. Abbott disregards this distinction. But this distinction matters due to the patentee's prosecution disclaimer.

### 2.    The Patentee Narrowed Claim Scope During Prosecution by Disclaiming Dosage Forms with an Internal Hydrophobic Component

A patent's prosecution history serves a public-notice function, and the prosecution-disclaimer doctrine promotes that function by (a) protecting the public's reliance on definitive statements made during prosecution and (b) preventing the patentee from changing position after filing suit. *See Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003). By distinguishing the claims from the prior art, a patentee indicates what the claims do not cover. *Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1998).

For the '428 and '930 patents, Abbott suggests that prosecution disclaimer does not apply because the patentee sought to avoid an interference rather than overcome a prior-art rejection. (Pls.' Br. 15-17, 24-27.) But the patentee's purpose in distinguishing application claims should not matter. To issue in a patent, application claims should not be anticipated under § 102 or obvious under § 103 in light of the prior art. 35 U.S.C. §§ 102-03. That is, the application claims should be patentably distinct from the prior art. Accordingly, when the patentee here disclosed prior art to the PTO during prosecution, it asserted that the claims were "patentably distinct over the art of record." (JA000188, '428 pros. hist., 4/17/95 Inf. Discl. Statement at 2.)

An interference may arise when different parties claim the same patentable invention. *See* 37 C.F.R. § 1.131(a)(1). Under the two-way test, an interference should proceed only if the application claims under consideration and the claims in the other application/patent are anticipated under § 102 or obvious under § 103 in light of each other. *See Noelle v. Lederman,* 355 F.3d 1343, 1351 (Fed. Cir. 2004). That is, invention A must anticipate or make obvious invention B, and invention B must anticipate or make obvious invention A. *Id.* An interference should not proceed if the claims in the two patent documents are patentably distinct from each other. *See Bosies v. Benedict,* 27 F.3d 539, 543 n.3 (Fed. Cir. 1994).

Whether seeking to avoid an interference or overcome a rejection, a patentee attempts to demonstrate that its application claims are patentably distinct. A court may use statements made during an interference to construe claim language. *Phillips Petroleum Co. v. Huntsman Polymers Corp.,* 157 F.3d 866, 872-73 (Fed. Cir. 1998). Thus, a court may also use statements made during prosecution about an interference's propriety to construe claim language. *See Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.,* 93 F.3d 1572, 1579-81 (Fed. Cir. 1996).

Here, the patentee unambiguously disavowed claim scope during prosecution of the '428 and '930 patents, starting with an August 1996 communication to the PTO. While some limiting statements in that communication referenced application claim 15 ('428 patent claim 10) rather than application claim 1 ('428 patent claim 1), other statements applied to every application claim. (JA000280-81, '428 pros. hist., 8/5/96 Amendment and Response at 6-7.)

In section III, the patentee sought to distinguish all pending claims from O'Neill's claims. (JA000281-84, '428 pros. hist., 8/5/96 Amendment and Response at 7-10.) Application claim 1 covered a method for treating hyperlipidemia by administering nicotinic acid (niacin) "once per day in the evening or at night" in an "oral solid dosage form" containing niacin and "at least one pharmaceutically acceptable carrier," i.e., at least one inactive ingredient. (JA000219.)

– 4 –

Application claim 15 covered a method for treating hyperlipidemia by administering nicotinic acid "once per day in the evening or at night" in an "oral solid dosage form" consisting essentially of "nicotinic acid, hydroxypropyl methylcellulose [HPMC], a binder and a lubricant." (JA000275.)

These claims largely paralleled O'Neill's claims. O'Neill's claim 1 covers a method for lowering serum lipids by administering a "single daily dose of niacin" in a tablet containing niacin and certain inactive ingredients, i.e., "hydroxypropyl methylcellulose" (HPMC), a "binder," and a "hydrophobic component." (LA000962, '181 patent, col. 10, ll. 14-30.) O'Neill's claim 3 specifies that "the single dose of niacin is administered with the evening meal . . . or after the evening meal . . . but before bedtime." (LA000962, col. 10, ll. 34-37.)

In section III, the patentee presented arguments regarding all pending claims. (JA000281-84, '428 pros. hist., 8/5/96 Amendment and Response at 7-10.) For instance, that section's title reads, "The Patentable Distinction Between the Presently Claimed Invention and the O'Neill Patent is Emphasized by the Lack of an Appropriate Count That Corresponds to Both Inventions." (JA000281.) That section did not differentiate between application claim 1 ('428 patent claim 1) and application claim 15 ('428 patent claim 10). (JA000281-84.)

Trying to distance the application claims from O'Neill's claims, the patentee argued that the '428 application's disclosure did not support the composition limitations in O'Neill's claims. (JA000282-83, '428 pros. hist., 8/5/96 Amendment and Response at 8-9.) It asserted that the application's inability to support O'Neill's composition limitations showed "that the present applicant and O'Neill *et al.* are not claiming essentially the same invention." (JA000283.)

The '428 application disclosed nicotinic acid, hydroxypropyl methylcellulose (HPMC), and a binder (e.g., povidone). (JA000159, p. 3, ll. 24-32; JA000161, p. 5, ll. 20-29.) But the '428 application did not disclose an internal hydrophobic component according to O'Neill's

– 5 –

claim 1. (JA0000157-79.) Abbott admits that O'Neill's claim 1 includes an internal

hydrophobic component. (Pls.' Br. 16.)

Thus, the patentee's arguments regarding lack of support in the '428 application for

O'Neill's composition limitations concerned at least O'Neill's internal hydrophobic component.

The patent statute provides that a patent's "specification shall contain a written

description of the invention, and of the manner and process of making and using it . . . ."

35 U.S.C. § 112, ¶ 1. "It has long been the case that a patentee 'can lawfully claim only what he

has invented and described, and if he claims more his patent is void.'" *Carnegie Mellon Univ. v.*

*Hoffman-La Roche Inc.*, 541 F.3d 1115, 1122 (Fed. Cir. 2008) (quoting *O'Reilly v. Morse*, 56

U.S. (15 How.) 62, 121 (1853)). The written-description requirement serves to prevent an

inventor from asserting—after application filing—that he invented something which he did not.

*Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1383 (Fed. Cir. 2009); *see Ariad Pharms.*

*Inc. v. Eli Lilly & Co.*, No. 2008-1248, 2010 WL 1007369, at *10, 12 (Fed. Cir. Mar. 22, 2010)

(en banc). As Abbott's counsel said in a Federal Circuit amicus brief, "[T]he written description

requirement protects against overreaching by inventors who attempt to claim subject matter they

have not actually invented and disclosed." (LA001064.)

Because the '428 application does not support O'Neill's internal hydrophobic

component, it does not support claims encompassing an internal hydrophobic component. Due

to this lack of support, the '428 patent claims should not encompass dosage forms with an

internal hydrophobic component since the patent fails to satisfy § 112's written-description

requirement for such claims. *See, e.g., PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299,

1306-11 (Fed. Cir. 2008). The patentee's disavowal of support for O'Neill's composition

limitations concerned the entire '428 application and extended to all application claims.

As Abbott notes, the patentee in the August 1996 communication attempted to distinguish application claim 1 and the associated dependent claims from O'Neill's claims based on (1) dosing, (2) time of administration, and (3) differences in composition. (Pls.' Br. 16; JA000276-80, '428 pros. hist., 8/5/96 Amendment and Response at 2-6.) The patentee contended that "the present inventor discovered that the time of administration of a nicotinic acid is critical, regardless of the exact nature of the composition." (JA000277.) The patentee also contended that "the present method is based upon the timing of administration, while the O'Neill method is based upon the use of a defined composition." (JA000279.)

For (1) dosing and (2) time of administration, these features did not distinguish the '428 application claims from O'Neill's claims since (a) O'Neill's claim 1 recites administering a "single daily dose" and (b) O'Neill's claim 3 specifies administration "with the evening meal . . . or after the evening meal . . . but before bedtime." (LA000962, '181 patent, col. 10, ll. 34-37.) O'Neill's claim language does not differ in substance from the language "once per day in the evening or at night" in '428 application claim 1.

For (3) differences in composition, such differences between '428 application claim 1 and O'Neill's claim 1 would not suffice to avoid an interference. In particular, application claim 1's requirement for an "oral solid dosage form" containing niacin and "at least one pharmaceutically acceptable carrier" was anticipated (or at least obvious) in view of the tablet and three pharmaceutically acceptable carriers (HPMC, binder, and hydrophobic component) recited in O'Neill's claim 1. Application claim 1's more general reference to a dosage form was not patentably distinct over the more specific description of a dosage form in O'Neill's claim 1.

Hence, when the patentee's attorney and the inventor interviewed the examiner in October 1997, the attorney explained that O'Neill "requires 'hydrophobic component' where as

– 7 –

in the instant claimed application there is no 'hydrophobic component'." (JA000351, '428 pros. hist., 10/7/97 Interview Summary.) That disclaimer applied to all application claims. (*Id.*)

Subsequently, in August 1998, the examiner rejected the '428 application claims under § 102(e) based on O'Neill. (JA000357, '428 pros. hist., 8/26/98 Office Action at 2.) The patentee then argued that the application claims were patentably distinct from O'Neill and that an interference was improper. (JA000393-400, '428 pros. hist., 2/26/99 Response After Final at 5-12.) In doing so, the patentee again disavowed from claim scope formulations and dosage forms having an internal hydrophobic component.

As to application claim 1, the patentee reasserted that the '428 application "does not have support for the composition limitations recited in" O'Neill's claim 1. (JA000393-94, '428 pros. hist., 2/26/99 Response After Final at 5-6.) The patentee contended that the '428 application did not "teach or suggest the 'hydrophobic component' as claimed in independent claim 1 of the O'Neill Patent." (JA000397.) The patentee concluded by asserting that "all presently pending claims are patentably distinct over the disclosures of record . . . ." (JA000400.)

Abbott cites the examiner's statement of reasons for allowance, where the examiner said, "[I]t is apparent that the composition employed in the methods of instant ['428] application are materially different than O'NEILL et al. Patent 5,268,181, specifically there is no requirement of added hydrophobic component to be mixed with Niacin prior to tablet formulation." (Pls.' Br. 17; JA000473, '428 pros. hist., Notice of Allowability at 2.) Abbott focuses on the language "no requirement of added hydrophobic component" in urging that the '428 claims cover dosage forms containing an internal hydrophobic component. (Pls.' Br. 16-17.) But if so, the '428 claims would not be "materially different" and patentably distinct from O'Neill's claims.

The '930 patent resulted from a continuation-in-part (CIP) application based on the '428 application. (JA000016, col. 1, ll. 6-10.) Lupin's appendix includes a redlined version

– 8 –

comparing the '930 and '428 patent specifications. (LA000781-92.) The material that the patentee added did not include language supporting an **internal** hydrophobic component. (LA000781-92.) Instead, the new material describes "an **external** lubricant [used] in the Niaspan® formulation." (JA000018, col. 5, ll. 56-58; LA000786 (emphasis added).)

During the '930 patent's prosecution, the patentee confirmed the lack of support for an internal hydrophobic component. In particular, the examiner rejected the application claims as "clearly anticipated" by O'Neill. (JA000627, '930 pros. hist., 12/3/97 Office Action at 3.) To address this rejection, the patentee argued that the "O'Neill Patent claim" had "particular limitations on the nature of the composition" and that "these limitations are not supported by the disclosure of the present ['930] application." (JA000665, '930 pros. hist., 3/3/98 Amendment at 33.) The patentee then argued that "the fact that the present application does not support the composition limitations of the O'Neill Patent shows that the present application and the O'Neill Patent claims are not claiming essentially the same invention." (JA000666.) The patentee's arguments regarding lack of support in the '930 application for O'Neill's composition limitations concerned at least O'Neill's internal hydrophobic component.

The patentee attempted to distinguish the application claims from O'Neill's claims based on the reduction or absence of certain side effects, e.g., hepatoxicity (liver damage). (*See, e.g.*, Pls.' Br. 25-26; JA000658-68, 3/3/98 Amendment at 26-36; JA000833-36, 6/1/98 Suppl. Amendment at 13-16; JA000857-59, 8/28/98 Amendment at 17-19; JA001023-28, 11/20/98 Amendment at 52-57.) But fewer side effects would not suffice to avoid an interference under the two-way test because minimizing side effects would have been obvious to an ordinarily skilled artisan. Common sense indicates that side effects should be minimized. In contrast to the reduction or absence of side effects, an interference would be avoided by the fact that the '930 application has no internal hydrophobic component whereas O'Neill does have one.

– 9 –

Because the '930 application does not support O'Neill's internal hydrophobic component, it does not support any claim encompassing an internal hydrophobic component. The patentee's disavowal of support for O'Neill's internal hydrophobic component involved the '930 application in its entirety and extended to all application claims.

### 3. Abbott Misplaces Its Reliance on the Ordinary Meaning of the Disputed Claim Language

Abbott relies on the ordinary meaning of "oral solid dosage form," "oral sustained release solid dosage form," and "sustained release composition," contending that the '428 and '930 patents lack express limitations excluding an internal hydrophobic component and therefore "encompass an oral solid dosage form that contains an internal hydrophobic component." (Pls.' Br. 12, 23.) But prosecution disclaimer operates "[e]ven where the ordinary meaning of the claim is clear . . . ." *Pall Corp. v. PTI Techs. Inc.*, 259 F.3d 1383, 1392 (Fed. Cir. 2001), *vacated on other grounds*, 535 U.S. 1109 (2002). If ordinary meaning prevailed despite prosecution disclaimer, that would nullify the doctrine.

Abbott mischaracterizes Lupin's position by asserting that "Lupin suggests" that the dosage-form limitations "exclude internal hydrophobic components on their face . . . ." (Pls.' Br. 26.) If that were true, a prosecution-disclaimer argument would seem superfluous.

### 4. Abbott Misplaces Its Reliance on the Intrinsic Evidence

Abbott misplaces its reliance on the lubricant (e.g., stearic acid) recited in '428 claims 8-9 and '930 claims 25-26, 64, and 140-41. (Pls.' Br. 12, 23.) The patentee's prosecution statements establish that those claims concern a lubricant used as a processing aid, i.e., an external hydrophobic component. (JA001146, '930 pros. hist., 9/28/99 Response at 2.) After the examiner maintained that the grandparent application (08/124,392) lacked support for "the concept that stearic acid is used as an external lubricant," the patentee pointed to a paragraph in that application, which also appears in the '428 and '930 applications.

– 10 –

(JA001145-46, LA000785, JA000161, JA000527.)  That paragraph states, "Processing aids such as lubricants, including stearic acid, may also be employed, as is known in the art."  (*Id.*)

During the '930 patent's prosecution, the patentee discussed that paragraph, saying:

> It is respectfully submitted that (1) a "processing aid" is an external lubricant, (2) those of skill in the art would clearly understand that the term "processing aid", as used in the grandparent, parent and present applications, means an external lubricant, (3) stearic acid is a well known external lubricant utilized in the industry in connection with tablet processing formation, and (4) the above quoted passage teaches that stearic acid is one example of a processing aid or external lubricant that can be used in the tablet processing step.

(JA001146, '930 pros. hist., 9/28/99 Response at 2.)

Abbott notes that "several of the ['930] dependent claims explicitly state that the swelling agent in the sustained release composition may be ethylcellulose or a wax . . . both of which are hydrophobic." (Pls.' Br. 23.)  Abbott then asserts that a court must construe an independent claim consistently with its dependent claims.  (*Id.*)  But that is not a hard-and-fast claim construction rule.  *See Regents of the Univ. of Cal. v. Dakocytomation Cal., Inc.*, 517 F.3d 1364, 1375 (Fed. Cir. 2008).  A patent's specification or prosecution history may dictate a construction that results in an inconsistency between an independent claim and its dependent claims.  *Id.*

In *Dakocytomation*, the Federal Circuit held that the patent's prosecution history overcame the general rule regarding consistency between an independent claim and its dependent claims.  517 F.3d at 1375.  The Court decided that the term "heterogeneous mixture" in an independent claim excluded repetitive sequences even though certain dependent claims required them.  *Id.*  Just as the prosecution history in *Dakocytomation* dictated a construction inconsistent with some dependent claims, the prosecution histories of the '428 and '930 patents dictate a construction inconsistent with some dependent claims in the '930 patent.

– 11 –

Abbott misplaces its reliance on a sentence in the specifications that discusses the use of ethylcellulose and waxes as swelling agents. (Pls.' Br. 13-14, 24.) The grandparent application (08/124,392) included that sentence, and the patentee repeated it in the '428 and '930 applications. (LA000785, JA000161, JA000526.) Thus, the patentee disclosed the use of ethylcellulose and waxes as swelling agents long before the examiner rejected claims based on O'Neill and long before it made representations narrowing claim scope to avoid O'Neill. (LA000785.) *See, e.g., Sentry Prot. Prods., Inc. v. Eagle Mfg. Co.*, 400 F.3d 910, 915-16 (Fed. Cir. 2005) (noting that the patentee "expressly disclaimed the use of multiple components" during prosecution). That the specifications discuss embodiments abandoned when the claims were narrowed during prosecution is understandable. Patent claims need not encompass every embodiment disclosed in the specification. *See, e.g., N. Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1345-46 (Fed. Cir. 2005).

Abbott incorrectly contends that Lupin's constructions would exclude the preferred embodiment. (Pls.' Br. 13-14, 24.) Niaspan is the preferred embodiment. (Compl. ¶ 29.) During prosecution, the patentee asserted that the FDA "substantiated the significance of Applicant's invention" by approving Niaspan to treat mixed dyslipidemia. (JA000392-93; JA000440-42; JA000644; JA000693-95; JA000832-33; JA000856; JA001028.)

Niaspan lacks an internal hydrophobic component. (JA000018-19, '930 patent, col. 5, l. 1-col. 8, l. 32.) Instead, Niaspan includes the hydrophobic component stearic acid as an "external lubricant." (JA000018, col. 5, ll. 56-58.)

Abbott misplaces its reliance on the paragraph in the specifications regarding variations in formulations that "fall within the scope of the claimed invention . . . ." (Pls.' Br. 13, 23-24.) Patents typically include that sort of boilerplate "broadening" paragraph immediately preceding the claims. Here, the grandparent application (08/124,392) included the paragraph that Abbott

– 12 –

cites, and the patentee repeated it in the '428 and '930 applications. (LA000738, JA000176, JA000548.) This "broadening" paragraph, included in the grandparent application as filed, should not abrogate the patentee's later statements narrowing claim scope.

As for the prosecution histories, Abbott cites various arguments regarding O'Neill where the patentee did not make unambiguous statements narrowing claim scope. (Pls.' Br. 15-16, 25-26.) But Abbott neglects to address the statements that Lupin relies on for prosecution disclaimer. As explained in Lupin's opening claim construction brief (D.I. 54) ("Defs.' Br."), those statements clearly and unambiguously narrowed claim scope. (Defs.' Br. 11-13.)

Abbott notes that (a) the patentee amended some application claims to specify that the "dosage form does not contain an internal hydrophobic component" and (b) the examiner still rejected those claims. (Pls.' Br. 26.) Abbott urges that this demonstrates that an express limitation excluding internal hydrophobic components was necessary to limit claim scope. (*Id.*) That the examiner still rejected the claims despite this express limitation should not undermine the unambiguous statements regarding the absence of internal hydrophobic components. As the Federal Circuit explained in a similar situation, "Because an examiner has the duty to police claim language by giving it the broadest reasonable interpretation, it is not surprising that an examiner would not be satisfied with the applicant's insistence that particular claim language distinguishes a prior art reference, but that a court would later hold the patentee to the distinction he pressed during prosecution." *Springs Window*, 323 F.3d at 995 (citation omitted).

### 5. The Court Should Decline to Consider Abbott's Improper Expert Evidence Concerning Prosecution Disclaimer

Whether prosecution disclaimer applies constitutes a legal question. *See, e.g., Ecolab, Inc. v. FMC Corp.*, 569 F.3d. 1335, 1342 (Fed. Cir. 2009). Yet, Abbott offers opinion evidence from a patent-law expert that prosecution disclaimer does not apply for the '428 and '930

patents. (AA Ex. D, Stoner Decl. ¶¶ 54-69.) For instance, Abbott's patent-law expert opines that Lupin's prosecution-disclaimer argument "is misplaced." (*Id.* ¶ 54.)

While patent-law experts may explain PTO practice and procedure, they may not testify about substantive patent-law issues, such as claim construction. *Proctor & Gamble Co. v. Teva Pharms. USA, Inc.*, Civ. No. 04-940-JJF, 2006 WL 2241018, at *1 (D. Del. Aug. 4, 2006); *see also Lucas Aerospace, Ltd. v. Unison Indus., L.P.*, Civ. No. 93-525-JJF, 2008 WL 5868690, at *1 (D. Del. Sept. 30, 2008) (holding patent-law expert could not draw inferences, make statements, or offer conclusions about patent law). Allowing a patent-law expert to testify about substantive patent-law issues would improperly invade the province of the district court since it is the arbiter of the law. *See Specht v. Jensen*, 853 F.2d 805, 807-08 (10th Cir. 1988).

Accordingly, judges in this judicial district have adopted guidelines generally prohibiting "expert" legal testimony on substantive patent-law issues, such as infringement, invalidity, and claim construction. (LA000885-86.)

With the assistance of briefing, the Court can decide the legal questions resulting from the claim construction disputes before it. *See Mars, Inc. v. Coin Acceptors, Inc.*, Civ. No. 90-49-JCL, 1996 WL 34385065, at *2 (D.N.J. June 27, 1996). Expert testimony approximating legal argument will not help the Court. *Id.* Thus, the Court should disregard the improper opinion from Abbott's patent-law expert regarding Lupin's prosecution-disclaimer argument.

**B.     The Phrase "Intermediate Release Nicotinic Acid Formulation" in the '715, '967, '691, and '229 Claims**

**1.     Prosecution Disclaimer Should Apply**

The '715, '967, '691, and '229 patents resulted from CIP applications based on the '930 application. (JA000029; JA000050; JA000076; JA000103.) Lupin's appendix includes redlined versions comparing the specifications for these patents to the '930 specification. (LA000793-815, LA000816-38, LA000839-61, LA000862-84.)

– 14 –

A review of the material that the patentee added shows that the new material does not describe an internal hydrophobic component. (LA000793-884.) To the contrary, the patentee added a paragraph discussing the wet mixing of niacin with only HPMC—a hydrophilic component—to produce "dense niacin pellets." (JA000037, col. 6, ll. 3-11; JA00062, col. 5, l. 66-col. 6, l. 7; JA000089, col. 6, ll. 3-11; JA000117, col. 6, ll 1-9; LA000798; LA000821; LA000844; LA000867.) These "dense niacin pellets" were subsequently mixed with more HPMC and compressed into tablets. (Id.)

As discussed above, the patentee represented during prosecution of the '428 and '930 applications that they failed to support an internal hydrophobic component. Because the material added to the applications for the '715, '229, '967, and '691 patents does not disclose an internal hydrophobic component, these patents also fail to support an internal hydrophobic component. Accordingly, the claims in these patents should not encompass an internal hydrophobic component because they do not satisfy § 112's written-description requirement. *See, e.g., Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479-80 (Fed. Cir. 1998).

Abbott contends that prosecution disclaimer cannot apply because the phrase "intermediate release nicotinic acid formulation" in the '715, '967, '691, and '229 patents differs from the language in the corresponding limitations in the '428 and '930 patents, such as "oral sustained release solid dosage form." (Pls.' Br. 44-45.) But prosecution disclaimer may apply where claims in patents in the same family use different language. *See, e.g., Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314-16 (Fed. Cir. 2007); *Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1383-84 (Fed. Cir. 1999); *Jonsson v. Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990). For instance, the Federal Circuit in *Ormco* held that statements made during prosecution of the parent application limited claims in the child applications despite the absence of identical claim language. *Id.* at 1316.

For the reasons noted above regarding no support for an internal hydrophobic component, prosecution disclaimer should apply to the dosage-form limitations in the '715, '229, '967, and '691 patents, i.e., to narrow the phrase "intermediate release nicotinic acid formulation."

Abbott relies on the ordinary meaning of "intermediate release nicotinic acid formulation," arguing that nothing in the claim language excludes an internal hydrophobic component. (Pls.' Br. 42-43.) This ordinary-meaning argument fails for the same reason as Abbott's ordinary-meaning arguments for the corresponding limitations in the '428 and '930 patents. Prosecution disclaimer operates despite ordinary meaning. *See Pall*, 259 F.3d at 1392.

### 2.   The Meaning of "Intermediate Release"

The parties dispute the meaning of "intermediate release" in "intermediate release nicotinic acid formulation." Abbott proposes that "intermediate release" means a release "which is slower than that of immediate release niacin formulations, but faster and different than other sustained release niacin formulations." (Pls.' Br. 42.) Lupin proposes that it means a release "over a period of time which is greater than 1 hour but less than 24 hours." (*Id.*)

The patentee defined "intermediate release" in the specifications, saying:

> By the term "intermediate release," it is used herein to characterize the nicotinic acid formulations of the present invention which release their medication in vitro or in vivo over a period of time which is greater than about 1 to 2 hours, i.e., slower that [sic] IR niacin, but less than about 10 to 24 hours, i.e., faster than SR niacin.

(JA000037, col. 5, ll. 35-41; JA000062, col. 5, ll. 31-37; JA000089, col. 5, ll. 35-41; JA000117, col. 5, ll. 33-39.) Lupin's definition comports with this passage.

Abbott contends that the Court should reject Lupin's definition because "[i]t is axiomatic that the term 'about' avoids strict numerical limitations." (Pls.' Br. 43-44 n.9.) But the word "about" at issue with the phrase "intermediate release nicotinic acid formulation" appears in the specifications, not the claims. And it appears in a passage defining that phrase. Further, as

– 16 –

explained below, a court may properly construe the term "about" when it modifies a number recited in a claim by specifying upper and/or lower numerical limits.

Moreover, Lupin's definition gives the language "about 1 to 2 hours" and "about 10 to 24 hours" its full effect. The word "about" modifies the ranges "1 to 2 hours" and "10 to 24 hours." Lupin's lower limit extends the range "1 to 2 hours" to its lower endpoint of 1 hour. Similarly, Lupin's upper limit extends the range "10 to 24 hours" to its upper endpoint of 24 hours. In contrast, Abbott's definition lacks any limits and results in ambiguity.

For its definition, Abbott relies on a different passage in the specifications, which states:

> As indicated herein, "intermediate release" is understood to mean a composition or formulation which, when orally administered to a patient to be treated, the active ingredient will be released for absorption into the blood stream over a period of time which is slower than that of IR niacin formulations, but faster and different than SR niacin products.

(Pls.' Br. 43; JA000043, col. 17, ll. 2-9; JA000068, col. 17, ll. 2-9; JA000094, col. 16, ll. 30-38; JA000122, col. 16, ll. 33-40.)

As to an "intermediate release" being faster than SR niacin products and slower than IR niacin products, the specifications contain additional information quantifying the release rate, i.e., "about 1 to 2 hours" and "about 10 to 24 hours." (JA000037, col. 5, ll. 39-41; JA000062, col. 5, ll. 35-37; JA000089, col. 5, ll. 39-41; JA000117, col. 5, ll. 37-39.) Abbott's definition improperly disregards this. A court should construe claim language in light of the specification as a whole. *See, e.g.*, *Sinorgchem Co. v. Int'l Trade Comm'n*, 511 F.3d 1132, 1145 (Fed. Cir. 2007). Thus, the specifications' more specific passage should trump the more general passage.

Also, the lack of endpoints for an "intermediate release" renders the phrase "intermediate release nicotinic acid formulation" ambiguous. *See, e.g.*, *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003). As an example, determining whether release rates are "faster and different than other sustained release niacin formulations"

– 17 –

according to Abbott's definition could be impossible since Abbott's definition specifies no standard for assessing the extent to which the release rates must be "different."

Moreover, the reference to "other sustained release niacin formulations" in Abbott's definition could encompass numerous products. *USP XXII* and *USP XXIII* indicate that the terms "sustained release," "extended release," and "prolonged action" refer to dosage forms that "make the contained medicament [active ingredient] available over an extended period of time following ingestion." (LA000005.004, LA000005.010; LA000010.005, LA000010.012.) Thus, the reference to "other sustained release niacin formulations" encompasses extended-release and prolonged-action niacin products.

Also, the reference to "other sustained release niacin formulations" is unclear. Does Abbott's definition refer to (1) the other SR niacin products disclosed in the specifications or (2) SR niacin products currently marketed or (3) SR niacin products marketed at any time? Using the other SR niacin products disclosed in the specifications for comparison purposes could prove problematic since Niaspan had release rates slower—not faster—than several of those products, such as the Goldline 87, Rugby MO, Rugby SL, Upsher-Smith 16020, Geneva 4B124, and Mason 501199 products. (JA000039-40, col. 10, l. 49-col. 11, l. 28, with Tables 5A-5B; JA000064-65, col. 10, l. 50-col. 12, l. 28, with Tables 5A-5B; JA000091-92, col. 10, l. 28-col. 12, l. 10, with Tables 5A-5B; JA000119-20, col. 10, l. 25-col. 12, l. 8, with Tables 5A-5B.)

Depending on the number and nature of the "other sustained release niacin formulations," determining whether release rates are "faster" could require excessive experimentation. Further, that effort could be impossible if the "other sustained release niacin formulations" included products no longer marketed, and thus unavailable for testing.

Accordingly, the Court should adopt Lupin's definition of "intermediate release."

– 18 –

### C.   The Term "Dosing" in '848 Claim 1

The '848 patent resulted from a continuation application based on the '930 application. (Pls.' Br. 37 n.7; JA000130.) As explained in Lupin's opening claim construction brief, the term "dosing" in '848 claim 1 implicitly requires a dosage form because claim 1 specifies "dosing" with "nicotinic acid [niacin] . . . combined with pharmaceutically acceptable carriers . . . ." (Defs.' Br. 14; JA000139, col. 15, l. 66-col. 16, l. 37.) That is, niacin and pharmaceutically acceptable carriers result in a dosage form, such as a capsule or tablet. Asserted claim 6 makes this clear by noting that the niacin "is dosed in he [sic] form of a sustained release formulation or tablet . . . ." (JA000139, col. 16, ll. 52-55.)

As discussed above, the patentee represented during prosecution of the '428 and '930 applications that they failed to support an internal hydrophobic component. The '848 patent has the same specification as the '930 patent. (Pls.' Br. 37 n.7.) Because the '930 patent fails to support an internal hydrophobic component, so does the '848 patent. Due to this lack of support, the claims in the '848 patent should not encompass dosage forms with an internal hydrophobic component because the '848 patent does not satisfy § 112's written-description requirement for such claims. *See, e.g., Turbocare Div. v. Gen. Elec. Co.*, 264 F.3d 1111, 1119 (Fed. Cir. 2001).

Just as the patentee's prosecution disclaimer applies to the explicit formulation and dosage-form limitations in the '428 and '930 patents, it also applies to the implicit dosage form required by '848 claim 1. As noted above, prosecution disclaimer may apply where claims in patents in the same family use different language. *See, e.g., Ormco*, 498 F.3d at 1314-16.

Abbott asserts that Lupin's construction of "dosing" violates claim construction principles and "strains common sense." (Pls.' Br. 36.) But in a preliminary amendment filed with the '848 continuation application, the patentee changed the application's title from "Nicotinic Acid Compositions for Treating Hyperlipidemia and Related Methods Therefor" to

– 19 –

"**Hydrophobic Component Free** Sustained Release Nicotinic Acid Compositions for Treating Hyperlipidemia and Related Methods Therefor." (JA002906, '848 pros. hist., 12/22/99 Prel. Amendment at 1 (emphasis added).) Thus, the patentee expressly added the words "Hydrophobic Component Free" to describe dosage forms according to the '848 patent. The patentee presumably used common sense when filing the preliminary amendment.

A court may consider a patent's title when construing disputed claim language. *See, e.g., Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1270 (Fed. Cir. 2001).

After the examiner allowed the application claims, the patentee changed the application's title to its original form. (JA002998, '848 pros. hist., 6/15/04 Amendment After Allowance at 4.) The patentee explained this change, saying, "[N]either the specification nor the claims contain the term 'hydrophobic'." (*Id.*) But the specification does contain the term "hydrophobic," using it when discussing the '145 patent to Evenstad. (JA000132, col. 2, ll. 1-4; JA002875-76.) Moreover, the specification contains the antonym "hydrophilic" to describe Niaspan's controlled-delivery system. (JA000134, col. 5, ll. 32-48; JA002882.) Thus, the patentee's stated reason for eliminating the words "Hydrophobic Component Free" from the title lacks merit. Most likely, the patentee had concerns about claim scope in litigation because by the time of allowance the patentee had asserted related patents against another ANDA applicant. *See Kos Pharms., Inc. v. Barr Labs., Inc.*, 242 F. Supp. 2d 311, 313-14 (S.D.N.Y. 2003).

Abbott again misplaces its reliance on the claim language and the specification to argue the impropriety of Lupin's construction, making many of the same assertions that it did for the '428 and '930 patents. (Pls.' Br. 36-37.) For example, Abbott contends that dependent claims 8 and 9 recite hydrophobic lubricating agents, e.g., stearic acid and magnesium stearate. (Pls.' Br. 36.) As discussed above, however, the patentee's prosecution statements demonstrate

– 20 –

that a lubricant is a processing aid used as an external hydrophobic component. (JA001146, '930 pros. hist., 9/28/99 Response at 2.)

As another example, Abbott contends that Lupin's construction "is inconsistent with the preferred embodiments described in the specification." (Pls.' Br. 37.) As discussed above, however, Niaspan is the preferred embodiment, and Niaspan lacks an internal hydrophobic component. (JA000018-19, '930 patent, col. 5, l. 1-col. 8, l. 32.)

## II.   The Treatment-Related Limitations in the '930, '967, '848, and '428 Patents

### A.   The '930 and '967 Patents

Abbott characterizes Lupin's construction of "treatment-limiting" elevations in uric acid, blood glucose, and liver enzymes as an attempt to "import strict numerical ranges into the claims." (Pls.' Br. 28.) But the ranges Lupin proposes are by no means "strict" or narrow, as the specifications for the '930 and '967 patents indicate.

The Federal Circuit has repeatedly said that "the specification 'is always highly relevant . . . [and] is the single best guide to the meaning of a disputed term.'" *See, e.g., Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Here, the guidance in the specifications points directly to the reference ranges that doctors use to determine harmful levels of blood glucose, uric acid, and liver enzymes. (JA000020-22, JA000071-73 (Tables III-VIII).)

As Tables III-VIII in the specifications show, nearly all of the subjects tested using the preferred embodiment Niaspan either demonstrated results well within the reference ranges or in the case of uric acid and blood glucose did not demonstrate repeated results above the reference ranges. (JA000020-22, JA000071-73 (Tables III-VIII).) Notably, based on the test results reported in Tables III-VIII, the specifications explain that "this sustained release dosage form caused no elevation in liver function tests (i.e., no liver damage), no elevations in uric acid and

– 21 –

only a small, 7.5% increase in fasting glucose levels . . . ." (JA000022, '930 patent, col. 14, ll. 63-66; JA000073, '967 patent, col. 27, ll. 51-54.) The specifications also explain that "[t]he present invention is also **demonstrated** not to cause elevations in liver function tests, uric acid or glucose levels for hyperlipidemics." (JA000023, '930 patent, col. 15, ll. 5-7; JA000073, '967 patent, col. 27, ll. 60-62 (emphasis added).)

Thus, the only means by which an ordinarily skilled artisan could understand what constitutes "treatment-limiting"—an elevation above that associated with the preferred embodiment but covered by the claims—is the upper level of the reference ranges the preferred embodiment was tested against. No other guidance appears anywhere in the specifications.

Abbott mischaracterizes Lupin's proposed ranges as "strict." But the patentee selected these ranges when assessing whether Niaspan was safer than prior-art SR products.

As for hepatoxicity, Lupin proposes a measure supported by evidence from an inventor and one of Abbott's experts. During his deposition, David Bova noted that patients in Niaspan clinical trials were discontinued when any liver enzyme reached three times the upper limit of normal according to FDA guidance. (LA000433, Bova Dep. 113:9-13.) Moreover, Abbott's expert Dr. Frank Sacks acknowledged that "a patient may have liver enzymes lower than three times [the upper limit of normal] ULN and yet have symptoms indicative of hepatotoxicity that may warrant discontinuation of niacin treatment." (AA Ex. C, Sacks Decl. ¶ 43.) Lupin's proposal to construe the claims to the outermost boundary according to FDA guidance is anything but imposing a "strict" or narrow limitation.

Further, using the specifications to discern the claim scope comports with Federal Circuit precedent. The Federal Circuit has recognized two common situations where information in a patent's specification would improperly limit claim scope, neither of which occurs here. The most common improper use of specification information to limit claim scope occurs when a

– 22 –

party—usually the alleged infringer—attempts to restrict the claims to the preferred embodiment so as to avoid infringement. *See, e.g., Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1326-28 (Fed. Cir. 2002) (affirming construction of "clip (28)" as not limited to "a single pair of legs" as disclosed in the patent's specification). Lupin does not seek to limit the claims to the preferred embodiment Niaspan. Lupin's construction incorporates liver enzyme, glucose, and uric acid levels well **above** the results disclosed in the specifications for subjects taking Niaspan.

Further, Abbott does not assert that Lupin attempts to limit claim scope to one preferred embodiment. (Pls.' Br. 28-35.) Thus, Abbott's citation to *Dow Chemical Co. v. Nova Chemical Corp.*, 629 F. Supp. 2d 397, 411 (D. Del. 2009), has no relevance here because the alleged infringer there attempted to limit claim scope to one preferred embodiment. (Pls.' Br. 30.)

The second, and less common, improper use of specification information to limit claim scope occurs where the claim language at issue has a clear meaning to ordinarily skilled artisans, but a party nonetheless asserts that the specification dictates a different meaning. *See, e.g., Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182 (Fed. Cir. 1998). In *Comark*, the alleged infringer sought to limit the claim language "video delay circuit" by pointing out its function in the preferred embodiment. *Id.* at 1186-87. The Federal Circuit rejected the alleged infringer's construction, noting that the disputed language had a "clear and well-defined meaning" to ordinarily skilled artisans. *Id.* at 1187. In contrast to that situation, where the disputed language is ambiguous, resort to the specification to resolve the ambiguity is expected. *See, e.g., E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 n.4 (Fed. Cir. 2003).

Unlike the situation in *Comark*, the phrase "treatment-limiting" can mean many things to many people, such as doctors, patients, and even insurance companies. Due to this ambiguity, Abbott seeks to clarify the phrase "treatment-limiting" by using the words "clinically significant" in its construction. But Abbott's attempt to use "clinically significant" as a measure of claim

– 23 –

scope simply shifts the subjective determination of what is "treatment-limiting" to the subjective

determination of what is "clinically significant." (Pls.' Br. 32.) Neither the '930 specification

nor the '967 specification makes any reference to that sort of subjective determination. Neither

specification uses the words "clinically significant." In contrast to Abbott's construction,

Lupin's construction draws directly from the specifications.

As noted in Lupin's opening brief, Abbott's reliance on someone's subjective judgment

would render the claims ambiguous. *See Geneva*, 349 F.3d at 1384 (rejecting construction due to

ambiguity). Indeed, Abbott proposes a definition of an ordinarily skilled artisan that does not

require a background in medicine but instead allows for a "basic knowledge" and some years of

experience in any "relevant" art, such as the formulation of pharmaceutical products. (Pls.'

Br. 11.) Because Abbott's ordinarily skilled artisan may or may not have a background in

medicine, such a person could only guess at what might constitute a "clinically significant"

elevation requiring discontinuation of current treatment.

Abbott cites *Cohesive Technologies, Inc. v. Waters Corp.*, 543 F.3d 1351 (Fed. Cir.

2008), to support its position that there should be no "hard and fast numeric line" for the phrase

"treatment-limiting . . . hepatoxicity" in '930 claim 115. (Pls.' Br. 33-34.) But Abbott misplaces

its reliance on *Cohesive*. There, the parties disputed the meaning of "about 30 μm" for particles

in high-performance liquid-chromatography equipment. *Id.* at 1359-60. The Federal Circuit

noted that when a patentee uses the term "about" before a numerical limitation, a court "must

focus . . . on the criticality of the [numerical limitation] to the invention." *Id.* at 1368. The term

"about" does not appear in '930 claim 115. Thus, Abbott's citation to *Cohesive* has no relevance

in construing the phrase "treatment-limiting . . . hepatoxicity."

Further, Abbott cites selectively from the '930 patent's prosecution history to support its

contention that doctors must ultimately determine what constitutes "treatment-limiting"

– 24 –

elevations. (Pls.' Br. 31-32.) During prosecution, the patentee relied on the specification to

explain the meaning of "treatment-limiting," saying:

> By the terms "treatment-limiting", "treatment-limiting elevations" or "treatment-limiting abnormalities", as used through out the claims, they mean or refer to that level or range which is not or would not be acceptable to the Food & Drug Administration ("FDA"). This definition is supported by the specification at, for example, on page 17, lines 25-26, pages 18-28 and page 29, lines 6-9 and 13-14.

(JA000855-56, '930 pros. hist., 8/28/98 Amendment After Final at 15-16.)

The specification pages cited in the preceding paragraph include Tables III-VIII.

(JA000536-48.) The lines cited on specification page 29 read as follows:

> The tests [sic] results reported above indicate that this sustained release dosage form caused no elevation in liver function tests (i.e., no liver damage), no elevations in uric acid and only a small, 7.5% increase in fasting glucose levels which in fact decreased during continued therapy.
>
> . . . The present invention is also demonstrated not to cause elevations in liver function tests, uric acid or glucose levels for the hyperlipidemics.

(JA000548.) Thus, to explain the meaning of "treatment-limiting" during prosecution, the

patentee relied on the same specification information that Lupin now relies on.

### B.     The '848 Patent

#### 1.     "significant increase in HDL cholesterol"

According to Abbott, the phrase "significant increase in HDL cholesterol" either requires

no explanation or can be construed by replacing the term "significant" with its synonym

"substantial." (Pls.' Br. 38.) But replacing "significant" with "substantial" would not "explain[]

and define[] a term used in the claims, without ambiguity or incompleteness." *See Multiform

Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998). Rather, the

'848 patent's specification—and Lupin's proposed construction—resolves the ambiguity that

exists with the word "significant" (and its synonym "substantial") in claim 1.

In particular, the '848 patent discusses prior-art niacin products, describing changes in HDL cholesterol in percentage terms, i.e., "-5% for the sustained release versus +37% for the immediate release." (JA000132, '848 patent, col. 2, ll. 5-18.) A proper construction of '848 claim 1 should therefore place the claimed HDL cholesterol increase in its proper context, i.e., a "balanced lipid alteration" between prior-art IR and SR products. (JA000132, '848 patent, col. 2, ll. 51-52.) A 20% increase, as Lupin proposes, derives directly from the percentage increases discussed in the specification and achieves the balanced lipid alteration according to the specification. (JA000136, '848 patent, col. 9, ll. 54-57.)

Abbott notes that the studies described in the specification show a per-patient increase of "as little as 3.8%" and suggests that the patentee meant to cover such a small increase. (Pls.' Br. 39.) The specification does not use the word "significant" for an increase in HDL cholesterol as low as 3.8%. Instead, it describes increases of 23.0% and 25.3% as "significant," saying:

> Additionally, the increases in HDL cholesterol obtained from dosing the sustained release formulation during the evening or at night were +23.0% for one group and +25.3% for the other group. Dosing during the evening therefore provides reduction in LDL cholesterol plus **significant** decreases in triglycerides and **increases in HDL cholesterol** with once-a-day dosing.

(JA000136, '848 patent, col. 9, ll. 53-60 (emphasis added).)

Abbott tries to circumvent the specification's teaching by offering extrinsic evidence, i.e., Dr. Frank Sacks's declaration. (Pls.' Br. 39-40.) But that declaration—read in its entirety—is not helpful in ascertaining the disputed claim language's meaning. Although Dr. Sacks parrots the definition of an ordinarily skilled artisan found in other declarations that Abbott submits, he only provides his opinion as a professor or physician, apparently without consulting the specification. For example, when discussing cholesterol, Dr. Sacks states: "We often characterize cholesterol as bad cholesterol, good cholesterol, and total cholesterol." (AA Ex. C, Sacks Decl. ¶ 20.) "We" in this context refers to physicians. Later, Dr. Sacks relates his

personal experience prescribing niacin products, again devoid of reference to the ordinarily skilled artisan. (*Id.* ¶¶ 29, 33.)  With respect to the dispute at hand, Dr. Sacks nowhere discusses the specification—integral to understanding the claims—but instead refers only to his experience.  (*Id.* ¶ 40.)

In contrast, proper claim construction requires that the claim language be read in the context of the intrinsic evidence as a whole:  "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313.  An expert's personal claim construction should be treated with caution.  *See Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1290-91 (Fed. Cir. 2008) (reversing district court construction based on expert testimony).

Abbott distorts the law by contending that courts have "repeatedly recognized" that terms of degree, such as "significant" and "substantial," are not susceptible to precise numerical interpretation.  (Pls.' Br. 38.)  But the cases that Abbott relies on all concern situations where numerical limitations did not capture the inventive concept.  Here, however, the patentee described the invention in numerical terms in the specification.  (JA000132, '848 patent, col. 2, ll. 5-18; JA000136, col. 9, ll. 54-57.)

Abbott cites *Playtex Products, Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 903-04 (Fed. Cir. 2005), which involved a tampon applicator having "substantially flattened surfaces." (Pls.' Br. 38.)  The district court's construction included a requirement that the "substantially flattened surfaces" be flat within a manufacturing tolerance.  *Id.* at 904.  The Federal Circuit reversed, reasoning that (1) the specification did not "describe the tampon applicator at the level of a manufacturing specification" and (2) the district court's construction improperly equated "flattened" with "flat" by requiring flatness within a manufacturing tolerance.  *Id.* at 907-08.

*Playtex* has no relevance here because Lupin does not advance a manufacturing tolerance or attempt to redefine "significant" contrary to the specification.

Similarly, in *Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298 (Fed. Cir. 2003), the claims concerned the interlocking features of masonry blocks to resist pressure from behind. Nowhere in the specification did the patentee attempt to numerically delineate the geometric concepts of "generally parallel" and "substantially horizontal." Thus, the Federal Circuit construed "generally parallel" to allow for "some amount of deviation from exactly parallel." *Id.* at 1311. As for "substantially horizontal," the district court failed to construe it, and the Federal Circuit did not address its construction. *Id.*

Further, *Playtex* and *Anchor Wall* predate the Federal Circuit's en banc *Phillips* decision, which emphasized that the specification is the "single best guide" and usually "dispositive" in construing disputed claim language. 415 F.3d at 1315.

Abbott's reliance on the district court's decision in *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 540 F. Supp. 2d 1233 (M.D. Fla. 2008), is more apt, but only marginally so. There, the court construed the phrase "significant corneal swelling" to mean "swelling of the cornea to such a degree as to cause significant harm to the cornea or significant wearer discomfort during a prescribed extended wear period." *Id.* at 1269. But Abbott cites only part of that construction, a part not involving the inventive concept of wearer comfort. (Pls.' Br. 38.) Abbott apparently chose to do so because wearer comfort is not susceptible to numerical limits. And elsewhere in the decision, the court rejected a construction that included the very modifiers "significant" and "substantial" that Abbott contends should define claim scope. *Id.* at 1259. The court in *Johnson* reasoned that these terms do "nothing to further delineate 'ophthalmic compatibility' and introduce[] additional uncertainties to the definition." *Id.* The case has since been appealed to the Federal Circuit. (LA000941, Docket Entry 332.)

– 28 –

### 2.    "minimum liver damage, uric acid increases or elevations in fasting glucose levels"

Regarding "minimum liver damage, uric acid increases or elevations in fasting glucose levels" in '848 claim 3, Abbott offers little more than the bare conclusion that its construction is consistent with the intrinsic and extrinsic evidence. (Pls.' Br. 40.)

As noted in Lupin's opening brief, Abbott's construction conflicts with the intrinsic evidence. The '848 patent's specification indicates that an increase in **any** liver enzyme is indicative of "potential liver damage." (JA000132, col. 2, ll. 35-36.) Because no elevation occurred in at least one study with Niaspan as reported in Table VIII (JA000139), it stands to reason that the study reported in Table IV (JA000137), which detailed an increase in ALT levels of up to 9% with Niaspan's use, represents the upper limit of specification support.

Further, the patentee's use of different phrases, "treatment-limiting hepatoxicity" in the '930 and '967 claims and "minimum liver damage" in '848 claim 3, to describe effects on the liver, indicates that these phrases have different meanings. *Phillips*, 415 F.3d at 1314. The interpretation most in keeping with the intrinsic evidence is that "minimum liver damage" refers to an acceptable amount of the increase in a given liver enzyme, i.e., no more than 9%, whereas "treatment-limiting hepatoxicity" equates to an elevation generally agreed to require discontinuation of therapy. (JA0000137, Table IV; LA000433, Bova Dep. 113:9-13.)

Although Abbott relies on evidence from its expert Dr. Sacks, that evidence does not help. Dr. Sacks notes that "there is no one size fits all" threshold for determining liver damage because that determination requires an evaluation of many factors. (AA Ex. C, Sacks Decl. ¶ 44.) A doctor would have to assess these factors based on his or her training, experience, and judgment. (*Id.* ¶ 43; *but see* LA000965-66, Suppl. Wharton Decl. ¶¶ 4-5.) Abbott fails to explain how, if at all, ordinarily skilled artisans other than doctors could conceivably determine whether liver damage only reached a "minimum" level according to '848 claim 3 or exceeded

– 29 –

that "minimum" level. The public is entitled to know the boundaries of patent claims. *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

Abbott is on equally shaky ground concerning its position that "minimum . . . uric acid increases, or elevations in fasting glucose levels" means no treatment-limiting elevations that would require treatment to be discontinued. (Pls.' Br. 40.) The only objective standards for what constitutes "minimum . . . uric acid increases or elevations in fasting glucose levels" appear in Tables VI and VII in the '848 patent. (JA000137-38, cols. 12-14.) Absent these objective standards, a doctor may—as Abbott's expert Dr. Sacks admits—repeatedly test a patient and evaluate the test results based on personal experience and training. (AA Ex. C, Sacks Decl. ¶ 55; *accord* LA000674, Wharton Decl. ¶ 18.) Under Abbott's construction, persons of ordinary skill other than doctors—such as formulators and pharmacists who would qualify under Abbott's definition—would not know when a minimum elevation for a particular patient is reached.

### C.    The '428 Patent

Relying on the '428 patent's specification, Abbott contends that "little or no serious liver damage" equates to "no treatment-limiting hepatoxicity . . ." that requires a doctor's judgment to discern. (Pls.' Br. 18-19.) Abbott's attempt to draw support from the specification falls flat. Abbott cites a study discussed in the specification that compared patients dosed with IR products to those dosed with SR products, i.e., a study by McKenney et al. ("McKenney study"). (JA000006, col. 2. ll. 19-32; LA000887-92, "A Comparison of the Efficacy and Toxic Effect of Sustained- vs Immediate-Release Niacin in Hypercholesterolemic Patients," 271 JAMA 9, pp. 672-77 (1994).) Because "18 of 23 patients 'withdrew at the direction of the investigator' due to 'an increase in their respective liver function tests,'" Abbott concludes that liver toxicity ultimately depends on the treating physician's personal view. (Pls.' Br. 19.)

The McKenney study does not reflect this clinical subjectivity. Rather, it used objective criteria for patient withdrawal based on liver toxicity: "Patients were always withdrawn when the results of liver function tests were greater than three times the upper limit of normal." (LA000888.) Most of the patients taking SR products were discontinued because they exceeded the objective criteria specified in the study design: "Liver aminotransferase elevations more than three times the upper limit of normal were encountered in 12 of the 18 patients who were withdrawn." (LA000890.) Apparently, with only 6 patients was there some degree of clinical judgment. But even with this small group, the clinical judgment applied to nonspecific symptoms not necessarily addressed by the asserted patent claims. (LA000891, Table 3 (noting withdrawn patients experienced rashes, diarrhea, and fatigue).)

The '428 patent discloses mean data for patients taking the preferred embodiment Niaspan and relies on that mean data when asserting that Niaspan is both safe and effective relative to prior-art SR products. (JA000008, col. 6, ll. 6-27; JA000010-11, Table VIII, col. 10, ll. 42-50, col. 11, ll. 44-62.) Abbott contends that using mean data for liver enzyme elevations to define claim scope is "an arbitrary choice" because certain patients exceeded the 9% increase recorded as a mean but were not withdrawn. (Pls.' Br. 19-20.) But this contention rests on an incorrect premise, that "little or no serious liver damage" equates to "no treatment-limiting hepatoxicity . . . ." The phrase "little or no serious damage" appears in '428 claim 3. (JA000011, col. 12, ll. 26-27.) In contrast, the phrase "without inducing treatment-limiting hepatotoxicity" appears in '930 claim 77. (JA000025, col. 20, l. 54.) The patentee could have used the same claim language in these related patents but chose not to. Differences in claim language should correspond to differences in meaning. *Phillips*, 415 F.3d at 1314. That is the case here. The '428 patent discloses ranges beyond which toxic effects can be "treatment limiting" but also indicates that minor elevations of liver enzymes reflect little or no serious liver

damage.  The support for acceptable elevations appears in Tables III-V, where the maximum

acceptable elevation in liver enzymes is 9%.  (JA000009-10, cols. 7-9.)

Abbott cites the '428 patent's prosecution history, claiming that the inventor "repeatedly"

described the invention as a method of treatment that did not cause treatment-limiting side

effects.  (Pls.' Br. 20.)  But the general statements about the invention's alleged advantages in the

prosecution history should not override the specific language in '428 claim 3 and the data in

Tables III-V.  As observed in *Phillips*, a patent's prosecution history "often lacks the clarity of

the specification and thus is less useful for claim construction purposes."  415 F.3d at 1317.

## III.    The Biopharmaceutic Limitations in the '715, '229, '691, and '967 Patents

As explained in Lupin's opening brief, Lupin's constructions of the term "about" with

respect to the dose amounts, blood-plasma concentrations, urinary-metabolite profiles, and

dissolution profiles according to the '715, '229, '691, and '967 claims are appropriate to their

respective scientific contexts as evidenced by *USP XXII* and *USP XXIII*.  (LA000001-5.010;

LA00000610.012; LA000679-96.)  The '691 and '967 patents reference *USP XXII* in their

claims, and all four specifications discuss either *USP XXII* or *USP XXIII*.  Lupin's constructions

therefore comport with "the technological facts" of this case, consistent with Federal Circuit

precedent concerning the term "about" when it modifies a claimed range.  *See, e.g., Pall Corp. v.*

*Micron Separations, Inc.*, 66 F.3d 1211, 1217 (Fed. Cir. 1995).

In contrast, Abbott does little to place the word "about" in its proper scientific context,

asserting instead that "about" has what Abbott refers to as its "ordinary and customary" meaning

of "approximately."  (Pls.' Br. 47.)  Under *Phillips*, however, "the ordinary and customary

meaning of a claim term is the meaning that the term would have to a person of ordinary skill in

the art in question."  415 F.3d at 1313.  While a journalist, for instance, might render "about" as

"approximately" in a nonscientific context, an ordinarily skilled artisan here would understand

that "about" when used to modify dose amounts, blood-plasma concentrations, in vivo and
in vitro profiles, for example, means a range within an acceptable degree of scientific error given
the equipment used. The inventors' testimony supports Lupin's position, not Abbott's.

Abbott's contention that Lupin's constructions "read[] the term 'about' out of the claims"
lacks merit. (Pls.' Br. 48.) Lupin's constructions provide variability around the numbers recited
in the claims, e.g., ± 10% and ± 15% according to *USP XXII* and *USP XXIII*.

No case cited by Abbott requires the Court to construe the disputed claim language
divorced from its scientific context. In *Merck & Co. v. Teva Pharmaceuticals USA, Inc.*, 395
F.3d 1364 (Fed. Cir. 2005), the Federal Circuit addressed the meaning of "about" in the phrases
"about 35 mg" and "about 70 mg." *Id.* at 1369-70. There, the district court decided that "about"
in these phrases meant "exactly" even though the parties agreed that "about" meant
"approximately." *Id.* at 1367. In *Merck*, the dispute concerning the amounts claimed in
milligrams had nothing to do with the variability inherent in measurements. *Id.* at 1371. Rather,
the specification described a range of acceptable dosage amounts, i.e., anywhere from "about
17.5 mg to about 70 mg." *Id.* at 1371-72.

Abbott cites *Cohesive* to support its assertion that "about" avoids numerical boundaries.
(Pls.' Br. 48.) But the Federal Circuit in *Cohesive* did associate numerical boundaries with the
phrase "about 30 µm," concluding that "about 30 µm" encompassed particles greater than or
equal to 25.434 µm but excluded particles less than or equal to 23.044 µm. 43 F.3d at 1369-70.

Abbott cites two district court cases: *UCB, Inc. v. KV Pharmaceutical Co.*, Civ. No. 08-
223, 2009 U.S. Dist. LEXIS 72764 (D. Del. Aug. 18, 2009); and *Unigene Laboratories, Inc. v.
Apotex, Inc.*, Civ. No. 06-CV-5571, 2008 WL 3992294 (S.D.N.Y. Aug. 28, 2008). (Pls.' Br. 47-
48.) But the circumstances in those cases differ from the circumstances here.

In *UCB*, the evidence failed to support the defendant's position that the range "about 10 to 40 mg" should be limited to rounding or measurement error. 2009 U.S. Dist. LEXIS 72764, at *8-16. And the defendant did not propose error bars for the claimed range consistent with the evidence. *Id.* at *13-14. In contrast to *UCB*, Lupin's proposed variances ("error bars") rest squarely on evidentiary foundations provided by the *USP* and scientific literature.

In *Unigene*, the district court rejected a proposed construction that rested solely on an expert's inclination "to think in terms of round numbers." 2008 WL 3992294, at *8-9. Thus, the district court in *Unigene* chose what amounted to the dictionary definition "approximately" over the expert's unsupported opinion. *Id.*

### A.   The Dose-Amount Limitations in the '229, '715, and '967 Patents

With regard to the dose amounts recited in '715 claims 1, 3, 5, 7, and 9, in '967 claim 16, and in '229 claims 17 and 25, both inventors testified that "about" does not simply mean "approximately." Instead, "about" refers to scientifically accepted variability when determining a dose amount. That acceptable variability appears in *USP XXII* and *XXIII*, which the patents in suit cite. (LA000005; LA000010.)

For example, Dr. Cefali addressed "about 1500 mg" recited in '715 claim 5, explaining that

REDACTED

(LA000283-84, Cefali Dep. 260:24-261:8.)

With regard to dose amounts, Mr. Bova testified, "About scientifically means within test error, within weight error, within error that is contained within any piece of equipment or testing apparatus, etcetera." (LA000457, Bova Dep. 137:3-6.)

The inventors' testimony comports with the evidence from Lupin's expert Dr. David Taft. As Dr. Taft explains, the actual weight of an active ingredient in a solid dosage form, such

as a tablet, will vary depending on manufacturing conditions. (LA000683, Taft Decl. ¶ 10.) Thus, the variability allowed by the *USP* for active ingredients, like niacin, is no more than ± 15%. (LA000683-84, Taft Decl. ¶¶ 10-11.) A larger variance may result in safety or efficacy issues: Too much above the nominal dose may cause harm, while too little may not suffice to treat the patient's disease or disorder. (*Id.*)

Abbott's experts Drs. McGinity and Foster similarly refer to "inherent variability" in the manufacturing process. (AA Ex. A, Foster Decl. ¶ 56; Ex. B, McGinity Decl. ¶ 63.) But they fail to say what level of variability is acceptable when measuring a dose amount. (AA Ex. A, Foster Decl. ¶¶ 56-57; Ex. B, McGinity Decl. ¶¶ 63-64.)

In its opening brief, Abbott acknowledged that "[c]laim terms are generally given their 'ordinary and customary meaning,' defined as 'the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention.'" (Pls.' Br. 7 (quoting *Phillips*, 415 F.3d at 1313).) Abbott's appendix includes an excerpt—which lacks a publication date—from *USP XXIV*. Dr. McGinity asserts that Lupin's ± 15% variance is inconsistent with this "respected monograph" regarding niacin. (AA Ex. B, McGinity Decl. ¶ 64.) But *USP XXIV* postdates the time of invention and has little, if any, relevance for claim construction purposes.

As explained in Lupin's opening brief, two *USP* versions reflect the ordinary and customary meaning at the time of invention: *USP XXII*, published in 1989 and effective January 1, 1990; and *USP XXIII*, published in 1994 and effective January 1, 1995. These two *USP* versions constitute contemporaneous references at the time of invention due to patent application filing dates in 1993, 1995, and 1997. In contrast, *USP XXIV*, published in 1999 and effective January 1, 2000, does not constitute a contemporaneous reference.

A court should assign disputed claim language the meaning it would have to an ordinarily skilled artisan "in view of the state of the art at the time of invention." *Phillips*, 415 F.3d

– 35 –

at 1332.  Because *USP XXIV* does not reflect the state of the art at the time of invention, Abbott

and its expert Dr. McGinity wrongly rely on it for claim construction purposes.  Abbott's experts

cite no material published during the appropriate period to support their positions on this point.

(AA Ex. A, Foster Decl. ¶¶ 56-57; Ex. B, McGinity Decl. ¶¶ 63-64.)

### B.    The Blood-Plasma-Concentration Limitations in the '229 Patent

Based on the evidence from Dr. Taft and relevant *USPs* that "about" with respect to the

blood-plasma concentrations recited in '229 claims 17 and 25 refers to scientifically acceptable

variability, Lupin proposes a construction for these limitations of no more than 10%.  This level

of variability is generally accepted for pharmacokinetic results, including results relating to

niacin.  (LA000970-72, Suppl. Taft Decl. ¶¶ 6-9.)  Further, the *USP* notes that volume and time

measurements, such as those involved with blood-plasma parameters, should be construed within

10% of the specified volume and time.  (LA000003; LA000008.)

The inventors agreed that "about" means to a level of scientifically acceptable variability.

For example, when addressing $C_{max}$ values (e.g., "about 3 µg/mL" in '229 claim 17), Dr. Cefali

explained his understanding of "about," saying,

# REDACTED

(LA000067, Cefali Dep. 44:12-19.)

Mr. Bova provided similar testimony concerning "about" as it applies to $C_{max}$:  "Every

test has slight variations embodied within equipment, the acid methodology or whatever and my

understanding is that about refers to variations based upon the equipment. . . .  Tolerances [sic] is

perhaps a word that you can use for that."  (LA000480-81, Bova Dep. 160:22-161:4.)

With respect to "about" modifying Tmax values in the claims (e.g., "about 5.6 hours"), Mr. Bova said, "About means the same thing as I said before. Every test has variability. So you wouldn't be within the . . . tolerance of the test." (LA000482, Bova Dep. 162:7-10.)

With respect to "about" modifying AUC values in the claims, Dr. Cefali testified,

# REDACTED

(LA000070, Cefali Dep. 47:18-22.) Mr. Bova echoed this, noting that "about" with respect to AUC values relates to "the test and the tolerance that's associated with the test." (LA000484, Bova Dep. 164:7-9.)

Abbott's expert Dr. Foster, who devoted portions of his declaration to the use of "about" in the '229 patent, does not contradict the inventors' testimony. He attributes the variability associated with scientific measurements to "the accuracy of the assay, the tolerances of the equipment, the accuracy of the method/technique utilized by the technician performing the test, how accurately the data are reported, and any rounding conventions that may be utilized." (AA Ex. A, Foster Dec. ¶¶ 37, 56.) Although Dr. Foster alleges that a 10% variance is "erroneous and unsupportable," he fails to explain how or why. (*Id.* ¶ 57.) Nor does he provide any standards or expectations of accuracy in a relevant field. (*Id.* ¶ 3.) This failure is surprising in light of his 20-year membership in the *USP*, which he describes as "the preeminent national pharmaceutical standard-setting organization." (*Id.* ¶ 12.) In any event, "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." *Phillips*, 415 F.3d at 1318.

## C.    The Urinary-Metabolite-Profile Limitations in the '715 Patent

As with the blood-plasma concentrations recited in the '229 claims, Lupin proposes that "about" with respect to the percentages of urinary metabolites recited in the '715 claims means a 10% variance based on the accuracy expected in urinary assays. (LA000684, Taft Decl. ¶ 12.)

– 37 –

Ordinarily skilled artisans would expect a urinary-metabolite profile (including a profile for niacin) to be within 10% of the stated values. (LA000970-72, Suppl. Taft Decl. ¶¶ 6-9.) Dr. Cefali's testimony supports this variance. He said, REDACTED

(LA000282, Cefali Dep. 259:10-14.)

Abbott relies on with Dr. Foster's conclusory assertions, which should be rejected given the *USP* guidance, Dr. Taft's evidence, and Dr. Cefali's testimony. (AA Ex. A, Foster Decl. ¶ 57; LA000003; LA000008; LA000684, Taft Decl. ¶ 12; LA000282, Cefali Dep. 259:5-14.)

### D.   The Dissolution-Profile Limitations in the '691 and '967 Patents

Lupin has consistently asserted that "about" in the patents' scientific context means within the scientifically acceptable variance for each recited weight, volume, or parameter. Lupin proposes that the term "about" modifying the dissolution percentages recited in the '691 and '967 patents means within 10% of the specified value. (LA000684, Taft Decl. ¶ 12.)

Dr. Cefali's testimony again supports Lupin's position. He explained his understanding of the term "about" in the asserted claims, saying, REDACTED

(LA000171, Cefali Dep. 148:18-20.) And the *USP* provides that a given volume is commonly understood as falling within 10% of the specified value. (LA000003; LA000008.)

In contrast to Lupin, Abbott takes inconsistent positions by contending that "about" in connection with dissolution percentages means "approximately." (Pls.' Br. 47-48.) The '691 and '967 claims specify dissolution percentages at various times. (JA000074, col. 30, ll. 47-61; JA000101, col. 30, ll. 17-33.) For the time values in the claims, Abbott abandons its default construction of "approximately" for a construction of ± 2% (LA000706), presumably because the *USP* specifies this variance. (LA000004; LA000009.) There is no principled basis

– 38 –

to distinguish between dissolution times and dissolution percentages, and Abbott provides none in its brief or in the conclusory assertions of its experts Drs. Foster and McGinity. The *USP* either controls or it does not. Abbott cannot have it both ways.

### E.    The Fit Factor $F_2$ Limitation in the '691 and '967 Patents

As for "at least about" fit factor $F_2$ in the '691 and '967 claims, Dr. Cefali testified that

REDACTED

(LA000159, 136:7-10.) Abbott's expert Dr. McGinity agrees, though he is silent on the accepted deviation, instead supporting Abbott's nebulous language "approximately." (AA Ex. B, McGinity Decl. ¶ 66.)

The Court should impart significance to the patents' use of the ".0" values in the specification following the fit factors in Table 6 (JA000065, JA000092), which transferred to the claims in whole numbers. This change from the specification to the claims shows that the inventors understood the fit factor calculation in terms of conventional rounding techniques, where numbers between 43.5 and 43.9 round to the nearest whole number 44. Thus, the Court should construe "at least about 44" as "no less than 43.5."

### IV.    The Attributes of a Person Having Ordinary Skill in the Art

The parties dispute the attributes of a person having ordinary skill in the art. According to Abbott, that person "would have had basic knowledge of oral solid dosage formulation, biopharmaceutics, pharmacokinetics, and the treatment of hyperlipidemia, either through experience or training (such as a degree in pharmacy or a medical degree), and several years of experience or training in one or more of the relevant arts." (Pls.' Br. 11; AA Ex. A, Foster Decl. ¶ 53; Ex. B, McGinity Decl. ¶ 39; Ex. C, Sacks Decl. ¶ 37.) According to Lupin, that person "is someone with an advanced degree in pharmacology and/or pharmaceutics, an advanced degree in

a related field, or an M.D. degree, plus two or more years of experience." (LA000966-67, Suppl. Wharton Decl. ¶ 7; LA000972, Suppl. Taft Decl. ¶ 10.)

The controversy concerning the attributes of a person having ordinary skill in the art constitutes a disputed issue of material fact. *See, e.g., Source Search Techs., LLC v. LendingTree, LLC*, 588 F.3d 1063, 1069 (Fed. Cir. 2009). In an obviousness analysis, for example, the characteristics and understanding of an ordinarily skilled artisan in the relevant field at the time of invention are factual issues. *Id.* In contrast, construing claim language involves the resolution of legal issues, not factual issues. *Markman v. Westview Instrs., Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Thus, the Court should not reach the controversy concerning an ordinarily skilled artisan's attributes in construing the disputed claim language. *See Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms. Inc*, Civ. No. 07-CV-5855, 2010 WL 715402, at *4 (D.N.J. Feb. 19, 2010) (factual dispute concerning level of ordinary skill precluded summary judgment).

## CONCLUSION

A patentee may not construe claim language one way in order to obtain claim allowance and a different way against an alleged infringer. *See Spectrum*, 164 F.3d at 1379. But Abbott attempts to do just that by advancing its no-disclaimer arguments for the formulation and dosage-form limitations.

For many claim terms and phrases, such as "about" and "treatment-limiting," Abbott's constructions provide no yardstick for measuring infringement or validity. In contrast, Lupin's constructions provide objective standards so that the fact-finder may determine whether the asserted claims read on the accused products or read on the prior art. Because Lupin's constructions comport with the intrinsic evidence and avoid ambiguity, they should be adopted.

March 29, 2010

**YOUNG CONAWAY STARGATT & TAYLOR LLP**

*/s/ Karen L. Pascale*
_____
Karen L. Pascale (# 2903) *[kpascale@ycst.com]*
Megan C. Haney (#4489) *[mhaney@ycst.com]*
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600

*Attorneys for Defendants, Lupin Limited and
Lupin Pharmaceuticals, Inc.*

*Of Counsel:*

Barry S. White
Steven M. Amundson
Kevin F. Murphy
Mary Ann G. Lemere
**FROMMER LAWRENCE & HAUG LLP**
745 Fifth Avenue
New York, New York 10151
Telephone: (212) 588-0800

— 41 —

## CERTIFICATE OF SERVICE

I, Karen L. Pascale, Esquire, hereby certify that on April 5, 2010, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification of such filing to the following counsel of record:

> Mary B. Graham [mgraham@mnat.com]
> MORRIS, NICHOLS, ARSHT & TUNNEL LLP
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE 19801

I further certify that on April 5, 2010, I caused a copy of the foregoing document to be served by e-mail on the above-listed counsel and on the following non-registered participants in the manner indicated:

> ### By E-Mail
>
> William F. Lee [william.lee@wilmerhale.com]
> Vinita Ferrera [vinita.ferrera@wilmerhale.com]
> Christopher R. Noyes [cristopher.noyes@wilmerhale.com]
> Wyley S. Proctor [wyley.proctor@wilmerhale.com]
> WILMER CUTLER PICKERING HALE AND DORR LLP
> 60 State Street
> Boston, MA  02109

YOUNG CONAWAY STARGATT & TAYLOR LLP

*/s/ Karen L. Pascale*

Karen L. Pascale (#2903) *[kpascale@ycst.com]*
Megan C. Haney (#5016) *[mhaney@ycst.com]*
The Brandywine Building
1000 West St., 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone:  (302) 571-6600

*Attorneys for Defendants, Lupin Limited and Lupin Pharmaceuticals, Inc.*