```
                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE


ABBOTT LABORATORIES,      )
and ABBOTT RESPIRATORY,   )
LLC.,                     )
                          )
          Plaintiffs,     )
                          ) C.A. No. 09-152(JJF)(LPS)
v.                        )
                          )
LUPIN LTD. and LUPIN      )
PHARMACEUTICALS, INC.,    )
                          )
          Defendants.     )


                          Friday, May 21, 2010
                          1:01 p.m.
                          Courtroom 6C
                          Markman Hearing

                          844 King Street
                          Wilmington, Delaware


BEFORE:  THE HONORABLE LEONARD P. STARK
         United States District Court Magistrate


APPEARANCES:


         MORRIS, NICHOLS, ARSHT & TUNNELL
         BY: MARY B. GRAHAM, ESQ.


              -and-
         WILMER HALE
         BY:  WILLIAM LEE, ESQ.
         BY:  VINITA FERRERA, ESQ.
         BY:  CHRISTOPHER NOYES, ESQ.


              -and-

         ABBOTT LABORATORIES AND ABBOTT RESPIRATORY, LLC
         BY:  JOHANNA CORBIN, ESQ.


                    Counsel for the Plaintiffs
```

1   APPEARANCES CONTINUED:

2

         YOUNG, CONAWAY, STARGATT & TAYLOR, P.A.
3        BY:  KAREN L. PASCALE, ESQ.

4               -and-

5   FROMMER, LAWRENCE & HAUG, LLP
    BY:  KEVIN MURPHY, ESQ.
6   BY:  BARRY S. WHITE, ESQ.
    BY:  JULIE KURZROK, ESQ.

7
                    Counsel for the Defendants
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    THE CLERK:  All rise.  Court is

 2      now in session.  The Honorable Leonard P. Stark

 3      presiding.

 4                    THE COURT:  Good afternoon.

 5                    (Everyone said, Good afternoon,

 6      Your Honor.)

 7                    THE CLERK:  You may be seated.

 8                    THE COURT:  Begin by noting the

 9      appearances on the record, please.

10                    MS. GRAHAM:  Good afternoon, Your

11      Honor.  Mary Graham on behalf of plaintiff,

12      Abbott.  And with me today from Wilmer Hale are

13      William Lee.

14                    MR. LEE:  Good afternoon, Your

15      Honor.

16                    MS. GRAHAM:  And Vinita Ferrera.

17                    MS. FERRERA:  Good afternoon, Your

18      Honor.

19                    MS. GRAHAM:  And Christopher

20      Noyes.

21                    MR. NOYES:  Good afternoon.

22                    MS. GRAHAM:  And Mr. Lee and

23      Ms. Ferrera will be making the presentation

24      today.
```

```
 1                    And also with us are senior

 2      counsel from Abbott, Johanna Corbin.

 3                    THE COURT:  Welcome.

 4                    MS. CORBIN:  Good afternoon.

 5                    MS. GRAHAM:  Thank you.

 6                    THE COURT:  Thank you.

 7                    MS. PASCALE:  Good afternoon, Your

 8      Honor.  Karen Pascale from Young Conaway for the

 9      defendant, the Lupin entities.  I'd like to

10      introduce co-counsel from the New York office of

11      Frommer, Lawrence & Haug.

12                    This is Kevin Murphy.

13                    MR. MURPHY:  Good afternoon, Your

14      Honor.

15                    MS. PASCALE:  Barry White.

16                    MR. WHITE:  Good afternoon.

17                    MS. PASCALE:  And Julie Kurzrok.

18                    MS. KURZROK:  Good afternoon.

19                    MS. PASCALE:  And I'd also like to

20      introduce the head of intellectual property

21      management who is Sophia Montaz.

22                    THE COURT:  Welcome.

23                    MS. PASCALE:  Thank you.

24                    THE COURT:  Thank you, everyone.
```

1    I believe you all inquired of us as to a

2    breakdown of time, and I think we indicated to

3    you we had in mind about an hour and a half per

4    side.  Have the parties conferred as to what

5    order you might like to approach these terms

6    here?

7                    MR. LEE:  Yes.

8                    MR. MURPHY:  Mr. Lee and I have

9    conferred, Your Honor, and Mr. Lee is going to

10   go first and introduce some of the background

11   for the patents.  And I think that's followed by

12   Ms. Ferrera on the oral argument portion, the

13   main portion.

14                    Then it will be followed by our,

15   Lupin's presentation.  And then Mr. Lee will

16   rebut for whatever period of time, and then I

17   will rebut for whatever period of time.

18                    MR. LEE:  We are in agreement, but

19   only one slight modification.  We are going to

20   split an hour and then yield the floor and then

21   try to reserve a half hour for rebuttal.

22                    I'll try to introduce the patents

23   quickly, a little bit of the background, and

24   deal with what we call the formulation claim

1    limitations, most of which rise or fall on this

2    prosecution history disclaimer issue.

3              And then Ms. Ferrera is going to

4    try to, in 15 minutes, address the clinical

5    limitations and the about limitations.  And

6    we'll get that done in an hour and then yield

7    the floor.

8              THE COURT:  Okay.  And then on the

9    Lupin side, you'll reserve whatever time you

10   want?

11             MR. MURPHY:  That's correct.  It

12   will probably be about ten minutes, if

13   everything goes according to plan.

14             THE COURT:  I appreciate you

15   having worked it out to that extent.  So we can

16   proceed with Mr. Lee.

17             MR. LEE:  Thank you, Your Honor.

18   We have a hard copy of the slides we're going to

19   use.

20             THE COURT:  Okay.

21             MR. LEE:  I'm not going to use

22   them all, --

23             THE COURT:  Okay.

24             MR. LEE:  -- but we'll be able to

1    skip through because they're numbered.

2              THE COURT:  Okay.  Subject to your

3    time limitations, you can show me as many as you

4    like.

5              MR. LEE:  I think in the interest

6    of time limitations, given it's Friday

7    afternoon, I don't think we'll need them all.

8              So if I start on Slide Number 2,

9    Your Honor, and I think this is consistent with

10   what we just described to you.  I will provide

11   the background of the invention itself.

12             I actually will skip the portion

13   called Niaspan patents, because all we did there

14   is, as you go through the patents with

15   representative claims underlying the limitations

16   that were in dispute.

17             I'll move to what we've called for

18   the purpose of collecting all of the terms under

19   all the patents formulation terms.  And then

20   Ms. Ferrera will address the clinical terms and

21   about.

22             If I move to Slide Number 4, as

23   Your Honor knows, this is a Hatch Waxman case

24   that arises from Lupin's filing of the ANDA

1    seeking approval to sell a generic version of

2    Abbott's blockbuster drug Niaspan.  Now, Niaspan

3    is Niacin.  It is extended release tablets of

4    Niacin.

5              It's available in 500 milligrams,

6    750 milligrams and a thousand milligram doses.

7    It is administered once a day at night.

8              Now, without going into all the

9    details, much of which is before Your Honor in

10   some of the declarations we have provided,

11   Niaspan was approved by the FDA on July 19, '97

12   and specifically for the treatment of

13   hyperlipidemia, which for our purposes today I

14   think all we need to say is it's abnormally high

15   bad cholesterol and abnormally low good

16   cholesterol.

17             If I move to the next slide, this

18   isn't just a slight irritant that we're trying

19   to treat here.  The too much bad cholesterol or

20   too little good cholesterol has an effect upon

21   the cholesterol in your arteries.

22             It can result in coronary artery

23   disease, peripheral arterial disease and stroke.

24   So there is a reason that Niaspan has become the

1    blockbuster it has, because it's treating a

2    condition of some importance.

3              Niaspan's effectiveness in

4    reducing bad cholesterol and increasing good

5    cholesterol was known, and no one disputes it

6    was known at the time the inventions were made.

7    But there were -- and I'm going to go into this

8    a little bit -- significant side effects that

9    limited its use.

10              Some of them are quite severe.

11   They were liver damage, hepatotoxicity.

12              Some of them were flushing.  And

13   some of them were what are described in the

14   patent as dangerously high uric acid or glucose

15   levels.

16              Now, in the prior art, and again

17   there's no dispute about that genus, there were

18   immediate release formulations and sustained

19   release formulations.

20              If I could go to the next slide.

21              An immediate release formulation

22   is just what it sounds like.  It was available

23   over the counter.

24              It was typically dosed three or

1    four times a day.  It released all of the

2    Niaspan into the bloodstream immediately, but

3    there were problems.  And the problem was

4    something called flushing.

5                It was an abnormal redness.  It

6    was discomfort.  It was a tingly feeling under

7    your skin.

8                And if you can imagine taking this

9    three or four times a day, about an hour later

10   you would have the flushing side effect.  So

11   you're talking about three or four times a day

12   having a reaction which was undesirable and

13   actually might affect your willingness to take

14   the drug, according to the regime what you're

15   supposed to do.

16               Now, the other version was

17   sustained release, which released it much

18   slower.  And without a doubt it reduced

19   flushing.  It was developed for the purpose of

20   reducing the flushing.  Again, it was typically

21   taken two to four times a day.

22               But it turned out that this

23   sustained release over longer periods of time

24   had even greater problems.  And the problem was

1   liver toxicity also known as hepatotoxicity.

2   And that caused treating physicians some real

3   concerns.

4              So you have immediate release

5   causing flushing.  You have sustained release

6   causing hepatotoxicity.

7              So what is the invention of

8   Niaspan?  And if we turn to Slide Number 10,

9   Niaspan is a Niacin administered once a day in

10  the evening at night.

11             Now, it's not just once a day in

12  the evening at night, but the specification

13  discloses it's once a day at the evening or at

14  night.  And it's a big dose.

15             You have the prior art

16  administering two or three times a day in

17  smaller doses.  The idea that -- the solution to

18  the problem would be to give a single dose at

19  night, but at a much larger dose was both

20  inventive and actually explains the success of

21  Niaspan.

22             It was at night because it enabled

23  the drug to work at a time when actually our

24  rate of cholesterol synthesis in our bodies is

1    at its highest.  It was once a day which helped

2    avoid hepatotoxicity.

3                I think I can show you why in a

4    second.  And the fact that it was at night

5    reduced the flushing problem.

6                Why is that?  Now, this is a

7    confusing chart.  And it becomes particularly

8    confusing because there's something called

9    pathway one and pathway two.  And in fact, one

10   way to think about it, Your Honor, is that

11   pathway two is, in fact, phase one and pathway

12   one is phase two.

13               And what was discovered was the

14   following:  When Niacin, which is in the upper

15   corner of Slide Number 11 is first taken, it

16   first makes its way into pathway number two.

17   That's why I say it's actually sort of phase

18   one.

19               The immediate release Niacin is

20   released obviously entirely immediately.  It

21   goes into pathway two and it saturates that

22   pathway.

23               It becomes fully saturated with

24   the immediate release.  And then it starts

1    moving to pathway one.

2              So you have basically saturated

3    pathway two.  You move into pathway one and

4    that's what causes the flushing.  And that's

5    what has been discovered about Niacin.

6              The alternative, which is

7    sustained release, which releases at more slowly

8    over a longer period of time never resulted in

9    saturation of pathway two.  So you're constantly

10   sending Niacin down pathway two.

11             The problem with that is it

12   results in hepatoxicity problems.  And what the

13   inventors of the patent discovered was there is

14   a sweet spot.  A sweet spot between sustained

15   release intermediate releases.

16             It's called intermediate release

17   and it's formulated to release Niacin more

18   slowly than immediate release, faster than

19   sustained release.  And the end result is you

20   now have a product that can be dosed in a manner

21   that avoids hepatoxicity, avoids flushing, and

22   still gives you the clinical benefits of -- if I

23   move to Slide 13 -- more good cholesterol, less

24   bad cholesterol, total less -- total less

 1    cholesterol.

 2                As a result of this discovery,

 3    Your Honor, Niacin became the first and only FDA

 4    approved extended release Niacin.

 5                Now, I'm going to skip, Your

 6    Honor, from Slide 14 all the way up to Slide 33.

 7    And we'll leave those slides with Your Honor,

 8    but they have in them representative claims for

 9    each of the patents and representative claim

10    terms.

11                And what I'd like to do is move

12    immediately to a group of terms where the

13    parties don't fundamentally disagree except in

14    one or two instances about what the plain

15    meaning of the term is.  The question is whether

16    the terms should be interpreted to have in

17    addition not containing and internal hydrophobic

18    component added on to the claim.

19                And if I go to Slide 34, we've

20    tried to capture the dispute.  And Lupin may

21    disagree in the way we've characterized it, but

22    I think we've done it accurately, which is

23    whether this collection of terms, oral solid

24    dosage form, sustained release composition, oral

1       sustained release solid dosage form,

2       intermediate release nicotinic acid formulation

3       and dosing, and we've put the patent numbers

4       from which those claim terms emerged, whether

5       they should be construed there for their plain

6       meaning, plus to exclude an internal hydrophobic

7       component.

8               Our argument, as summarized on

9       Slide 35, follows the regime Your Honor has

10      followed in many Markman decisions.  And it is

11      that the formulation patents don't on their face

12      exclude this internal hydrophobic component.

13              If we go through the claim terms,

14      they do not.  If we go through the

15      specification, they do not.

16              And in fact, the claim terms

17      themselves you will see cover internal

18      hydrophobic components, even as Lupin's

19      described them.  The specification covers

20      internal hydrophobic components.

21              The real dispute between us, I

22      think, turns on the question of whether, even if

23      you look at the plain meaning of the claim, even

24      if you look at the specification, somehow what

1      occurred during the prosecution history of two

2      of the patents resulted in a disclaimer.

3              And we would suggest -- and again,

4      I don't -- we're not going to agree to know that

5      if we look at the law on disclaimer and we look

6      at the context in which these occur, and I think

7      that's critically important, there is no

8      disclaimer.

9              Now, I'm going to start, Your

10     Honor.  Here, I'm going to divide up the

11     patents.  I'm going to start on Slide 36 with

12     the '428 and '930 patents.

13             THE COURT:  I'm sure this will

14     become clear to me, but let me get the answers

15     upfront here.  Other than the prosecution

16     disclaimer argument, is it Abbott's view that

17     this issue of whether you exclude the internal

18     hydrophobic, I need to decide that once or do I

19     need to decide it seven times?

20             That is, is the analysis going to

21     be the same across all of the patents with the

22     exception of I understand there's separate

23     prosecution history?

24             MR. LEE:  I think, Your Honor, I

1    would break the analysis up into two parts.  I

2    may have 1A and 1B.

3              In the first part, I think you

4    might look at it as to the '428 and '930 patents

5    where there actually is prosecution history

6    that's relevant to this fight between us.

7              Then you might look at the other

8    five separately, because there is no prosecution

9    history.  It's just an infection question.

10             So that issue would be predicated

11   upon whatever Your Honor found as to the earlier

12   patents, but it still would have a separate

13   legal and factual issue of:  Do you find that

14   the claim terms are sufficiently identical that

15   there's going to be infection under the Federal

16   Circuit's cases?

17             And then if I go back to the first

18   two, I say 1A and 1B, because I think it's

19   important to remember what Lupin's really urging

20   you to find is an internal hydrophobic

21   component.  But one of -- the prosecution

22   history, it's just hydrophobic component.

23   There's nothing about internal.

24             The second, there is.  And so I

1     think you have to look at them a little.  You

2     have to look at them at least separately for

3     analytical purposes, because the fact that

4     you're being urged to adopt a claim

5     interpretation that adds a limitation that I

6     think we all agree is not expressed in the

7     claims or in the specification.

8                    And it has three words, internal

9     hydrophobic component.  It does become relevant

10    that the word internal doesn't appear in one of

11    the file histories.

12                    So if I turn to Slide 37, Your

13    Honor, the next two slides just pick out

14    examples of the differences in our claim

15    interpretation.  So I put on Slide 37 oral solid

16    dosage form.

17                    And I think Your Honor can see

18    that we're fundamentally close on agreement.

19    It's just the phrase not containing an internal

20    hydrophobic component.

21                    If I turn to Slide 38, too, for

22    the '930 patent, we're close, but there's a

23    phrase not containing an internal hydrophobic

24    component.

```
 1              And on Slide 39, we see the same

 2    in the '930 patent on Claims 51 and 115.  So if

 3    I start at Page 40, Slide 40, I'm going to go

 4    through, Your Honor, just the Phillips'

 5    discipline of claims specification and

 6    prosecution history, but focusing principally on

 7    the prosecution history.

 8              So if we start with claims, which

 9    is what Phillips says we have to do and we look

10    at the '428 and '930 formulation terms, and I'm

11    now on Slide 41, the patent terms claim oral

12    dosage forms sustained release composition

13    without any limitation to internal hydrophobic

14    components.

15              So that is a starting point.  I

16    don't think there's any real disagreement

17    between us.

18              On Slide 42, we can look at Claim

19    18 and Claim 34 of the '930 patent.  It's the

20    same.

21              Now, I think importantly, Your

22    Honor, if you accept Lupin's disclaimer

23    argument, you will nullify -- actually nullify

24    certain dependent claims.  You have to read the
```

1  dependent claim in a way that is inconsistent

2  with the dependent claim.

3  And let me give you an example.

4  If I turn to Slide 44, there's a dependent Claim

5  9, and it's on the screen now.

6  And it says a method, as set forth

7  in Claim 8, wherein said lubricating agent is

8  selected from the group consisting of stearic

9  acid and magnesium stearate.

10  I don't think there's any

11  disagreement that stearic acid is well known in

12  represented hydrophobic components.  So this is

13  a dependent claim that says you can have the

14  method of Claim 8, but the lubricating agent,

15  which can be internal to the tablets, it can be

16  intragranular or not -- there's nothing that

17  limits it in the claim, can be a hydrophobic

18  component.

19  So if you were to accept Lupin's

20  construction, the claim interpretation would be

21  a method using a composition that excludes a

22  hydrophobic component wherein said lubricating

23  agent is selected from a hydrophobic component.

24  It's a little bit like interpreting a claim to a

1    car with wheels to be a car without wheels that

2    has wheels.

3                And that's why interpreting the

4    claims concludes this disclaimer would result

5    in, we suggest, illogical interpretation of the

6    dependent claim terms.

7                The same is true on Slide 45,

8    which are Claims 10, 26 and 41.  And again, the

9    key here, Your Honor, is that ethylcellulose and

10   stearic acid are without a doubt hydrophobic

11   components.

12               And Your Honor, I think in the

13   specification, hydrophobic components can

14   perform two purposes.  One is they're described

15   as a lubricating agent, which can be used to

16   help the manufacturing process along.

17               The other, as Dr. McGinity

18   explains in his declaration, you have

19   hydrophilic and hydrophobic components when

20   you're trying to come up with the sweet spot,

21   which what you want to do is get release of the

22   drug calibrated correctly.

23               And as he explained, it's a

24   combination of hydrophilic and hydrophobic that

1    collectively can be used by the person of

2    ordinary skill to hit a sweet spot.

3              So you have ethylcellulose.  You

4    have stearic acid specifically in the claims, in

5    the dependent claims.  And so just starting with

6    the claims and nothing else, their claim

7    interpretation would be a method of using a

8    composition that excludes a hydrophobic

9    component uses a hydrophobic component.

10             Now, if we turn to the

11    specification on Slide 46, that's the second

12    part of the analysis.  And the specification,

13    Your Honor, is similar.

14             But if I start at Slide 47, we

15    start with what I think is an important claim.

16    The specification itself says, and we recognize

17    that this is boiler plate to some degree, but it

18    says, thus, the scope of the invention shall

19    include all modifications and variations that

20    may fall within the scope of the attached

21    claims.

22             That becomes important in this

23    context if you view the discovery, the invention

24    here of the solution to the problems of

```
 1     immediately and sustained release formulation

 2     and the dosing of once a day at night with large

 3     amounts, two or three times, what anybody

 4     thought would be given in single dose before.

 5               And if we read the specification,

 6     we'll find that the exclusion or the addition

 7     that would exclude that Lupin's urged upon Your

 8     Honor would actually be inconsistent with the

 9     specification.

10               So if we go to Slide 49, Your

11     Honor will find a portion of the '428

12     specification, the '930 specification and this

13     portion specifically describes and the use of

14     hydrophobic components.  Again, I'm going to

15     read it off from here because my 60-year eyes

16     are not so good off the little one.

17               Preferably there is also included

18     in the sustained release composition, according

19     to the present invention, a swelling agent.  And

20     then as you move down, it says polymers such as

21     and you will find ethylcellulose and bees wax.

22               So what Lupin asks you to exclude

23     are precisely things that are identified as

24     capable of being used in the preferred
```

1      embodiment.  Now, Your Honor, we're not going to

2      suggest even for a second that hydrophilic

3      components aren't referred to, that hydrophilic

4      components aren't important.

5                  And that the preferred

6      embodiments, and this Your Honor you'll

7      recognize, sometimes there are labels in patents

8      that say the preferred embodiment.  This said

9      preferred embodiments plural do refer to

10     hydrophilic components, but hydrophobic

11     components as well.

12                 Now, the specification refers to

13     bees wax, refers to ethylcellulose.  It also

14     refers to stearic acid which we've talked about

15     before.

16                 And this is, again, in both the

17     '428 and '930 patents.  And again, this is a

18     hydrophobic component.

19                 The specification, though, goes

20     even further.  It tells you that these

21     ingredients can be mixed together or compounded

22     together to form the tablet the patient takes.

23                 So I'm now on Slide 51.  And we

24     have a quote again from the two specifications

1      referring to Table 1.

2                  Table 1 identifies stearic acid.

3      No doubt that it's a hydrophobic component.

4                  And the sentence that follows

5      immediately Table 1 is the ingredients were

6      compounded together to form a tablet.  Now, I

7      think if we stopped with the claim language of

8      the independent claims and the dependent claims

9      and the specification, it would be very hard to

10     make the argument on the exclusion.

11                 So that's why I think the focus

12     becomes on the prosecution histories.  And

13     that's why, Your Honor, I think I divided them

14     into the two categories, 1A, 1B category two,

15     because prosecution disclaimers are very

16     dependent upon the facts of that prosecution.

17                 THE COURT:  Before we move onto

18     prosecution history, --

19                 MR. LEE:  Sure.

20                 THE COURT:  -- what is your

21     understanding of the relationship between

22     swelling agents and lubricants as far as the

23     specification is concerned?

24                 MR. LEE:  A swelling agent is

1       something that actually helps with the sustained

2       release.  A lubricant is something that helps in

3       the manufacturing process.

4                    A single component -- and a

5       hydrophobic component and a hydrophilic

6       component can strike the right balance on the

7       swelling.  Something like stearic acid can be

8       used both as a lubricant and as a hydrophobic

9       component that becomes the hydrophilic

10      component.  Dr. McGinity describes that in his

11      declaration.

12                   THE COURT:  And the relationship

13      between internal and external or intragranular

14      and extergranular, how do they relate to

15      swelling agent and lubricant?

16                   MR. LEE:  Your Honor, let me say

17      these three things.  First, if I focus on

18      internal hydrophobic component, that internal

19      hydrophobic component is obviously nowhere in

20      the specification or the claims of this patent.

21                   In fact, if you go back to the

22      O'Neill patent, which I'm going to get to now,

23      which is the source of this, it's not really in

24      there.  It's in the parent to O'Neill.  The

1    Evershed patent without any definition at all.

2    So, that's number one.

3              Number two is if it means internal

4    not external, if I look at the slide that's on

5    the screen right now, 51, it says that stearic

6    acid can be compounded together to form a

7    tablet.  And that would say that a hydrophobic

8    component can be used for that purpose.

9              That is consistent with the

10   meaning that Dr. McGinity says one of ordinary

11   skill in the art would have for the concept of

12   internal.

13             Third point, if I go to the next

14   level down and say, Well, it's got to be

15   intragranular, whatever that precisely means.

16   And there is a reference to intragranular.

17             If you look at the specification,

18   the prosecution histories of these patents and

19   consider all the different references, bees wax,

20   et cetera, ethylcellulose, stearic acid and to

21   focus upon the reference as the dosing machine,

22   there is nothing that would prohibit it and

23   there's nothing that precludes making

24   intragranular when you make the compounded

 1       composition of the tablet.  And I think that

 2       would be our response and it's sort of going

 3       from most general to most specific.

 4               If I go to Slide 53, we know the

 5       Court is familiar with this law, but let me just

 6       say two things.  Two things broadly.

 7               The disclaimer, if there is one,

 8       and we suggest there's not, needs to be clear

 9       and unmistakable.  And it needs to be clear and

10       unmistakable because the Federal Circuit has

11       recognized when you get these prosecution

12       histories that are sometimes several hundred

13       pages long and there's a back and forth over

14       time, it is sometimes harder to determine

15       precisely what is being said by whom.  And,

16       therefore, it needs to be clear and unequivocal.

17               Second point is there are two

18       types of prosecution history disclaimers.  And

19       it's important to break it down into those two

20       categories.

21               And I'm going to move to Slide 55.

22       And we suggest that it's important to consider

23       those because we're in the second category which

24       requires it to be clear and unequivocal, but

 1        also tied to or addressing disputed terms.

 2                   The first type of prosecution

 3        history disclaimer, Your Honor, is where you're

 4        amending to that specific claim, and so there's

 5        no doubt to anybody in the world what you're

 6        doing to the claims.

 7                   And then what you're saying about

 8        those amendments might educate the process.

 9        That's not what we're doing here.

10                   They're saying that, no, there

11        weren't claim amendments, but there are

12        arguments made.  But the Federal Circuit has

13        said and this Court has said correctly, if

14        you're going to do that, it can't be discussions

15        about the invention in the abstract or in

16        general.  You need to tie it to the specific

17        claim terms.

18                   That becomes important, Your

19        Honor, because you think about what you're being

20        asked to do.  Go back to Your Honor's first

21        question about:  Are you being asked to make one

22        decision or multiple decisions?

23                   You're being asked to read this

24        negative limitation into a host of claim terms,

 1     all or many of which are different.  And that's

 2     why this second principle of law becomes

 3     important.

 4              Now, we would suggest that it's

 5     very important to consider the context in which

 6     the claim terms, the statements in the

 7     prosecution were made.  And if I move the Court

 8     to Slide 57.

 9              Here is a place where we do start

10     to disagree and to part on what we've

11     represented to the Court.  And this focuses on

12     the O'Neill patent.

13              There is a suggestion that the

14     O'Neill patent was distinguished as prior art.

15     What happened, Your Honor, is O'Neill was

16     Section 102(e) prior art.

17              If you're Section 102(e) prior

18     art, the patent applicant can swear behind it by

19     filing a Rule 131 declaration.  And if you swear

20     behind it, for purposes of the Patent Office,

21     it's not prior art any longer.  You're the first

22     inventor, so the 102(e) is not prior art.

23              That becomes important here

24     because that's a fundamental place where we have

```
 1    characterized this differently to Your Honor.

 2    And what happened in this case, and we can see

 3    it on Slide 58 in the '428 application file

 4    history.  And I should say, Your Honor, while we

 5    recognize this District Court's reluctance to

 6    have patent experts generally and historically,

 7    we haven't offered Mr. Stoner for the purpose of

 8    having him reach legal conclusions, but to

 9    explain instead the context.

10              And I think two things are

11    important.  He was the chief judge of the Patent

12    Board of Appeals and Interferences.

13              And secondly, there's been no

14    rebuttal declaration before you to explain the

15    circumstances in which it arose.  And there's a

16    reason.  We would suggest to you that it's

17    pretty clear.

18              On Slide 58, you'll see the

19    examiner writing applicant has overcome the

20    102(e) objection over the O'Neill patent.  It

21    appears to the examiner that applicant and the

22    patentee are claiming the same subject matter.

23    In such circumstances, interference is in order.

24              So, what are they saying?  They're
```

```
 1    saying, Here's O'Neill.  It's 102(e) prior art.

 2    You have successfully shown that you have an

 3    invention date before it.  But the inventions

 4    look similar enough that maybe an interference

 5    is required.

 6              Now, if I could ask Mr. Noyes to

 7    skip to Slide 80.  We'll just put it up and

 8    we'll come back to it.

 9              This becomes important for this

10    reason.  If I could approach the screen, Your

11    Honor?

12              THE COURT:  You may.

13              MR. LEE:  If you look at the '428

14    application, you will see that there is a moment

15    in time when the 102(e) rejection is overcome

16    because there has been a swearing behind.  Then

17    all of the responses that Lupin is relying upon

18    occur after that at a time when the question is:

19    Is there interference or is there not?

20              In the '930, the same thing

21    occurs.  O'Neill is overcome.

22              The question is:  Is there an

23    interference?  And then all of the events that

24    Lupin relies upon occur after that.
```

```
 1              That becomes important, Your
 2   Honor, because if we go back to Slide 59, the
 3   question becomes:  Should interference be
 4   declared or not?
 5              And there's a two-way test. It's
 6   articulated in a case called Eli Lilly from the
 7   Federal Circuit.  I actually happened to have
 8   argued the case.
 9              And it's a two-way test.  It says
10   if you've got two claims, you have to
11   demonstrate both, that A, it's not anticipated
12   and obvious by B; and B, it's not anticipated or
13   obvious by A.
14              And the argument made to the
15   Patent Office was it doesn't work either way.
16   Right.
17              The two-way test doesn't work.
18   And fundamentally one of the reasons it doesn't
19   work here, Your Honor, is that unlike the Lilly
20   case itself, which was comparing either a CDNA
21   sequence to another sequence or -- and I'm going
22   to come back to this -- an ADNA sequence to a
23   genus of CDNA sequence.
24              Here we have a very specific
```

1    composition.  O'Neill, that happens to have two

2    to 20 percent hydrophobic component.  And a

3    dosing regime that's not specific to the

4    composition.

5              So, Your Honor, if I turn to Slide

6    61, and I am going to go through these quickly.

7    If I can say this, let me say this broadly, Your

8    Honor, so that I can be sure that I yield the

9    floor to Ms. Ferrera in time.

10             In the next 30 slides or so what

11   we do is we go through each of the portions of

12   the file history that Lupin relies upon.  And I

13   think what Your Honor will see is that read in

14   context, what the applicant is doing is trying

15   to apply the two-way test and trying to

16   demonstrate that the two-way test is not

17   satisfied.

18             And what they say over and over

19   again is O'Neill is composition specific.  It

20   requires a specific composition.

21             Our invention is not specific.

22   It's not composition specific.

23             Therefore, the specific

24   composition of O'Neill is not anticipated or

```
1    obvious in light of our broad genus of

2    compositions that can be administered once a day

3    at night.

4              Nor, in reverse, is our invention

5    of this once a day at night dosing regime

6    obvious in light of O'Neill's very, very

7    specific composition.

8              THE COURT:  And so it's important

9    that we keep in context that the context is

10   whether there's going to be an interference, but

11   it is still relevant prosecution history.

12             You accept that?

13             MR. LEE:  I do.  I do accept that.

14             We do accept that, and we're not

15   suggesting that because it's in the context of

16   an interference, you couldn't make a prosecution

17   disclaimer.

18             What we're saying is instead this:

19   We're saying that when you consider that it was

20   in that context, and you consider the fact that

21   the two-way test was what was an issue, then the

22   statements that went back and forth about what

23   O'Neill required, didn't require and what our

24   invention required and didn't require make good
```

```
 1    sense.

 2                    And, you know, to be sure, Your

 3    Honor, there are some statements that say there

 4    is no hydrophobic component.  But there are

 5    answers, as Your Honor will see, that there's no

 6    requirement of a hydrophobic requirement in

 7    ours.

 8                    And there's --

 9                    THE COURT:  The legal regime is

10    not any different.  It still has to be clear and

11    unmistakable.  It has to be on point, but -- and

12    it's relevant.

13                    MR. LEE:  Right.

14                    THE COURT:  But the context you

15    think goes to analyzing what the substance and

16    what they're saying is and whether or not it is

17    meeting that standard?

18                    MR. LEE:  That's exactly correct.

19    I mean, I think the three legal standards that I

20    articulated are or tried to summarize are still

21    the right standards.  I think when the Federal

22    Circuit says to look at the prosecution history

23    in its entirety, you have to look at the context

24    in which the statements are made.
```

```
 1              The fact that this is in an

 2    interference context becomes part of that

 3    context.  The fact that they're applying the

 4    two-way test is important, and the fact that

 5    consistently throughout the prosecution history

 6    the statements that are made by the applicant

 7    fall into two categories.

 8              They say O'Neill is composition

 9    specific.  We are not.  That's category number

10    one.

11              The second is O'Neill requires an

12    internal hydrophobic component.  Hydrophobic

13    component actually at two to 20 percent.  We do

14    not.

15              Now, there's a difference between

16    requiring a hydrophobic component and not having

17    it be the central.  And that's the point that in

18    the next series of slides is consistently made.

19              Let me address two points on these

20    slides without going through them, all that I

21    think address claims that Lupin has made.  Lupin

22    focuses on the fact that at one point in time at

23    the examiner's urging, and maybe we could go to

24    those slides, we added claims that would have
```

1    covered -- so if we go to Slide Number 72.  This

2    occurs in the '930 patent prosecution history,

3    Your Honor.

4              And without a doubt, there is a

5    discussion between the examiner and the

6    applicant about the possibility of arguing the

7    claims that have expressly this negative

8    limitation.

9              If I go to Slide 73, in fact, the

10   applicant proposed claims in group one that had

11   the negative limitation, but also proposed group

12   two, group three, group four that did not.

13             Turning to Slide 74, Your Honor,

14   what happened was those claims got rejected and

15   were ultimately cancelled.

16             Now, Your Honor, if those claims

17   had issued as the examiner suggested they might,

18   and you accepted Lupin's prosecution disclaimer

19   argument, the other three categories of claims,

20   many of which did issue, would have precisely

21   the negative limitation that was cancelled.  And

22   we would suggest that doesn't make much sense.

23             Second point is this:  Lupin says

24   to Your Honor, Well, wait a minute.  Wait a

```
 1    minute.

 2                    If there is insufficient support

 3    for the negative limitation, how can you claim

 4    that your dosing claims cover a composition

 5    without excluding an internal hydrophobic

 6    component?  And the answer, Your Honor, is in

 7    the Lilly case.  And if we draw the Court's

 8    attention to Page 1271 and 72.

 9                    You will see in the Lilly case,

10    Your Honor, that what happened was initially in

11    the interference context a comparison to 1 CDNA

12    sequence against another and the finding in two

13    different patents.  And the finding was they're

14    two different sequences.  Two-way test isn't

15    satisfied.

16                    Another argument was made by Lilly

17    that said, Well, wait.  Wait.  The first is just

18    a particular sequence.  The second is a group of

19    sequences.

20                    Maybe the test is satisfied.  And

21    of the pages that I just brought to Your Honor's

22    attention, you'll see that the Court said no.

23                    When you apply the two-way test,

24    you could have what I think Your Honor knows
```

1    is -- it's a genus claim which covers a big

2    group.  And, in fact, the words used in Lilly at

3    the bottom of 1271 is the vast number

4    potentially encompassed by the broad claim.

5    Then there was individual CDNA sequence.

6              There was no doubt that that

7    individual CDNA sequence was one of that broad

8    groups.  But the patent in the broad group

9    didn't specifically identify it.

10             The genus is patentable, but the

11   species -- the specific example that had not

12   been identified in the first is also patentable.

13             And that's why you'll see the

14   two-way test wasn't satisfied.  That's also why

15   in our particular case we have broad claim to a

16   dosing regime of any composition can have an

17   internal hydrophobic component.

18             It cannot.  And it would cover

19   what they're describing.

20             But because we didn't specifically

21   claim the specific example excluding an internal

22   hydrophobic component, we weren't entitled to a

23   claim that specifically had that negative

24   limitation.

1            Last point, Your Honor, and I'm

2     going to timely cede the floor to Ms. Ferrera.

3     Can I go to Slide 84?

4            The question for the patents '715,

5     '967, '691 and '229 patents, Your Honor, is

6     this:  Are they somehow infected by a

7     prosecution disclaimer that occurred in the

8     earlier patents?

9            And as a legal matter, and as a

10    factual matter, we would suggest, Your Honor, we

11    have suggested the answer is no.  If I could go

12    lastly to Slide 88.

13            If you're going to have

14    disclaimers in patents one and two infect

15    patents three, four, five and six, the Federal

16    Circuit has said you ought to have the same

17    limitation or substantially the same limitation.

18            The arguments ought to be directed

19    at the same limitation or substantially the same

20    limitation.  And if the patents use different

21    language, you can't have this infecting

22    prosecution disclaimer.

23            The reason, Your Honor, this is

24    important and the reason that the argument we've

1    made to you that you have to find a claim term

2    to tie the clear and unequivocal disclaimer to

3    is this:  It doesn't have it in this prosecution

4    history.  It's not tied to dosing.

5              It's not tied to intermediate

6    release formulation.  And there's a reason why.

7              All of those statements were made

8    to deal with the two-way test for interference

9    purposes.  That's why it's not tied specifically

10   to a claim limitation.  That's why there's no

11   disclaimer and there certainly is no infectious

12   disclaimer moving downstream.

13             And with that, I'll turn the

14   podium over to Ms. Ferrera to talk about what

15   we've dubbed the clinical terms and about.

16             THE COURT:  Okay.

17             MS. FERRERA:  Good afternoon, Your

18   Honor.  Your Honor, I'll start briefly with the

19   clinical terms.

20             And this category of terms

21   basically refers to several terms that relate to

22   the inventions desired to avoid harmful side

23   effects such as hepatoxicity, and uric acid and

24   glucose increases as Mr. Lee referred to earlier

1    in his summary of the background of the

2    invention and the problems with some of the

3    prior art sustained release products.

4               And in addition, there are terms

5    related to the desire of the inventors to

6    capture the benefits of Niacin products in terms

7    of their ability to significantly increase HDL,

8    the good cholesterol.  And so there's a category

9    of terms that generally fall into those two

10   categories.

11              If I can turn to Slide 99, Your

12   Honor, I think you will see that that summarizes

13   generally the proposition and the principles

14   that are at issue here.  The key issue is

15   whether or not it is appropriate or necessary to

16   read into any of these claim terms specific

17   numerical thresholds that the parties agree are

18   not in the claims.  They're not in the

19   specifications and they're not in the

20   prosecution history.

21              Abbott's position, of course, is

22   that it is not proper and it is not necessary.

23   It's not proper because in doing so, Lupin

24   ignores both the requirement of several of the

1    claim terms as well as the overall objective of

2    the invention, which was to avoid

3    treatment-limiting side effects and to avoid

4    having to discontinue treatment as a result of

5    those side effects.

6              And when you -- if you were to

7    adopt Lupin's claim construction, that

8    limitation and that requirement would really be

9    eviscerated.

10             And it's not necessary because a

11    person of ordinary skill in the art would

12    understand how to apply these terms even without

13    a specific numerical limitation.  That is, Lupin

14    urges you to adopt based on their training,

15    their experience, their qualifications exactly

16    the things that make them people of ordinary

17    skill in the art.

18             THE COURT:  Now, of course,

19    there's a dispute here between who is a person

20    having ordinary skill in the art.  And as I

21    understand it, the law is evidently that that's

22    a factual dispute and I'm not supposed to

23    resolve on claim construction.

24             But somehow I'm supposed to decide

 1     what that person would think if they read this

 2     patent.

 3                    MS. FERRERA:  Your Honor, I think

 4     that the parties are actually in agreement in

 5     terms of the general broad definition who a

 6     person of ordinary skill in the art is.  It

 7     could be either a formulator or a

 8     pharmacologist, or when we're talking about the

 9     treatment-limiting terms and the clinical terms,

10     doctors, the people that administer the drug and

11     the people who have the opportunity to observe.

12                    THE COURT:  Isn't that the issue?

13     How would a formulator have the skill to assess

14     the treatment-limiting terms?

15                    MS. FERRERA:  Your Honor, I think

16     there are guide posts that are known to people

17     of ordinary skill in the art.  And in fact, one

18     of those guide posts is the one that Lupin wants

19     to actually read into the claim terms and the

20     claim limitations.

21                    And that, for example, is that for

22     liver enzymes, one guide post is three times the

23     upper limit of normal.  People of ordinary skill

24     in the art are aware of that.  That is a general

1    principle.

2              But the dispute here is whether or

3    not that's a hard and fast rule that should

4    apply in all circumstances.  And because we're

5    treating patients here, we're not treating

6    machines or robots, obviously, there are going

7    to be individual circumstances that dictate

8    whether or not that limitation is met for a

9    particular patient.

10             And that's what clinicians and

11   people of ordinary skill in the art recognize

12   and are able to assess.

13             THE COURT:  Is it Abbott's view

14   that I do not have to decide the identity of the

15   person having ordinary skill in the art for

16   purposes of claim construction?

17             MS. FERRERA:  Your Honor, I don't

18   think you have to decide -- no.  I don't think

19   you have to decide that.

20             I think that the parties for this

21   purpose, the parties' definition are generally

22   similar enough that that issue should not --

23   this issue should not rest on the definition of

24   the person of ordinary skill in the art.

```
 1                     The claim terms that are at issue

 2      here very generally, Your Honor, are if we could

 3      turn to Slide 100, treatment-limiting

 4      hepatoxicity that appears in claims of the '930

 5      patent and the '967 patent, which would require

 6      use of the formulation to be discontinued.  And

 7      that is extremely important language.

 8                     And similarly, if you turn to the

 9      next slide, Slide 101, the '930 patent and the

10      '967 patent seek to avoid either abnormalities

11      or treatment-limiting elevations in uric acid

12      glucose.  Again, which would require treatment

13      to be discontinued.

14                     And if we turn to Slide 104,

15      again, this is a representative claim from the

16      '930 patent.  And the claim language is very

17      clear that it's not just any elevation in

18      hepatotoxicity, or any elevation in uric acid or

19      glucose that's important.  It's a

20      treatment-limiting limitation that requires the

21      treatment to be discontinued.

22                     And this is important.  This is

23      reinforced by the specification.

24                     If we turn to Slide 105, for
```

1    example, in describing both the prior art as

2    well as the invention, the inventors focused

3    heavily on the fact that in the prior art,

4    individuals were forced to withdraw from

5    treatment because of elevations, and liver

6    function and liver enzymes, whereas with the

7    invention, there was no -- there were no

8    patients that had to withdraw from treatment.

9            There's nothing in the

10    specification that says that the levels of the

11    liver function increases that occurred in the

12    prior art or that didn't occur with the

13    invention.  The focus is on the outcome, whether

14    or not people were required to withdraw from

15    treatment or to have treatment discontinued.

16            Now, if we turn to Slide 106.

17            Lupin's construction is drawn from

18    the tables in the patents that describe the

19    results of some of the clinical studies.  And in

20    particular, they rely on the reference ranges

21    that are identified in those tables relating to

22    liver enzymes, increases in uric acid and

23    increases in glucose.

24            And essentially what Lupin does is

1    they take the upper limit of the reference

2    range, and in the case of uric acid and glucose,

3    they say that's the threshold.  And in the case

4    of the liver enzymes, they say it's three times

5    that and that's the threshold.

6              The problem is that those

7    reference ranges can't be determinative.  First

8    of all, the inventors never said that they

9    intended them to be determinative.  And if you

10   look at the specification, it just doesn't make

11   sense because in some cases and in several

12   cases, there were individuals who had elevations

13   that were above the upper threshold and they

14   were not forced to withdraw.

15             They did not discontinue

16   treatment.  Given that that was the objective of

17   the invention and given that the claims, in some

18   cases the claims specifically require

19   discontinuation of treatment, it makes no sense

20   to rely on the reference ranges to determine

21   what that claim term means.

22             And in addition to that, Your

23   Honor, Lupin's own expert, Dr. Wharton,

24   acknowledges that the three times the upper

1   limit of normal, for example, in the case of

2   liver enzymes is not determinative.  He himself

3   says that he would discontinue treatment for

4   some patients if two and a half times the upper

5   limit of normal.

6                 So even Lupin's expert recognizes

7   that three times the upper limit of normal or

8   the upper end of the reference range is just a

9   guide post.  It's not a hard and fast rule that

10   applies in all circumstances.

11                 And with respect to the

12   prosecution history, Your Honor, if we turn to

13   Page 109, you can see that the inventors also

14   made this clear in their discussion of the

15   significance of the reference ranges during

16   prosecution.  And this is an excerpt from, I

17   believe, the '715 patent file history, Your

18   Honor, in which the reference -- the inventors

19   specifically said that the reference ranges are

20   not hard and fast, that they represent normal

21   ranges, but that they vary at times due to a

22   variety of factors including, in this case,

23   differences between laboratories.

24                 But they can also vary based on

```
1    age.  They can vary based on gender.  They can

2    vary based on the patient's medical history.

3              So it's clear that the reference

4    ranges cannot be the basis for imposing the

5    treatment limiting on those claims.

6              Now, if we turn to Slide 119, Your

7    Honor, there are some other terms that don't

8    specifically incorporate the language regarding

9    treatment limiting or discontinuation of

10   treatment.  But I think the same principles that

11   apply to those terms also apply here.

12             Lupin admits that under the

13   construction of these claim terms, there would

14   be patients, including patients that are

15   identified in the studies that are part of the

16   specifications who would have increases in liver

17   enzymes, uric acid or glucose that exceed the

18   thresholds that Lupin's proposing.  And yet, and

19   therefore, they would be deemed to have serious

20   liver damage or they would be deemed to have

21   uric acid or glucose problems.

22             But yet, they would not be

23   discontinued from treatment.  And that just

24   makes no sense, given the objective of the
```

1      invention as spelled out in the specification

2      that the inventors wanted to avoid exactly that

3      scenario.

4             THE COURT:  What about the idea

5      that the claim language itself is of most

6      importance?  How could I find that claims that

7      do recite treatment limiting have the very same

8      meaning as claims that recite little or no

9      damage or minimal liver damage?

10     How could it be that the inventor

11     really intended for all those different words to

12     mean the very same thing?

13            MS. FERRERA:  Well, Your Honor,

14     certainly the claim terms are always supposed to

15     be interpreted in light of the specification.

16     And here the specification makes the objective

17     to avoid treatment-limiting side effects clear.

18     But in addition, that the

19     principle of claim differentiation, which is

20     what Lupin articulates in its brief and appears

21     to be the primary driver for the different

22     construction offers here, applies to different

23     claim terms that appear in the same patent.

24     The terms that we're talking about

1      here are claim terms that appear in different

2      patents from the treatment-limiting terms that

3      we looked at earlier.

4                  So there's no prohibition on

5      interpreting these terms in a similar fashion to

6      the terms that specifically include the

7      treatment-limiting language.  And I think given

8      the objective of the invention and the

9      statements in the specification to that effect,

10     it makes perfect sense to do so.

11                 And very quickly, Your Honor, I'll

12     also address the language about a significant

13     increase in HDL, which is on Slide 127.  So the

14     issue here, Your Honor, is that in the '848

15     patent, the claim requires a significant

16     increase in HDL cholesterol.

17                 And again, the dispute is whether

18     or not that requires a specific numeric

19     threshold or whether it's something that a

20     person of ordinary skill in the art can

21     understand.  And here, Your Honor, we think the

22     case law is very clear that significant is one

23     of those terms that doesn't require

24     construction.  And in fact, Abbott's initial

1    position is that it doesn't require

2    construction.

3              However, if you were to construe

4    it, we believe that the appropriate construction

5    is substantially increase, which Courts have

6    recognized is what terms of degrees such as

7    significant may mean.

8              Now, I'd like to turn Your Honor

9    to the about terms that the parties also

10   dispute.  And if we go to Slide 133.  I'm sorry.

11   134, Your Honor.

12             Essentially the word about is used

13   in several of the claim terms relating to

14   different types of biopharmaceutical tests that

15   the inventors proposed to use in terms of

16   evaluating or assessing the invention and

17   products that practice these claims.

18             And if we turn to Slide 136, Your

19   Honor, I think you can see what the critical

20   issues here are.  Again, Lupin's position is

21   that it's necessary to impose strict numerical

22   ranges or thresholds for each of these claim

23   terms.

24             However, the Federal Circuit has

1    repeatedly stated that about may be and ought to

2    be construed consistent with its plain and

3    ordinary meaning, unless there is a concrete

4    guidance in the specification that the inventors

5    intended something different.

6              And here, there is no such

7    intention, no such evidence in the

8    specifications if that was the case.  In fact,

9    the inventors are notably silent about it.

10             And I think this is one of those

11   cases where it's clear that if the inventors

12   wanted to include specific numerical

13   limitations, that there's lots of claim phrases

14   in the patent which have thresholds and have

15   numbers assigned to them.  And there are also

16   places in the specification where they list a

17   specific error rate or tolerance that they

18   believe ought to apply.

19             But where they used about, they

20   did that for a reason.  And the Federal Circuit

21   has said that Courts should honor that intention

22   by the inventors and not impose a strict

23   numerical construction.

24             Now, Lupin points out that the

1      about language has to be interpreted in the

2      context of the scientific context of the

3      invention.  And there's no disagreement about

4      that, Your Honor.

5                  But what we're talking about here

6      are tests, as I said, that are used to assess

7      the biopharmaceutical properties of the product.

8      So there's inherent variability in those tests.

9                  They can vary based on equipment

10     that's used, the method that's used, the

11     operator that's doing the testing.  And as both

12     of the experts in this case that addressed these

13     terms acknowledge, that variability is bound to

14     exist.

15                 Lupin, of course, wants to give

16     some certainty to that variability.  That is,

17     the Federal Circuit has stated in the Cohesive

18     case, for example, which is cited on Slide 138,

19     that when about is used as part of a numeric

20     range such as it is in these patents, it's, I

21     think, typically done so to avoid a strict

22     numerical boundary to specify a parameter.

23                 So, Your Honor, we think that the

24     case law is very clear on this.  And the only

1    evidence that Lupin relies on to the contrary is

2    extrinsic evidence.

3              They cite the U.S.P., the United

4    States Pharmacopeia.  But it is extrinsic

5    evidence, which as Your Honor knows is

6    relatively less relevant in cases unless there's

7    some ambiguity with respect to the term.

8              And it doesn't even apply to some

9    of the parameters that we're trying to test

10   here.  It doesn't apply to in vivo parameters.

11   It only applies to in vitro parameters.  And it

12   only applies where you're talking about a listed

13   drug which sustained release Niacin is --

14   subject to the invention is not.

15             So to sum up, Your Honor, Abbott's

16   proposed construction of both the clinical terms

17   as well as the about limitations are appropriate

18   because they give meaning to the objectives of

19   the invention.  And they are consistent with the

20   plain and ordinary meaning of those terms.

21             On the other hand, Lupin's

22   construction is erroneous because it attempts to

23   import numeric limitations into the claim where

24   there's no basis for doing that in the

1    specification.  There's no basis for doing that

2    in the prosecution history.

3              And the inventors -- if the

4    inventors had wanted to include such type of

5    limitations, they would have done so.  And the

6    fact that they didn't is important.

7              THE COURT:  There's one place, at

8    least one place where you, Abbott, cited to the

9    U.S.P.  I think for Niacin specific -- the

10   Niacin specific portion.  And I think what you

11   gave us in the record was a very recent edition

12   or printout from the U.S.P.

13             Is there anything in the record

14   about what that Niacin-specific portion of the

15   U.S.P. would have been at the time that these

16   patents were prosecuted?

17             MS. FERRERA:  Your Honor, I

18   believe that there have been excerpts of the

19   U.S.P. submitted from an earlier time.  And the

20   issue there is whether or not it's a 15-percent

21   tolerance or a 10-percent tolerance.  Abbott's

22   position is it shouldn't be either of those

23   because the U.S.P. doesn't apply, except for the

24   one very narrow circumstance where the inventor

```
1     specifically referred to the U.S.P. for the
2     purpose of defining the apparatus to be used in
3     a certain type of test.
4               And in fact, the fact that they
5     used it for that one purpose and then didn't
6     refer to it anywhere else in the specification,
7     we think again supports Abbott's position that
8     the U.S.P. doesn't apply.
9               THE COURT:  But where the inventor
10    did use it, do we have in our record the
11    specific contemporaneous reference of the U.S.P.
12    at the time that the patentee would have been
13    using it?
14               MS. FERRERA:  I believe it is in
15    the record, Your Honor.  I can find the cite for
16    that in the appendix.
17               THE COURT:  Okay.
18               MS. FERRERA:  But it is just for
19    that one limited place.
20               THE COURT:  And I think you also
21    said that there was -- if I got you right, there
22    are examples of claims in these patents where
23    the inventor, you would agree, does have
24    specific numerical limitations?
```

```
 1                    Let's see if you could give me an

 2        example of those, also.  And if you don't have

 3        it now, we're going to get at least Mr. Lee up

 4        on rebuttal.

 5                    That's fine.

 6                    MS. FERRERA:  Certainly, Your

 7        Honor.

 8                    THE COURT:  Okay.  Thank you.

 9                    Let's turn to Lupin then.  Thank

10        you.

11                    MR. MURPHY:  May it please the

12        Court, Your Honor, we have some additional

13        materials that we thought relevant to Your

14        Honor's claim construction proceeding since the

15        answering brief was filed.  And we've provided

16        that in our binder.

17                    Your Honor, this seems to be a

18        difficult case.  There are 51 claims in dispute.

19        There are many, many claims at issue, but it

20        boils down really to two fundamental claim

21        construction principles.

22                    The first one and perhaps the most

23        important one in this case is that when a

24        patentee goes to the Patent Office and they get
```

1    around the Patent Office's objections, they

2    avoid the interference.  They get the patent

3    claims allowed.  The limitations that they made,

4    the admissions that they made along the course

5    of that journey, they matter.

6         Abbott attempts to walk away from

7    those limitations and we'll go through each of

8    them throughout the course of the prosecution

9    history of the seven patents.

10        Secondly, patent documents are

11    public documents.  They're supposed to give the

12    public notice of what the boundaries of the

13    invention are.

14        Abbott in each case gives us no

15    boundaries.  They leave for another day the

16    question of claim construction, because they

17    want to leave that job to their experts and not

18    to Your Honor.

19        Lupin gives objective balance, the

20    balance that -- the balance the public can

21    understand so accused infringers would know what

22    the boundaries might be during the term of the

23    patent.  And after the expiry of the patent,

24    people will know how to practice the invention.

1          Let's talk about the dosage form

2     limitations.  Mr. Lee has given great detail

3     about the background and you have Mr. Lee's

4     slides about all the items that are at issue,

5     various claim language that's at issue.  So

6     we're going to skip over that.

7          And Mr. Lee is also correct that

8     the dosage form limitations from Lupin's

9     perspective should be construed to exclude this

10    internal hydrophobic component, which Your Honor

11    has identified as possibly intragranular.  We'll

12    talk about that.

13         Abbott wants to encompass that

14    internal hydrophobic component that Kos walked

15    away from during the prosecution of the patents.

16         What is the internal hydrophobic

17    component?  Well, as the intrinsic evidence that

18    is the specification and the prosecution history

19    make clear, hydrophobic, it is a hydrophobic --

20    that is a water repellant component that's

21    intimately mixed with a Niacin.

22         That means before it becomes a

23    tablet in the internal portion in the

24    granulation portion.  That's where the

1      hydrophobic component is mixed.

2                    Take, for example, the '930 patent

3      to illustrate the concept.  The '930 patent

4      provides an example of Niaspan and that's the

5      example, the sole example that runs through

6      every single one of these patents.  It's the

7      only example we have to focus on.

8                    Table 1B in the '930 patent

9      discloses the Niaspan formulation.  And it shows

10     that it doesn't have an internal hydrophobic

11     component.  Here in the intragranular phase, you

12     see that Niacin is present, along with Methocel

13     E10M.  That's a kind of hydroxypropyl pill.

14                   Ethylcellulose, which I'm going to

15     refer to as an HPMC.  And you'll see that that's

16     intragranular and also Povidone.

17                   Now, all of these elements, it's

18     undisputed, are in the intragranular phase.

19     It's important, the internal portion of what

20     eventually becomes the tablets.  The tablet is

21     formed after this additional Methocel E10M is

22     added, which is called extergranular.  And this

23     Hystrene 5016 is added.

24                   This is stearic acid.  And the

1    parties don't dispute that that stearic acid is

2    a hydrophobic component, but it's not internal.

3    It's external.

4                    THE COURT:  And the basis for what

5    you've just asserted that it's not internal,

6    it's external is the underlying reference to

7    intragranular and extergranular?

8                    MR. MURPHY:  That's only one

9    basis.  So if Your Honor looks to the

10   specification, for example, you'll see in Column

11   5, Lines 56 through 59 there's a discussion of

12   this Hystrene 5016 that we see in the

13   extergranular where the orange highlighted area,

14   right here 5016.

15                   And it's called, you'll see, an

16   external lubricant in the Niaspan formulation.

17   Now, Mr. Lee talked about Abbott's expert, Dr.

18   McGinity.  It's our view that Dr. McGinity

19   distorted Lupin's position.

20                   He noted that there are certain

21   excipients, including hydrophobic examples that

22   are added during the initial milling step and

23   will become incorporated into the granules.

24                   Now, that's not for Niaspan.  It's

1    not for what's been disclosed in any of these

2    patents.  That's, in general, for wet

3    granulation.

4              But then he goes on to say that

5    excipients that are added during the mixing step

6    just prior to tablet compression, that is after

7    the granulation phase, will become mixed with

8    the granules and other ingredients and becomes

9    interspersed throughout the tablet matrix.

10             That's simply wrong.  It's not

11   Lupin's position and it's not consistent with

12   the specification here.

13             What we've been provided is the

14   example only of Hystrene 5016 as an external

15   lubricant.

16             Now, the '428 patent was the first

17   patent in the series that was prosecuted.  And

18   again, as we'll see, Kos wanted to make sure

19   that the claims did not cover that O'Neill

20   reference and trigger an interference.

21             THE COURT:  Let me just ask you:

22   Is there more coming on the specification or the

23   claims for your exclusion or is it all

24   prosecution history?

1          MR. MURPHY:  Mr. Lee is correct

2     that the claims themselves don't have that

3     limitation in there, but the specification does.

4     And Your Honor has seen that portion of the

5     specification that we rely on.

6          And, Your Honor, there is no other

7     formulation that's in any of these

8     specifications other than Niaspan.  There's no

9     other alternative form of Niaspan that has an

10    internal hydrophobic component.  And I believe

11    the parties don't dispute that Niaspan doesn't

12    have an internal hydrophobic component.

13          THE COURT:  All right.  And before

14    you move on to prosecution history, just so I'm

15    absolutely clear back at Slide 6.

16          MR. MURPHY:  Yes.

17          THE COURT:  And I think this

18    phrase is in your briefing, too.  You say an

19    internal hydrophobic component is a hydrophobic

20    component intimately mixed with Niaspan in the

21    dosage form regime of granules.

22          I just want to understand:  The

23    only support you can point to in the

24    specification for the hydrophobic component

1   being "intimately mixed" is what you've just

2   shown me on the screen?

3            MR. MURPHY:  That's correct with

4   the specification.  So what Your Honor needs to

5   do is look at the prosecution history for that

6   issue.  And that issue that you need to

7   understand is:  What the boundaries are, what

8   the scope of O'Neill is.

9            And O'Neill is an intragranular

10  formulation where the Niaspan is -- Niacin is

11  intimately mixed in the granules with this

12  internal hydrophobic component.  And that's why

13  it was essential for Kos to continually say

14  again and again that their patent didn't support

15  this internal hydrophobic component.  That's

16  what distinguished it from O'Neill.

17            That's what allowed the patents.

18  That's what allowed Kos to get the patents.

19            Now, we're on Slide 11 now.  And

20  Abbott suggests that the prosecution disclaimer

21  does not apply because the issue is really

22  whether it was in the context of an interference

23  rather than overcoming a prior art rejection.

24  But statements that are made about the

1      interference effect prosecution disclaimer.

2                  I heard Mr. Lee say that as well.

3      And that's our position and that's the holding

4      of the Ethicon Endo-surgery case that we

5      provided to Your Honor.

6                  Admissions are admissions no

7      matter what the context.  And if a patentee

8      makes an admission and says, This is our

9      invention.  That's not our invention.  In the

10     course of whatever context, it is before the

11     Patent Office.  It matters.

12                 Let's take a look at intrinsic

13     evidence this time consisting of the prosecution

14     history.  This is found in Slide 12.

15                 Here we have O'Neill, Claim 1 from

16     that history.  Understanding this claim, this

17     Claim 1 will help you in understanding the

18     situation that Kos faced during prosecution.

19                 O'Neill Claim 1 specifies four

20     internal -- that is intragranular components.

21     And the first one -- here is the first one

22     that's highlighted.  If I can get my dots to

23     appear there.

24                 Okay.  Hydroxypropyl.  Methocel,

1      that's one.  The second intragranular is a

2      water-soluble pharmaceutical binder and then a

3      hydrophobic component.  And then cellulose and

4      then Niacin.

5                  Now, that's very close to the

6      intragranular composition of Niacin, which again

7      is the only example we have for any of the

8      claims in the patents.

9                  Here's that intragranular or

10     internal portion in Slide 13.  And this refers

11     to the '930 patent.  Column 7 in the

12     specification, you will see that that internal

13     portion consists of Niacin, Povidone and

14     Methocel.

15                 You will see it's talking about

16     the granulation.  Right here it tells us that

17     this is the intragranular portion.  Now, we see

18     that there's one element missing and that's that

19     hydrophobic component.

20                 So what we've done here is we've

21     put up on a list for Your Honor to

22     cross-reference the O'Neill intragranular or

23     internal portion of what's to become the tablets

24     and the Niaspan intragranular.  That is what the

1    internal portion of what is to become the

2    tablets.

3              They share Niacin in common.  They

4    share HPMC in common.  They share the

5    water-soluble binder in common.

6              Povidone is specifically listed.

7    And then whereas here there's a hydrophobic

8    component inside the granules intimately mixed

9    with the granules.  It doesn't happen for

10   Niaspan.

11             MR. LEE:  I'm sorry, what slide is

12   that?

13             MR. MURPHY:  That slide is 14.

14             The slide is 14.  To overcome the

15   interference over O'Neill, Kos attempted to

16   distinguish itself again and again from that

17   internal hydrophobic component.  Let's take a

18   look at those admissions.

19             THE COURT:  By the way, you're at

20   15.  You do have in quotes "internal hydrophobic

21   component".

22             I think Mr. Lee said his reading

23   of the O'Neill patent is that it never uses that

24   phrase internal hydrophobic component.  Is he

1          right about that?

2                    MR. MURPHY:  He may be right that

3          the patent doesn't say that, but it's clear when

4          you go through the manufacturing process that

5          the hydrophobic component in O'Neill is

6          intimately mixed in the granules.  And you know,

7          the Kos inventor, David Bova was asked this

8          question at his deposition in an earlier

9          litigation.  And he admitted that while the

10         hydrophobic component is intimately mixed in the

11         O'Neill formulation, that's not the case with

12         Niacin in the O'Neill specification.  That's not

13         the case with Niacin in Niaspan.

14                   THE COURT:  Is that prior

15         deposition in our record?

16                   MR. MURPHY:  We have it, but we

17         haven't provided it to Your Honor.  I can

18         provide it to Your Honor today.

19                   THE COURT:  Okay.  Yeah, please do

20         that.

21                   MR. MURPHY:  Okay.  Again, as I

22         said, again and again Kos disclaimed the

23         presence of this internal hydrophobic component.

24                   And just as Mr. Lee did, I'm going

1    to try to divide up patent by patent and talk

2    about what happened in the course of the '428

3    patent and then the next one in the series, the

4    '930 patent.

5              This comes from the '428

6    prosecution history.  This is Slide 16.  And it

7    is Kos' first word, if you will, as to what are

8    the limitations in O'Neill and what the

9    limitations are in the disclosure of the

10   application, the '428 application.

11             And what they said here on Page 8

12   is that the O'Neill patent claim limitations are

13   not supported by the disclosure of the present

14   application.

15             The following page they say, The

16   present application does not support the

17   composition limitation of the O'Neill patent.

18   In other words, this patent doesn't have support

19   for an internal hydrophobic component whereas

20   O'Neill does.  And so Mr. Examiner, you're wrong

21   about what you're saying.

22             THE COURT:  Why can't it be it

23   does not support requiring the internal

24   hydrophobic component as opposed to does not

1    ever support?

2              MR. MURPHY:  Well, we have further

3    on, another -- a more specific statement where

4    they say that it doesn't teach or suggest the

5    use of an internal hydrophobic component, which

6    is even a broader statement.  And I think that

7    would answer Your Honor's question.

8              If Your Honor can just indulge me

9    for a minute until we get to that section.

10             THE COURT:  Absolutely.

11   Certainly.

12             MR. MURPHY:  After this response,

13   the examiner considered a potential interference

14   with O'Neill.  And then he afterwards

15   temporarily suspended prosecution, and he called

16   for an interview he had with the inventor's

17   attorney.

18             And so that interview occurred on

19   October 1997.  This is Slide 17.

20             And the examiner prepared an

21   interview summary after talking with the

22   attorney.  And you'll see that in the summary,

23   he explains what counsel said to him.

24             Counsel explained in detail about

1      the O'Neill patent and Evershed patent, which is

2      the parent patent to O'Neill.  He explained that

3      the O'Neill patent requires hydrophobic

4      component whereas in the instant claim

5      application, there is no hydrophobic component.

6              We've already seen in that

7      application that Hystrene 5016 is mentioned.

8      Given that it was an external lubricant, it made

9      sense to say that because what we're talking

10     about in O'Neill is an internal hydrophobic

11     component.

12             So because the '428 application

13     didn't have a hydrophobic component, what he's

14     saying is that it doesn't have this internal

15     hydrophobic component.  This statement concerns

16     all the application claims in the '428 patent.

17             And although the examiner prepared

18     the statement, the statement was provided to the

19     applicant's representative.  It says personal

20     copy, applicant's representative.

21             Nothing in the intrinsic evidence

22     suggests that the attorney for Kos disagreed

23     with this characterization of the statement.

24     Kos made other claims to distinguish the

1    application claims from O'Neill.

2                    And in February 1999 in a February

3    1999 response, Kos argued that the '428

4    application does not have support for the

5    composition limitations recited in main Claim 1

6    of the O'Neill patent.  And such composition

7    limitations in the main Claim 1 of the O'Neill

8    patent were critical to the patentability of all

9    claims in the O'Neill patent.

10                   So this internal hydrophobic

11   component was critical to the patentability of

12   O'Neill.  And conversely, Your Honor, it was --

13   its absence in that application was critical to

14   avoiding the interference with O'Neill.  So it

15   was important for them to make sure that their

16   patent didn't reach this internal hydrophobic

17   component.

18                   This section concerns application

19   Claim 1, which among others issues as the '428

20   patent.

21                   In the same response -- and this

22   is what I foreshadowed to Your Honor -- it's

23   that broad statement where on February 28th,

24   1999, and this is Slide 19, it says, "Nor does

1    the specification of the above-identified

2    application for U.S. patent teach or suggest the

3    hydrophobic component as claimed in independent

4    claim 1 of the O'Neill patent."

5             That's a statement, Your Honor,

6    that the ordinary -- the person of ordinary

7    skill looking at this patent looking at it in

8    light of the disclosure would not come to the

9    conclusion that it used internal hydrophobic

10   component.

11            Why?  There's one example.  The

12   one example gives us this external hydrophobic

13   component only.

14            So we've seen again and again in

15   1996, in 1997 and in 1999, we have again and

16   again a limitation to avoid O'Neill, a

17   limitation of the scope making sure that the

18   claims of the '428 patent do not reach this

19   internal hydrophobic component in O'Neill or in

20   any other art that has an internal hydrophobic

21   component.

22            So having looked at the '428

23   patent, now let's look at the next patent in the

24   series.  It's the '930 patent.  And Kos made the

```
1     same narrowing admissions there, too.

2                    And to give Your Honor some

3     perspective on when these seven patents were

4     prosecuted, you'll see that the first

5     application that we have in yellow here, it's

6     the '428 application was filed in 1995.  And the

7     next one was filed, the '930 was filed in late

8     March of 1997.  This is Slide 21.

9                    Both of them issued in 2000.  So

10    Kos was prosecuting the applications during the

11    same period.

12                   And so because they were using the

13    same example, they were making admissions

14    consistent with each other through the course of

15    both of these patents.  To avoid the

16    interference during prosecution of the '930

17    patent, Kos also had to distinguish the '930

18    application claims from O'Neill.

19                   We're going back to March of 1998,

20    a few months after the application for the '930

21    patent was filed.  Kos argued here -- this is

22    Slide 22 on Page 33 -- that the O'Neill patent

23    is not -- the limitations in this patent are not

24    supported -- excuse me.
```

1            The applicant cannot copy an

2     O'Neill patent claim with the particular

3     limitations on the nature of the composition

4     because these limitations are not supported by

5     the disclosure of the present application.

6            We're not O'Neill.  We can't copy

7     O'Neill.

8            Why?  We don't have an internal

9     hydrophobic component.

10            And the same amendment on the

11     following page, Slide 23.

12            Now, the present application does

13     not support the composition limitations of the

14     O'Neill patent.  It shows the present

15     application and the O'Neill patent are not

16     claiming essentially the same invention.

17     O'Neill claims an internal hydrophobic

18     component.  We don't.

19            We've taken a look to see that the

20     application doesn't support certain composition

21     limitations.  Let's take a look and see what the

22     '930 patent application does support.

23            Well, it supports -- and this is

24     from the application, Pages 9 to 10.  This is

1          now Slide 24.

2                     Niaspan.  It has Niacin.

3     Methocel, Povidone and Hystrene, stearic acid.

4                     We've provided you some processed

5     flow sheets from the same application.  And you

6     will see consistent with our discussion in the

7     specification earlier that the intragranular

8     portion, that is the yellow portion up here, see

9     here in the granule contains Niacin, Povidone

10    K90, Methocel E10M intragranular and water.

11                    Only after that granular portion,

12    that internal portion is finished do they add

13    this Methocel E10 in, extergranular.  And this

14    Hystrene 5016 stearic acid, which acts as a

15    lubricant.

16                    This slide also contains an

17    excerpt from the '930 patent application.  It

18    indicates, which a Povidone here is a

19    water-soluble binder, material binder.  And

20    Hystrene 5016 is utilized.

21                    And here's the important language

22    that appears in the specification that Your

23    Honor recognized.  It's the external lubricant

24    in the Niaspan formulation, not an internal

1    lubricant.  It's not an internal hydrophobic

2    component.

3                    So to summarize, the '930

4    application supports Niacin.  It supports HPMC.

5    It supports a water-soluble binder all according

6    to O'Neill Claim 1.  What it does not support is

7    this internal hydrophobic component.

8                    Now, you've heard -- you saw in

9    the briefs that were provided to you by Abbott

10   and I think you heard from Mr. Lee today that an

11   examiner's statement cannot without more result

12   in a disavowal of claim scope.  But we've shown

13   you the more, Your Honor.

14                   It's not just some unilateral

15   statement.  Kos made repeated statements during

16   the '428 prosecution about the lack of support

17   for this internal hydrophobic component.

18                   Kos made those very -- Kos made

19   similar statements as to the lack of a

20   hydrophobic component in the '930 prosecution.

21   And we have the examiner saying what the

22   applicant's representative said that O'Neill

23   requires a hydrophobic component, whereas in the

24   instant claimed application there is no

1    hydrophobic component.  And there's no evidence

2    to suggest that he ever disagreed with that

3    statement.

4              Only difference is in composition,

5    it differed O'Neill from the '930 claims.

6              The O'Neill tablet had Niacin.

7    The '930 Niaspan had Niacin in it.

8              O'Neill had a certain kind of

9    HPMC.  The '930 Niaspan tablets had a certain

10   kind, similar kind of HPMC.  Still fitting

11   within, by the way, the boundaries of the

12   O'Neill claims.

13             The water-soluble binder was the

14   same between the both.  What they differed in

15   was that there was a hydrophobic component in

16   O'Neill intimately mixed with Niacin.

17             But nothing of the kind intimately

18   mixed with Niacin over here.  No hydrophobic

19   component present.

20             Abbott notes that, and I think you

21   heard today some of the dependent claims in the

22   '428 and the '930 patent specify the use of

23   lubricating agents, which are hydrophobic

24   components.  But the lubricating agent, as we've

 1     seen again and again, is not an internal

 2     hydrophobic component.

 3                    We've seen that it's, in fact, an

 4     external component outside the granulation.  And

 5     Kos made that clear in September of 1999 in this

 6     response where it said that a processing aid is

 7     an external lubricant.  And that stearic acid is

 8     a well-known external lubricant utilized in the

 9     industry in connection with tablet processing

10     formulation.

11                    Now, you heard from Mr. Lee that,

12     well, Hystrene could be used, but there's no

13     support for that.  We know that there's no

14     support, because we're again and again told that

15     there's no support throughout the '428 and the

16     '930 application for its use in Niaspan.

17                    Abbott also notes that there is

18     some dependent claims in the '930 patent that

19     specify the use of hydrophobic components.  And

20     you heard some of them today.

21                    This ethylcellulose and this bees

22     wax, which Your Honor identified as swelling

23     agents.  Well, it's true they do appear there,

24     and a Court may -- a Court generally is supposed

1      to construe an independent claim consistently

2      with the dependent claims.  Not in the case

3      here.

4                   We have provided Your Honor with a

5      case similar to this one.  It's the

6      Dakocytomation case.

7                   And that case is this one.  The

8      prosecution history dictates a construction that

9      happens to be inconsistent with certain

10     dependent claims, because again and again they

11     disclaimed coverage of this internal hydrophobic

12     component.  And that's Slide 31.

13                  Now, moving on to Slide 32.

14     Abbott also notes that the patent specifications

15     describe these hydrophobic swelling agents as --

16     such as ethylcellulose and wax in the

17     specification.

18                  Well, every patent-in-suit has

19     this.  This was first filed with the Patent

20     Office in 1993.

21                  It continued for the '428

22     application.  You'll see it in the '930

23     application.  You'll see it all throughout.

24                  So they filed this text in 1993.

1    And then in 1996, and then in 1997, 1998 and

2    1999 they walked away from any coverage of their

3    formulation with an internal hydrophobic

4    component.

5              They can't now try to recapture

6    that element a decade later.  As we saw earlier,

7    the '848 patent application was filed in 1999,

8    the last in a series of the seven patents.  Kos

9    disclaimer back in the '428 and the '930 applies

10   there as well.

11             You will see that the '848 patent

12   is a continuation, a continuation of the '930

13   patent.  As a continuation, it's going to have

14   the same disclosure as the '930 patent.

15             If the '930 patent doesn't support

16   an internal hydrophobic component, the '848

17   patent doesn't support it, either.  In fact, Kos

18   seemed to appreciate that it didn't cover an

19   internal hydrophobic component.

20             Very late in the prosecution

21   history here, December 22nd, 1999, Kos filed a

22   preliminary amendment where they changed the

23   title to hydrophobic component free sustained

24   release before nicotinic.  These words were

1     internally added and it was intentionally added

2     by Peter Manso.

3                     So whose signature appears at the

4     top here?  This Peter Manso is the same attorney

5     who represented Kos in that October 1997

6     interview.  So we have consistency from this

7     October 1997 all throughout these patents.

8                     So we've seen that the disclosure

9     applies through the '428, the '930 and the '848

10    patent.  Let's deal with another issue that's

11    before Your Honor and that's the question of the

12    word dosing in the '848 patent, Claim 1.

13                    Claim 1 here specifies dosing the

14    patient with nicotinic acid and that's combined

15    with pharmaceutically acceptable carriers.

16    Niacin plus pharmaceutically acceptable carriers

17    equals a dosage form, Your Honor.

18                    You can't dose a patient without a

19    dosing form.  Claim 1 requires that dosage form.

20                    And how do we know that?  Now

21    we're onto Slide 37.

22                    Slide 37 sets forth a method based

23    on Claim 1 that's in the form of a sustained

24    release formulation or tablet.  Now, dependent

1    claims narrow and they narrow by adding more

2    information.

3              Here, the more information is

4    about one to about four parts by weight of

5    binder.  You see back here there's no question.

6    There's no issue of a binder.

7              But here is what the form was that

8    was referred to up in Claim 1.  It's a sustained

9    release formulation or a tablet pill.  It's a --

10   there's no dependent claim in the '848 patent

11   that simply adds the limitation sustained

12   release formulation or tablet.

13             So we can tell that what they

14   meant by dosing was a dosing form in the form of

15   this sustained release formulation or tablet.

16             Now, we've talked about the

17   disclaimer through all the composition and

18   method claims.  One of the things that we've

19   done is divide this up into those composition

20   method claims.  Three patents, the '428, '930

21   and the '848 patent.

22             And then these other patents, four

23   of them, which we call the biopharmaceutics

24   patents.  We called them biopharmaceutics

1    patents because the specification talks about

2    that term.

3              And it describes how Niaspan --

4    once again, we're faced with Niaspan.  The only

5    example in any of the patents, how it acts

6    inside the body in vivo and how it acts outside

7    the body.

8              Let's take a look at the history

9    of these other -- these four other

10   patents-in-suit.  These patents-in-suit were all

11   continuations in part that were added all on the

12   same day, October 31, 1997.

13             And you'll see that consistent

14   throughout the yellow highlights.  And we're now

15   on Slide 39.  And they issued between 2002 and

16   2004.

17             The specification of all these

18   patents disclosed the same formulation and

19   concern, an intermediate release nicotinic acid

20   formulation.  Mr. Lee attempted to distinguish

21   that language from the language you saw in the

22   first three patents which refer to this

23   sustained release dosage form, et cetera.  But

24   given that it's the same formulation Niaspan,

1    it's the same subject matter.

2              Here is the language of

3    intermediate release nicotinic acid formulation

4    from the representative example in the

5    biopharmaceutics patents.  This is the '715

6    patent, Claim 5.  Now, on Slide 40.

7              As we mentioned, when Kos filed

8    these applications all on the same day, they

9    added just one paragraph that concerned the

10   formulation.  And you will see that paragraph in

11   the '715 patent in Column 6.

12             We're now on Slide 41.  You won't

13   find any additional material there about an

14   internal hydrophobic component.  No reference to

15   it.  Nothing more there.

16             So the '930 patent doesn't support

17   an internal hydrophobic component.  The

18   additional materials that were added as part of

19   the biopharmaceutics patent applications, they

20   don't support an internal hydrophobic component.

21   So none of the patents support an internal

22   hydrophobic component, Your Honor.

23             Abbott makes some legal arguments

24   as well.  You heard them today.

```
 1              The prosecution disclaimer can't

 2       apply because we're dealing with different

 3       language.  But that's not Federal Circuit

 4       precedent.  And we've provided three cases to

 5       Your Honor that we cited on Page 15 of our

 6       brief.

 7              The Ormco case, the Wang Labs case

 8       and the Jonsson case, which say what relates to

 9       the same subject matter prosecution disclaimer

10       will apply to that matter.

11                     THE COURT:  So before you move

12       on, --

13                     MR. MURPHY:  Sure.

14                     THE COURT:  -- whereas Mr. Lee

15       suggests that the issue of whether internal

16       hydrophobic component is excluded, I basically

17       have to decide it twice or make it three times,

18       1A, 1B, --

19                     MR. MURPHY:  I am afraid so, Your

20       Honor.

21                     THE COURT:  -- I take it you think

22       there's actually four decision points.  There's

23       the '930.

24                     Well, there's the '428.  There's
```

1   the '930.  And then it's at least slightly a

2   different issue with the '848.

3               MR. MURPHY:  That's right.

4               THE COURT:  But you would bunch

5   the last four, the biopharmaceutics together?

6               MR. MURPHY:  Together.  This one.

7   So what we would suggest to Your Honor is to

8   take a look in the context of the earlier

9   statements that there's no support in the '428

10  and the '930 and take a look to see if there is.

11  In the biopharmaceutics patents, we don't think

12  you're going to find any support there.

13              THE COURT:  Right.  I understand

14  why it is you're tracking it from what's in the

15  prosecution history.  And you found, for

16  instance, where they say there's no support.

17              But, of course, Abbott's view is

18  you essentially have the burden because it's a

19  disclaimer argument.  The claim language itself

20  does not, on its face, it appears exclude the

21  internal hydrophobic component.

22              So, you know, it's probably -- you

23  probably went into this in your presentation,

24  but focus on it again for me.

 1              MR. MURPHY:  Sure.

 2              THE COURT:  Should I not see it as

 3     a burden on you?  And if I should see it as a

 4     burden on you, again, what is it that you've

 5     just shown me that satisfies that burden?

 6              MR. MURPHY:  Your Honor, it's not

 7     really a burden question.  What Your Honor is

 8     asked to do is to take a look at the prosecution

 9     history and see if you find the clear and

10     ambiguous disavowal of claim scope.

11              So we have again and again a

12     situation where we have a potential interference

13     where we have a potential piece of prior art,

14     and we have the applicant wanting to get around

15     that piece of prior art.  And it's not like they

16     hedged.

17              THE COURT:  They said, We neither

18     teach nor suggest an internal hydrophobic

19     component.  That's a clear and unambiguous

20     disavowal.  That's the broadest disavowal we

21     have.

22              But why is it not ambiguous in

23     that they don't say we neither teach nor suggest

24     a required internal hydrophobic component?  Why

1    is there not the ambiguity that Abbott needs to,

2    you know, avoid your argument?

3              MR. MURPHY:  When you say that we

4    don't teach nor suggest a piece of prior art,

5    you're walking away from that prior art.  You're

6    claiming no coverage over that prior art.

7              When you say that your application

8    doesn't support that, you don't need to say we

9    don't require that.  We don't support it.

10             Which tells -- which says all --

11   both those two things together say that when a

12   person of skill picks up the patent and sees

13   that there's no support for it, there's no

14   teaching, there's no suggestion of its use.

15   There's no written description that backs it up;

16   and therefore, it's not part of the patent

17   claim.

18             This is why you have to read

19   claims in light of the specification.  And the

20   specification is the best guide to understanding

21   the scope of those claims.

22             You look at that specification.

23   There's nothing there.

24             And if it were a question of

1    ambiguity, because as Your Honor points out that

2    there's no specific language, there is this

3    language about external lubricant.

4            Maybe Mr. Lee was right that, Oh,

5    well, you know, if we just had the specification

6    and we know that persons of skill in the art can

7    use Hystrene inside in the granulation phase,

8    why wouldn't it be used inside?  That might be

9    ambiguous.

10           But where we are here is Kos

11   themselves, the inventors, the attorney on

12   behalf of the inventor is saying this.  Why?

13   Technically he needs to get around the

14   examiner's rejection.  He needs to avoid that

15   interference.  He did both in these

16   circumstances.

17           He got the sweet.  Now, Abbott

18   wants to get rid of the bitter.

19           THE COURT:  Okay.  We are going to

20   take a ten-minute break before you move on for

21   the rest of your terms.

22           MR. MURPHY:  Okay.

23           THE CLERK:  All rise.

24           (A brief recess was taken.)

```
 1                    THE CLERK:  All rise.  You may be
 2       seated.
 3                    THE COURT:  You may continue.
 4                    MR. MURPHY:  May I proceed, Your
 5       Honor?  Thank you.
 6                    Your Honor, rather than proceed to
 7       the next section, I'd like to revisit an issue.
 8       And Your Honor had asked me before whether the
 9       O'Neill patent Claim 1 was a patent Claim 1
10       where the Niacin was intimately mixed with the
11       granules.
12                    And so we believe that this is a
13       pairing from Claim 1 of O'Neill which appears in
14       our Slide 12.  And you'll see that the Slide 12
15       talks about what the controlled release tablet
16       comprises.
17                    It comprises an admixture.  And we
18       haven't highlighted that, but that's the
19       language that's important here is it says that
20       all of this stuff is together in one phase.
21       It's the mixing step.
22                    And that's the granulation phase.
23       That's the internal step.
24                    And that's the key language for
```

1      Your Honor on that issue.

2                     THE COURT:  Okay.  Thank you.

3                     MR. MURPHY:  I've got to speed

4      dial through the slides now to get to where I

5      was.

6                     Okay.  As has been discussed, the

7      parties also dispute the meaning of this term

8      intermediate release nicotinic acid formulation

9      that appears in each of the biopharmaceutics

10     patents.

11                    What's that mean?  Well, for

12     Lupin, Lupin proposes to define the term in

13     terms of the hours as it appears in the

14     specification.

15                    So it's a dosage form not

16     containing an internal hydrophobic component.

17     It releases an active ingredient, meaning

18     nicotinic acid in vitro.  That is, in the

19     laboratory or in vivo in the body over a period

20     of time which is greater than one hour, but less

21     than 24 hours.

22                    Abbott's proposed definition is

23     nebulous.  It's a nicotinic acid formulation

24     released for absorption into the blood stream

1    over a period of time, which is slower than that

2    of immediate release Niacin formulations.

3    Undefined, but faster and different than other

4    unsustained release Niacin formulations.  Faster

5    and different, undefined.

6              Each of the four patents uses --

7    discusses this in the context of a specific

8    definition.  So there's little question that the

9    inventors are acting as their own lexicographer.

10   They want to give you the definition.

11             And that definition appears in

12   only two places.  It appears in Column 5 of the

13   '715 patent, for example, in Column 17 of the

14   '715 patent.  But you'll see that there are

15   these two descriptions in each of the four

16   biopharmaceutics patents.

17             Lupin relies on this more complete

18   disclosure which specifies the hours in Column

19   5.  You will see that intermediate release means

20   release of medication in vitro or in vivo over a

21   period of time which is greater than about one

22   to two hours, that is slower than IR Niacin, but

23   less than about 10 to 24 hours.  I.e. faster

24   than SR Niacin.

1          And you can see where the Abbott

2     definition comes from.  It comes from this less

3     complete disclosure.  There's no mention of

4     hours here in Column 17.

5          Slower than that of IR Niacin

6     formulations, but faster and different than SR

7     Niacin products.

8          The description in Column 17 here

9     specifies no time points.  That time points for

10    the particular release are specified here.

11         In the first and more specific

12    description in Column 5, the word about

13    modifies.  It's hard for -- well, I'll just

14    focus on the underlying language.

15         You can see underscored in red,

16    you see that about modifies one to two hours,

17    and then down again at about 10 to 24 hours.

18    Lupin gives full effect to the about one to two

19    by starting off at the lower endpoint of one for

20    the proposed construction.

21         Similarly, Lupin gives the full

22    effect to the release about 10 to 24 by ending

23    at the upper endpoint 24 and going back to this

24    over a period of time which is greater than one

```
 1    hour, but less than 24 hours.
 2                   Lupin's definition in Column 5
 3    gives it the full effect.  And that's Slide 47.
 4                   There's a general claim
 5    construction principle that the Court should
 6    construe the claims in light of the
 7    specification key language as a whole.  Now,
 8    according to this principle, the details that
 9    are found in Column 5 should play some role in
10    the construction.
11                   Abbott ignores those, ignores this
12    time period in favor of its own construction,
13    basically ignoring the more complete disclosure
14    over here in Column 5.
15                   Disregarding that language in
16    Column 5 conflicts with that claim construction
17    principle that you should construe the claim
18    language in light of the specification as a
19    whole.
20                   Lupin's, however, comports with
21    that principle, because it defines by hours,
22    which are the what's slower than that of IR
23    Niacin and what's faster than that of SR Niacin.
24                   There's another problem with
```

1      Abbott's construction.  And you can see that in

2      the comparison tables in 5A and 5B, for example,

3      in the '715 patent.

4                    5A and 5B include data release

5      data for three sustained release products.

6      Niaspan, which is the only -- again, the only

7      example we have of a claim composition.  And

8      these two other prior art compositions Rugby and

9      Nigobid.  As you see for the Rugby product,

10     Niaspan is actually slower when the definition

11     of Abbott wants to rely on faster and different.

12                    And then for the Nigobid product,

13     it's slower at some time points, but faster than

14     others.  So the person of skill in the art would

15     not know based on Abbott's definition whether or

16     not to use these for purposes of comparison or

17     not.

18                    So we've dealt with all of the

19     dosage limitations and now we're getting into

20     the portion where we're talking about the

21     clinical benefits that are related here.  What

22     is treatment-limiting elevations in blood

23     glucose and uric acid?

24                    What is treatment-limiting

1    hepatotoxicity?  Each of these patents describe

2    a -- claim a level at which treatment must stop.

3    It's the ceiling at which treatment has to be

4    withdrawn.

5            Here's the language in dispute

6    from Claim 115.  You see the treatment-limiting

7    refers to hepatotoxicity.

8            As Mr. Lee said, very serious

9    condition.  And that's liver toxicity that was

10   associated with these prior art SR products and

11   then treatment-limiting elevations in uric acid

12   or glucose levels.

13           Treatment-limiting elevation in

14   uric acid are levels that would be of a concern

15   and in leading to the disease condition gout.

16   And excess blood glucose level leading to the

17   disease condition of diabetes.

18           Now, how did the patents assess

19   this treatment limiting?  They talk about

20   hepatoxicity always in connection with three

21   liver enzymes:  AST, ALT, and ALK, which are

22   generally released into the bloodstream when the

23   liver has some kind of trauma, chemical exposure

24   or virus, maybe drug induced.

1          And then elevations in uric acid

2     and glucose would suggest some kind of body

3     can't regulate the general levels of uric acid

4     and glucose in the system.

5          Now, the only way, looking at

6     these patents, to assess whether these claim

7     compositions have the clinical benefits of no

8     treatment-limiting hepatotoxicity, no treatment-

9     limiting elevations you have to look at the

10    specification.  There's no reference to doctor's

11    judgment in the specification.

12         Now, what I'm going to focus on,

13    in the interest of time -- we could go until

14    seven o'clock talking about every single one of

15    the many tables in the patent.

16         So what we're going to do is I am

17    going to try to just talk about one table.  It's

18    Table 4, which is the ALT for hepatotoxicity.

19    But the same principle applies for repeated

20    elevations in uric acid and blood glucose.

21         Here's the dispute.  Lupin says

22    the boundaries of the claims should be set forth

23    in the specifications, use of the reference

24    ranges.  The specification being the best guide

1    after all to the boundaries of the claims.

2                    And you set the limit at three

3    times the upper limit of normal for liver

4    enzymes.  And for the treatment limiting is

5    repeated abnormal elevations for glucose in uric

6    acid.

7                    Abbott, again, is more nebulous.

8    They set the boundary of the claims at

9    clinically significant elevations.  Elevations

10   in the judgment of some physicians, treatment

11   would have to stop.

12                   Now, that would have -- as Ms.

13   Ferrera acknowledged, that would -- that may

14   stop from physician to physician at different

15   levels.  And that's nebulous and it's

16   insufficient notice to the public of the

17   boundaries of the invention.

18                   How do we assess those boundaries?

19   Let's take a look at Table 4, for example.  And

20   if Your Honor doesn't mind, I'd like to approach

21   the podium just to identify these particular

22   sections.

23                   So Table 4 has a study group,

24   Group A and Group B, which is measuring the

1    levels of ALT, this particular liver enzyme that

2    may be indicative of hepatotoxicity.

3              They take the levels at baseline

4    before the drug is provided and then they take

5    them again at levels at two weeks, at four weeks

6    and eight weeks.  And then they assess the mean,

7    how the liver is changing.  That is how much --

8    what the increase in those ALT levels are over

9    that period.

10             You will see the highest number

11   here is at nine percent is a nine-percent

12   increase.  And what's happening over here is the

13   reference range.

14             Now, this reference range, this

15   reference range of zero to 50, it could -- if

16   you go back one.  This reference range of zero

17   to 55 establishes the level of normal in

18   patients.

19             Patients also have anywhere from

20   zero to 55.  If they go over 55, there's some

21   issue, not treatment limiting of hepatotoxicity,

22   but there's some issue.

23             And so you can see, the reference

24   range, as you recall here a little more

1        specifically.

2                Now, you may be wondering why it

3        is that Lupin set the treatment limiting, the

4        mandated withdrawal at three times the upper

5        limit of normal.  Well, as it was acknowledged

6        by Abbott, that's the FDA clinical endpoint.

7        That's the time when they believe that patients

8        should be withdrawn from further drug use that's

9        at issue, that's in question.

10               THE COURT:  But is it the time at

11       which the patient's study is cited in the

12       specification or withdrawn from the study?

13               MR. MURPHY:  Yes, indeed, they

14       were.  And so if Your Honor takes a look and

15       just dial forward a little bit, there are two

16       references that are cited in the specification

17       that answer Your Honor's question.

18               You'll find them in the '930

19       patent, Column 2.  And this one Henkin and this

20       one McKenney, these are both peer-reviewed,

21       well-known journals.

22               Henkin from the American Journal

23       of Medicine and McKenney from the Journal of the

24       American Medical Association.  Let's take a look

1          at how they define treatment limiting.

2                    We're talking about treatment

3          limiting.  Henkin has a table and this is now

4          Slide 58.  Henkin has a Table V where it

5          describes patients who developed hepatitis

6          during Niacin therapy.  And you'll find

7          hepatitis "defined as a three-fold or greater

8          increase in the serum transaminase levels and/or

9          alkaline phosphatase level above the normal

10         range."  Here's the important point, "reversing

11         to normal upon drug withdrawal".

12                   So what they did here was these

13         patients hit that FDA endpoint, treatment was

14         withdrawn and then they were watched to see if

15         the hepatitis reversed.  In this case, it did.

16                   So, too, in the McKenney reference

17         cited in the patent.  By the way, both of these

18         references were provided to the Patent Office

19         along with the application.

20                   In McKenney, 18 of 23 patents

21         assigned to the SR dosage form had to be

22         withdrawn before completing the dosage of 3,000

23         milligrams per day.  Liver aminotransferase

24         elevation.

1              This is what we're talking about

2    ALT, AST, ALK more times -- three times the

3    upper limit were encountered in 12 of the 18

4    patients who were withdrawn.  So the intrinsic

5    evidence provides for this clinical endpoint of

6    three times the upper limit of normal.  You can

7    find it directly in the specification which

8    incorporates by reference these two references.

9              And let's go back a little bit.

10   Why the FDA and why not a doctor?  Well, the

11   patent is addressed not to doctors, but to the

12   FDA.

13             And what was attempted was to get

14   a valuable contribution in the art to develop an

15   extended release nicotinic acid formulation for

16   once a day nocturnal administration.  And this

17   is key for approval by the FDA.

18             Approval by the FDA means you

19   provide them hard data.  You provide them

20   objective data.  You match their clinical

21   endpoints.

22             Now, this language from the '967

23   patent doesn't appear in the '930 patent at

24   issue, but this language does.  It's this

1    acceptable safety profile language.

2                    How do you get an acceptable

3    safety profile?  You match the FDA's review

4    requirements for acceptable safety before a drug

5    is marketed.

6                    And if we have any doubt that the

7    FDA was involved and not the subjective judgment

8    of some physician, we can look to the '930

9    prosecution history where there's a definition

10   that appears there by the terms

11   treatment-limiting, treatment-limiting

12   elevations or treatment-limiting abnormalities

13   is used throughout the trial.

14                   They mean or refer to that level

15   of ranges that is not or would not be acceptable

16   to the Food & Drug Administration.

17                   So we're talking about an

18   objective standard.  We're not talking about the

19   subjective standard that Abbott suggests.

20                   In fact, if we look through the

21   specification, the best guide -- we don't see

22   the words clinically significant appear there

23   anywhere, not in any one of these patents.

24                   In fact, the only basis to judge

1    the efficacy and the lower toxicity claims that

2    are in the patents is to look at the

3    specifications and see how patients did.  And

4    that data is provided in Tables 3 through 7.

5              Now, as Your Honor pointed out,

6    that Abbott suggests the person of skill for

7    these patents is not just doctors, but it

8    includes people who have experience in oral

9    solid dosage forms.  So we're talking about

10   formulators as well.  And I think it's very

11   reasonable to be confused by Abbott's reference

12   to clinical significance, what -- Abbott's own

13   person of skill in the art wouldn't understand

14   what clinical significance would be from one

15   patient to another.

16             THE COURT:  But it is your

17   position, as a matter of law, that I'm not

18   supposed to resolve who the person having

19   ordinary skill is at this time?

20             MR. MURPHY:  And we would very

21   much appreciate that, Your Honor.  We think that

22   the way around this problem, the safest way

23   around the problem, because we've gotten this

24   inconsistent mandate to the court is to take

1    Abbott's position, take upon who the person of

2    ordinary skill is, take Lupin's position on who

3    the person of ordinary skill is, see if there's

4    some construction that matches both of those to

5    avoid the problem or possibly to render

6    alternative constructions.

7                    THE COURT:  Do I have the

8    alternative under the law, in your view, to have

9    perhaps a short mini-trial or evidentiary

10   hearing to determine who the person having

11   ordinary skill in the art is?

12                    MR. MURPHY:  Of course.  Of

13   course, Your Honor.

14                    And you could do a separate report

15   and recommendation following that mini-trial,

16   which we hope won't take more than a day or so.

17                    THE COURT:  Right.  See how many

18   ordinary skilled people we can get in here.

19                    MR. MURPHY:  So given that Abbott

20   attempts to define the treatment limiting of

21   hepatoxicity in light of clinical subjectivity,

22   we think that doesn't give adequate notice to

23   the public of the boundaries of the patent.

24                    If the boundaries of what's

1    covered differs depending on who you ask, ask

2    one physician is this clinically significant,

3    the same physician for the -- the different

4    physician, same patient not clinically

5    significant, the public has no idea where those

6    boundaries are.  And they're supposed to after

7    claim construction.

8              According to the Haliburton case,

9    the patent statute requires that the scope of

10   the claims be sufficiently definite to inform

11   the public of the bounds of the protected

12   invention.  Abbott's proposal to rely on this

13   subjectivity of physicians does not give the

14   public those boundaries.  Lupin does.

15             Now, there is extrinsic evidence

16   on this point as pointed out by Abbott.  There

17   is a battle of the experts here between Abbott's

18   Dr. Frank Sacks and Lupin's Dr. Wharton.

19             Dr. Wharton's a practicing

20   cardiologist.  Dr. Sacks is a professor of

21   medicine.

22             Dr. Wharton says that a maximum

23   elevation in liver enzymes, a patient should be

24   expected to tolerate on lipid lowering

1    medications certainly no more than three times

2    the upper limit of normal.  And, in fact, as

3    pointed out for him, he's got a lower threshold

4    because he's a little more conservative with his

5    patients, particularly for lipid lowering drugs.

6    For Niaspan, there's no need to go that far.

7              But what we've tried to do is give

8    a ceiling that the ordinary skilled person would

9    do.  So they would take the FDA -- they would

10   take the FDA endpoint, multiply it against the

11   reference ranges for the ceiling.  And that

12   would give the full effect to the boundaries of

13   the claim.  That's an objective hard and fast

14   standard that will give the public adequate

15   notice.

16             Interestingly enough, Dr. Sacks

17   for Abbott, you know, he admits there's no FDA

18   endpoint.  He admits it's three times the upper

19   limit normal.

20             But he says it's a guide post.  He

21   says it's not a maximum limit in all cases,

22   suggesting that it's a maximum limit in at least

23   some, perhaps many.

24             Also, we thought it was

1   interesting that the way that the declarations

2   went in to Your Honor, Dr. Sacks said that in

3   the first round, clinicians will make a judgment

4   based on training and experience.

5             We're now at Slide 63.  Dr.

6   Wharton said that no clinical judgment is

7   subjective.  That was the first round of both

8   physicians providing support in the opening

9   brief.

10             Dr. Sacks made no response to

11   this, what we believe is a fact that clinicians'

12   judgment is subjective and therefore nebulous

13   and therefore should be not adopted by Your

14   Honor.

15             THE COURT:  On that last point,

16   though, that I think is the issue, what is it

17   that you cite to?  Do you have a case before

18   you?

19             MR. MURPHY:  Haliburton.

20             THE COURT:  Haliburton, right.  Is

21   that where I would find a basis to conclude that

22   asking the public to rely in some instances on

23   the subjective judgment of a professional is

24   somehow too much subjectivity to have in a

1    patent?

2             MR. MURPHY:  You could find it in

3    that case.  I believe we cited other cases to

4    Your Honor, including Datamise.  The Datamise

5    case -- the Datamise case is a particularly

6    extreme version of this where the public was

7    asked to assess what was aesthetically pleasing.

8             So we don't have aesthetically

9    pleasing here.  That's for certain.  But we do

10   have something that is going to change depending

11   on who you ask.  And it may change more and more

12   as you ask less and less informed people.

13            And both sides have suggested that

14   the level of ordinary skill in this art need not

15   be a doctor.  And only a doctor could judge this

16   according to Abbott's definition, what's

17   clinically significant.

18            This is the problem.  It's more of

19   a problem -- it's more of a problem with

20   Abbott's proposal.

21            We think the intrinsic evidence is

22   quite clear on this subject matter.  But, and

23   you know, there is extrinsic evidence in the

24   record, too.

```
 1                  But it should be noted in the lead
 2       claim construction case, Phillips, that
 3       extrinsic evidence should not be over relied on.
 4       Extrinsic evidence, for example, consists of
 5       expert reports and testimony is generated at the
 6       time of and for the purposes of litigation and
 7       can suffer from bias that is not present in
 8       intrinsic evidence.  We believe that the
 9       intrinsic evidence supports Lupin's proposed
10       construction and not Abbott's.
11                  Now, we face different claim
12       construction language whereas before in the '930
13       and '967 patents, we dealt with a ceiling
14       treatment-limiting hepatotoxicity, the point
15       beyond which you can't go.  You have to withdraw
16       your patient based on these FDA clinical
17       endpoints.
18                  We get to little or no serious
19       liver damage.  The first claim is without
20       causing -- without inducing treatment-limiting
21       hepatotoxicity.  In this instance, it's:  What
22       is caused?  It causes little or no serious liver
23       damage.
24                  One is a negative statement.  One
```

```
1    a positive.  Let's take a look.

2                   So if you take a look at the '428

3    patent, and this disputed language is in Claim

4    3, a method is set forth in Claim 1 which causes

5    little or no serious liver damage.

6                   So now you're not talking about a

7    ceiling.  You're talking about what's happening

8    in the body.

9                   When the patient gets the Niaspan,

10   what's it causing?  It's causing -- it's

11   supposed to cause little or no serious liver

12   damage.  And we think you need to refer to

13   another portion of the specification to get that

14   result.

15                  Consistent with that, Lupin

16   recommends that the construction be an increase

17   in blood stream, liver enzyme levels, including

18   AST, ALT and ALK of no more than nine percent.

19   Abbott defines it in the same way.

20                  So where do we get the support for

21   that?  Well, it comes right out of Table 4

22   again.

23                  Your Honor, if I might approach --

24                  THE COURT:  You may.
```

1          MR. MURPHY: -- the screen.

2          So whereas before, we were in the

3     territory of looking at what the reference range

4     provided and the ceiling, three times this

5     number.  We want to see if it's causing little

6     or no serious liver damage.  We want to see what

7     it's causing.

8          And that we can find down here in

9     the changes from baseline.  So we take the

10    baseline number and we see if the liver enzymes

11    are going up and how far they're going up.

12         We know they're only going up nine

13    percent and we know it's not causing little or

14    no serious liver damage, because it's never

15    exceeding the reference range, either.

16         So this number, this nine-percent

17    number is the highest number for any of the

18    given liver enzymes.  And because you could have

19    liver damage based on an elevation in any one of

20    these, the highest number should be nine percent

21    giving the broadest construction to the

22    patentee.

23         Moreover, as Your Honor

24    identified, the Phillips case says that

1       differences among claims can be a useful guide

2       in understanding the meaning of particular claim

3       terms.

4                    And I believe Ms. Ferrera is

5       incorrect when she suggests to Your Honor that

6       these are different patents, so you should be

7       able to decide them however you want to.  It

8       covers the same subject matter.

9                    We're both talking about patents

10      that are supported by one example, Niaspan.

11      Niaspan in both and the same tables in both.

12                   So you should construe them

13      different ways.  Little or no serious damage

14      does not equal treatment-limiting hepatotoxicity

15      and I don't think you've heard anything in

16      Abbott's briefs or today that suggests

17      otherwise.

18                   Moreover, Abbott, in fact, took a

19      position very similar to Lupin's recently.

20      Abbott had a patent application that it was

21      prosecuting covering Niaspan.  It didn't stop

22      after the '848 patent, but continued to

23      prosecute patent applications.

24                   And in response to an office

1    action, which by the way was filed with the

2    Patent Office the very same day that Abbott's

3    counsel here filed its answering claim

4    construction brief, they said that little or no

5    increases in liver function tests means little

6    or no increase.

7              Little or no increase means of

8    about 6.6 percent in AST, 2.8 percent in ALT,

9    and .005 percent in alkaline phosphonates, not

10   relying on the clinical, the subjectivity of the

11   physician, now just going right to the

12   specification and pulling those values out.

13             And if we go back a little bit, we

14   can see where this comes from.  Those numbers

15   come from the eight-week data, 2.8.  So here is

16   the 2.8 number for ALT from Table 4.

17             Now, we sent -- when we got ahold

18   of this, we sent letters to Abbott's counsel,

19   Wilmer Hale.  And to their credit, we sent those

20   letters in April.  We pointed this out to them.

21   And Abbott withdrew this, cancelled the

22   application claims.

23             And these -- I don't believe this

24   patent is being prosecuted anymore.

```
 1                    THE COURT:  Before we move on to
 2       that one.
 3                    MR. MURPHY:  Sure.
 4                    THE COURT:  I mean, I'm still
 5       thinking a little bit about a person of ordinary
 6       skill in the art.
 7                    MR. MURPHY:  Okay.
 8                    THE COURT:  In your view, would
 9       that person have to themselves be able to
10       measure, say, the nine-percent increase or
11       elevation?
12                    Is that part of what the person of
13       ordinary skill has to have the skill to do?
14                    MR. MURPHY:  No.  They've got to
15       be able to have the skill to interpret reference
16       range tables.  And so the more complex that
17       these tables are, the higher the level of
18       ordinary skill.
19                    If I can understand this, Your
20       Honor, I think a lot of people can understand
21       it.  And so I don't think they need to actually
22       run the tests themselves, but they need to be
23       able to interpret the reference ranges when they
24       get them back from the lab.
```

1           THE COURT:  Thank you.

2           MR. MURPHY:  There's also a

3    dispute about:  What is a significant increase

4    in HDL cholesterol in the '848 patent?

5           Here's the claim as recited in

6    Claim 1.  It calls for a reduction of the bad

7    stuff here, this LDL cholesterol, and then a

8    significant increase in HDL cholesterol.

9           Lupin proposes a 20-percent

10   increase or greater in a patient's HDL profile.

11   Abbott takes -- basically swaps this word

12   significant for substantial.

13           Again, we don't believe that's

14   adequate notice to the public.  It begs the

15   question of what the actual level of

16   significance is.

17           But the meaning can be found

18   directly in the intrinsic evidence.  If you look

19   at the specification of the patent in Column 9,

20   it's this Slide 74.

21           It says that there were two study

22   groups and these patients that were dosed with

23   Niaspan, they had a 23-percent elevation in HDL

24   levels.  This one group.  And a 25.3-percent

1    elevation in the other group.

2                    This was characterized as a

3    significant decrease in triglycerides and

4    increases, significant increases in HDL

5    cholesterol.

6                    So it was right out of the patent.

7    Because there's only one embodiment, it seems

8    fair to extend that a bit as well.  We've

9    extended it to 20 percent.

10                    But here we have, again, the

11   application that was cancelled up -- that was

12   Abbott's position up through May 13th before the

13   Patent Office.

14                    They got a rejection for

15   indefiniteness, a rejection saying we don't know

16   that that is a significant increase.  Tell us.

17   And they actually limited it to 23 percent or

18   greater.

19                    Significantly increased term

20   recited in the claim language means increase in

21   HDL cholesterol of about 23 percent or greater.

22   This new material, Your Honor, was provided to

23   Your Honor in the binder.  So you'll find it in

24   the binder.

1          And in one of the claims of that

2     application, Your Honor, you'll find a claim

3     that's drawn to Lupin's direct number here,

4     20-percent increase or greater in patient's HDL

5     profile.

6          Again, to Wilmer Hale's -- to

7     Abbott's credit, they withdrew this application,

8     but they took this position that relied on the

9     specification versus clinical subjectivity.

10         The parties also disagree, as Your

11    Honor knows, about the word about and what it

12    means when it modifies the percentages, and

13    dosages and data points in the context of the

14    biopharmaceutics patents.

15         As you've heard from Abbott's

16    counsel, Kos supplied for this series of patents

17    showing how the dosage form acts in vivo and in

18    vitro.  In vivo within a human focuses on the

19    '229.  For example, it covers the drug levels in

20    the plasma.

21         The '715 patent covers the

22    percentage of metabolite recovered in the urine

23    and in the laboratory.  The '691 and '967

24    patents cover the dissolution rates.

1           According to Abbott, Abbott

2    asserts that when the word about is used, it

3    just means approximately.  It just means

4    whatever the experts say it means.

5           That's not so.  When it comes time

6    to look at what about means, you have to look at

7    the function of the recited limitation, the

8    function of these numerical values in the

9    patent.

10          How critical are they?  What

11   you'll see is time and again that the

12   therapeutic benefits associated with this

13   formulation are associated with unique

14   absorption profiles, unique dissolution

15   profiles, unique urinary metabolite recovery,

16   unique enough to separate from the prior art.

17          What you need is precision,

18   scientifically acceptable precision here.  And

19   that's what Lupin has provided to you.

20          Here's an example of what we're

21   talking about from the '229 patent.  The '229

22   patent, Claim 17 recites a nicotinuric acid Cmax

23   in the range of between about three micrograms

24   per milliliter and 3.2.

1          And you can see how the about

2     modifies three, but it doesn't modify 3.2 which

3     says that this 3.2 is the ceiling.  It can't go

4     beyond it.

5          If you need to know how far under

6     three you can go, Abbott doesn't tell you that.

7     They just simply say approximately.

8          THE COURT:  I'm not sure.  How is

9     it that you're reading about is limited to three

10    and not also to 3.2?

11         MR. MURPHY:  What -- we're

12    actually not limiting it to three.  We're saying

13    that there's a 10-percent scientifically

14    acceptable deviation.  So going back here, about

15    must mean less than three because Abbott's

16    correct --

17         THE COURT:  Right.

18         MR. MURPHY:  -- that when you say

19    about, it doesn't mean three.  It means a little

20    less than three.

21         THE COURT:  Because it doesn't say

22    3.2, you read that as -- 3.2 as the ceiling?

23         MR. MURPHY:  I read that 3.2 as

24    the ceiling.  So here we have to deviate some

1      amount from the range on the floor and the range

2      on the ceiling, because about modifies both of

3      those terms.

4                  THE COURT:  Moving down to the

5      claim limitations.

6                  MR. MURPHY:  Moving down to the

7      claim limitations.  So here we have those

8      limitations aligned against each other.  It's

9      approximately straight through for Abbott, but

10     for Lupin it's a 10-percent tolerance.

11     Scientific precision requires a 10-percent

12     tolerance on these biopharmaceutics values.

13                 You heard Abbott say in its brief

14     and you heard Abbott say it today that about

15     means that it avoids a precise numerical

16     boundary.  In each instance, Abbott relies on a

17     portion of cases and doesn't focus on the

18     holding in the cases.

19                 About actually means it depends.

20     We don't know until we look carefully at the

21     technological facts in context, technological

22     facts of each particular case.

23                 And this case, Your Honor, is not

24     about a widget.  It's not about a contact lens.

1           This case is about a drug that you

2      give to humans that can cause serious side

3      effects if you get the rate wrong.

4      Approximately is just too nebulous for the

5      safety issues that are associated with a drug

6      like this.

7           Moreover, you need to avoid the

8      prior art.  And again and again, throughout the

9      biopharmaceutics patents, they talk about these

10     things as unique.  They talk here about unique

11     nicotinic acid formulations resulting in unique

12     absorption rate in the '229 patent, Slide 81.

13          The unique urinary metabolite

14     profiles in the '715 patent.

15          Unique dissolution profiles in the

16     '967 patent.

17          Now, let's take a look at this

18     unique profile in light of the prior art.  If

19     you look at Figure 4 of the patent, that sweet

20     spot that Mr. Lee identified, that's rather

21     difficult to achieve given all of this prior art

22     out there that might cause hepatotoxicity, uric

23     acid increases or glucose increases.

24          So what the person of skill in the

1    art has to do is travel that narrow channel.

2    And so what we've done here is we've tried to

3    show you where Niaspan, that Niaspan channel

4    falls here.  And it's quite difficult to see.

5              So what we did instead is we went

6    to the tables in the '967 patent and showed Your

7    Honor where that sweet spot is that has to be

8    found in the safe.  And there it is, that's

9    Niaspan 500 in blue.  That's how it dissolves in

10   water over time.

11             Let's take a look at it relative

12   to the prior art to see whether approximately is

13   right for this kind of acknowledgement.

14             That's the nicotinic product.

15   That's the product that's prior art.  A product,

16   that among others, would suggest that it's

17   potentially damaging.

18             And you can see how close this is,

19   this time point, this time point and this time

20   point.  Deviating here, adding the gold line

21   product, we see that that also intersects with

22   Niaspan's dissolution.

23             It deviates just over here along

24   that line.  And then finally the endurance

1   product crossing over the slope here and then

2   again over here, and then deviating more

3   significantly here.  So that sweet spot that has

4   to be found by the person of ordinary skill

5   requires some precision, indeed.

6              We believe Abbott's experts

7   tacitly admit subject matter calls for

8   precision.  If you look at their declaration,

9   they don't show anything in their declarations

10   about what might be a scientifically precise

11   result.  There's simply a shrug of the shoulder

12   like you heard today during argument.

13              These things are inherently

14   valuable.  They're not -- well, they're

15   variable, but they're rendered to a degree of

16   acceptable scientific precision.  A degree of

17   acceptable scientific precision that would

18   result in that sweet spot that Mr. Lee talked

19   about.

20              Moreover, Abbott's expert,

21   Dr. Foster, suggests that Lupin's reliance on

22   the U.S.P., as Your Honor pointed out, as found

23   in the patent is misplaced.

24              What's the U.S.P.?  In our view,

1    the U.S.P.'s the industry Bible.

2                    And if you take a look at the

3    website of the U.S.P., it's careful.  It says

4    that "The United States Pharmacopeia is a

5    non-governmental official public

6    standards-setting authority for prescription and

7    over-the-counter medicines and other health care

8    products manufactured or sold in the United

9    States."

10                   It appears in the patent defining

11   the how to do dissolution profile.  It appears

12   in the claims and in the '967 patent.

13                   Dr. Foster suggests that because

14   Niacin doesn't specifically show up in one of

15   these U.S.P.'s for that year, one of the -- I'm

16   going to end very soon -- one of the U.S.P.'s

17   for this -- for that year, that you wouldn't

18   follow it.  Well, Dr. Foster is a member of the

19   U.S.P. and it's surprising to hear that, because

20   the articles of incorporation which we've

21   provided to Your Honor in the binder talk about:

22                   One, you know, standard guide for

23   the use of those engaged in the practice of

24   medicine and pharmacy in the United States

1    whereby the identity, strength and purity of all

2    such medicines and drugs may be accurately

3    determined.

4            If Dr. Foster is to be believed,

5    and people who do research for non-commercially

6    available drugs that don't appear in the

7    national formulary wouldn't follow the U.S.P.,

8    even though the U.S.P. is followed by the FDA,

9    the argument doesn't make much sense.

10            I am going to talk quickly about

11    the dissolution curve similarity fit factor.

12    This is a mathematical formula comparing two

13    slopes of the solution profile to each other.

14    The closer you get to a hundred, the more

15    similar you are to the reference curve that

16    appears in the '967 patent.

17            Again, Abbott renders that as

18    approximately.  Lupin renders it as no less than

19    43.5.

20            Why?  Because everywhere in the

21    patent it's talked about in whole numbers.  And

22    as we know since fourth grade, we round up from

23    the digits.  43.5 up to 44, but we would round

24    down to 43 for anything lower.

1          Why is that significant here?  As

2     you can see, the trailing zeros in Table 6 and

3     Table 1A when they want to express whole

4     numbers, they express them as trailing zeros,

5     79.0 for the fit factors.  This one, 44.0.

6          Translate that to the patent, it's

7     rendered as a whole number.  Same thing down

8     here with the test tablet compositions.

9          And by the way, one point to

10    address.  Mr. Lee said that I believe that there

11    are several preferred embodiments here.  Well,

12    there are.  There are different dosage forms of

13    Niaspan.

14          That's what the patent refers to

15    when it says embodiments.  In any event, in

16    these embodiments, we're talking about trailing

17    zeros as well.  And these are also rendered as

18    whole numbers.

19          So are whole numbers acceptable to

20    the Federal Circuit?  Abbott says no.  We say

21    yes.

22          We take a look at the American

23    National Can Company case which Abbott cited in

24    its brief.  You will see that the Federal

1   Circuit agreed there that rounding to the next

2   significant digit was, in fact, a standard

3   scientific convention.

4            But in that case, that case the

5   issue of polyethylene density trumped.  And so

6   what you've heard today is nothing that trumps

7   the standard scientific convention.

8            I'll reserve the rest of my time.

9            THE COURT:  Just one thing before

10  you sit down.  We couldn't find the tab, the

11  initial expert report in our copy.  I assume if

12  we don't have it, that's inadvertent, I assume.

13           MR. MURPHY:  It's inadvertent.  I

14  am sure we have it.

15           We have a Lupin appendix.  We'll

16  provide that to Your Honor hopefully today.

17           THE COURT:  It's not in our copy

18  of the appendix, but if you have a copy with you

19  of his initial expert report that is tabbed, you

20  can leave it with us today or you can submit it

21  early next week.

22           MR. MURPHY:  Thank you, Your

23  Honor.

24           MR. LEE:  Your Honor, I don't

```
 1    think we'll need our whole half hour to respond.

 2    Let me start here.

 3                  I hear Lupin clearly.  I think I

 4    have the quote down.  "This is about a drug that

 5    results in serious side effects if you don't get

 6    it just right."  That's what this patent is

 7    about, getting it just right.

 8                  It's not a coincidence that they

 9    want to copy us.  They want the sweet spot.

10                  So how do they get at it?  And

11    let's look at what they've offered, Your Honor,

12    because I've sat here today and I've heard about

13    the articles of incorporation for U.S.P.  I've

14    seen some charts based upon prior art.

15                  I've seen some recitations about

16    articles cited and what the patents say.  But

17    let's go to the discipline that I think Your

18    Honor has applied in other proceedings.

19                  And Phillips says we have to

20    apply -- first, the issue is from the point of

21    view of one of ordinary skill in the art.  And I

22    have thought about two things that Your Honor's

23    raised.

24                  I've often thought in the jury
```

1    context what happens if there is -- you adopt a

2    definition of one of ordinary skill in the art

3    and then you go to trial.  And you submit the

4    factual question for the jury and they decide

5    it's different.

6              When I've been asked that question

7    before, I said I think you get a new trial based

8    upon that determination.  Here, though, we would

9    suggest the following.

10             First is there are competing

11   definitions.  Your Honor had 180 pages of

12   briefing in the Markman.  More than you probably

13   ever wanted.

14             On the 179th page, Lupin says,

15   Well, there's some differences between those of

16   ordinary skill in the art.  No one ever suggests

17   to you in the 179 preceding pages that it

18   matters.  Never once.

19             And that's because it doesn't.

20   Your Honor can adopt definitions that are very

21   close, as Ms. Ferrera says, to that which we've

22   offered you collectively and interpret the

23   claims.

24             And particularly, if there's no at

1    risk launch here and there's a jury waived

2    trial, that can be addressed if it needs to be

3    at the time of trial.

4              The second thing is this patent,

5    like many that we're starting to see here, many

6    patents are issuing today in sophisticated

7    science where people in multiple disciplines are

8    involved.  And the question of how you define

9    what one of ordinary skill in the art in that

10   particular context is not one that the Federal

11   Circuit has addressed precisely.

12             But at least based upon my

13   experience, the definition we'd offer, Your

14   Honor, is you take someone who is like the

15   people who made the invention who has a

16   background that's similar to theirs, but that of

17   an ordinary skill.  And they then can consult

18   just as the inventors did with people from these

19   other disciplines.

20             And that's how when you have

21   multiple discipline inventions, you get the

22   person of ordinary skill in the art and he can

23   interpret the patent.

24             Now, from that perspective of that

1        person of ordinary skill in the art, let's talk

2        about this internal hydrophobic component issue,

3        because I think I can demonstrate to Your Honor

4        three things very quickly on the intrinsic

5        evidence.

6                      First, that the claim terms don't

7        have it.

8                      Second, that the specification

9        fortunately that you discussed with Mr. Murphy

10       doesn't have it.

11                     And third, respectfully, the

12       portions of the file history that Mr. Murphy

13       showed you, all you have to do is read the next

14       sentence or the in connection with events to

15       show that he's wrong.  And I think that I can

16       show that to you.

17                     Now, let's start with the

18       Phillips' discipline on this issue of excluding

19       a hydrophobic, an internal hydrophobic

20       component.  The claim terms say nothing about

21       it, and we both now agree there is nothing in

22       the claim terms.

23                     So as a starting point, Lupin says

24       that you would have to interpret them according

1    to something other than their plain meaning.

2              Second, the specification.  One

3    portion intragranular.  That portion, the last

4    part of that portion is incorrect for three

5    reasons.

6              One, legal.

7              Two, factual.

8              The first is the Federal Circuit

9    has held in Johnson Worldwide that if you're

10   going to read some portion of the specification

11   into the claim as they're doing, you have to

12   have a hook in the claim.  And they have no hook

13   in the claim.

14             The second -- could I have our

15   Slide 47?  After the portion, the intragranular

16   portion has been set forth as an example, the

17   inventors say in both patents it is, therefore,

18   to be understood that any variations in

19   sustained release formulation evidence fall

20   within the scope of the claimed invention.

21             And thus, the selection of

22   specific component elements can be determined

23   without departing from the spirit of the

24   invention herein disclosed and described.  What

 1    was that invention?  Hitting the sweet spot so

 2    you don't have the disastrous consequences that

 3    Mr. Murphy described.

 4                  "In particular, sustained release

 5    excipients, binders and processing aids

 6    according to the present invention are not

 7    necessarily limited to those exemplified

 8    hereinabove."

 9                  Thus, the scope of the invention

10    shall include all modifications and variations

11    that -- typographical area -- may fall within

12    the scope of the attached claims.

13                  This is the portion that

14    immediately follows -- doesn't immediately

15    follow it.  It follows the portion that he cited

16    to you.

17                  The third point, Your Honor, is in

18    citing the intragranular portion of the spec,

19    they're asking Your Honor to limit the claims to

20    the specification and embodiment disclosed in

21    the specification, even though the specification

22    says it's not.

23                  And I can't think of a Federal

24    Circuit case that would say that was the right

```
 1    way to do it.

 2              Now, the prosecution history --

 3              THE COURT:  Before you get to

 4    that, I just want to make sure --

 5              MR. LEE:  Sure.

 6              THE COURT:  -- that we're on the

 7    same page as to what you're responding to.

 8    There was the defendant's Slides 7 and 8, which

 9    were Table 1B in the '930 patent and then Column

10    5, Lines 56 to 59 also in the '930 patent with

11    reference to Hystrene.

12              That was what I understood to be

13    Lupin's specification argument that they felt

14    supported them.

15              MR. LEE:  That's correct.  That's

16    what I'm responding to here.

17              THE COURT:  Okay.

18              MR. LEE:  Let me go to the

19    prosecution history.  Can I have our Slide 64?

20              And Your Honor, I'm going to focus

21    on the '428 patent.  But I heard Lupin say

22    unequivocally that things had been found.

23    Things never happened.  Things weren't said.

24              And I think with five slides, I
```

1    can demonstrate that, respectfully, that's just

2    not correct.

3              The starting point was this

4    interview summary on October 10, 1997 and I'm on

5    our Slide 64.  Mr. Murphy highlighted the

6    sentence.

7              He explained that O'Neill requires

8    hydrophobic component whereas in the instant

9    claimed application, there's no hydrophobic

10   component.  And if my notes are correct, he said

11   how could one of ordinary skill in the art

12   understand anything differently than they were

13   saying there is none.

14             The very next sentence, the

15   examiner informed the counsel that the Claim 1

16   has an open-ended expression comprising.  And it

17   is inclusive of all unrecited ingredients.  That

18   is precisely this issue of whether a hydrophobic

19   component is required or not.

20             So if we go to Slide 65, these are

21   filling in the blanks for what Lupin described

22   to you.  On February 26th, 1999, the inventor

23   specifically argued that the O'Neill patent was

24   based upon a defined acid composition.

 1                    But in contrast, currently pending

 2     independent Claim 1 and 15 are not formulation

 3     limited, so long as the composition is in an

 4     oral sustained release form, which when

 5     administered, deliver effective amount of

 6     nicotinic acid.

 7                    So then what happens -- we go to

 8     Slide 66.  And this was cited to you by Lupin.

 9                    And they cited to you the sentence

10     we have highlighted here, and said one of

11     ordinary skill in the art couldn't understand

12     anything other than what we were disclaiming, an

13     internal hydrophobic component.  And then they

14     were done.  But the file history demonstrates

15     that that's incorrect.

16                    Slide 67.  What does the examiner

17     say in July of 1999?

18                    "The composition employed in the

19     methods of instant application are materially

20     different than O'Neill".  "Specifically there is

21     no requirement of an added hydrophobic

22     component."

23                    So when Mr. Murphy says no one of

24     ordinary skill in the art could have understood

 1          it to be anything other than a disclaimer, and

 2          no one would accept our position that what we

 3          were saying is there's no requirement, that's

 4          what the examiner said.  But it wasn't just the

 5          examiner.

 6                     Can we have Slide 68?  In October

 7          of 1999, the applicant responds and says, That's

 8          correct.  Unlike O'Neill, such unique methods as

 9          claimed are accomplished irrespective of whether

10          a hydrophobic component is mixed with a

11          nicotinic acid prior to tablet or other product

12          formulation.

13                     Thus, the claims are not limited

14          to the requirement of adding a hydrophobic

15          component for mixing with nicotinic acid prior

16          to the tablet formulation.

17                     This is the applicant and the

18          examiner saying that the claims of the added

19          Abbott patent don't require a hydrophobic

20          component and O'Neill does.

21                     In fact, could we switch and could

22          I ask you to bring up your Slide 14?  This is

23          their Slide 14.

24                     In fact, Your Honor, it's a little

1    bit of an oversimplification of what's claimed

2    in O'Neill.  But this actually demonstrates the

3    two-way test issue.

4                    In this particular case, this box

5    in the bottom right-hand corner of their chart

6    can read with a hydrophobic component or not,

7    required or not.

8                    This is the genus.  The left-hand

9    side is the species where it's required.

10                   And what Lilly tells us is that if

11   you have a genus that would cover with or

12   without, and you have a species that requires a

13   hydrophobic component, then the two-way test is

14   satisfied.

15                   Now, there was some reference to

16   this being a comparison, Niaspan to the prior

17   art.  This is not prior art.

18                   This was antedated.  And the only

19   relevance of this comparison is to demonstrate

20   whether the one-way test or the two-way test was

21   satisfied.

22                   The concept is not -- the concept

23   is whether an internal hydrophobic component is

24   required.  O'Neill had support for it.  Ours

1    would cover it with or without, but would not

2    have allowed us to have a specific claim for

3    that negative limitation.  And that's why the

4    two-way test wasn't satisfied.

5                    THE COURT:  Niaspan, as a factual

6    matter, does not have an internal hydrophobic

7    component.

8                    MR. LEE:  As a factual matter,

9    that's true.

10                   THE COURT:  So your argument, I

11   think, goes to the claim as opposed to the

12   embodiment of Niaspan; is that right?

13                   MR. LEE:  It goes to the claim,

14   Your Honor.  And it goes to the broad language

15   of the patent that says we're not limited to the

16   precise composition of Niaspan.

17                   Now, the result is the same for

18   the '930 patent.  And let me just bring up Slide

19   82 of ours.

20                   Actually Slide 98.  I had it

21   wrong.

22                   Let me get back.  Just a second,

23   Your Honor.

24                   Ms. Ferrera is correct.  Niaspan,

1       it depends if you're going to interpret in terms

2       of the intragranular.  If it's not

3       intragranular, there are embodiments that have

4       the -- that could include this uric acid as a

5       lubricant.  If you go to intragranular, Your

6       Honor is correct.

7                    Can I have just one second to

8       bring up the correct slide?  I just want to

9       bring one slide, Your Honor.

10                   This is a collection of statements

11      that were made that I think make clear that what

12      the patentee was saying is an internal

13      hydrophobic component is not required.  So it's

14      Slide 79.

15                   And what's on Slide 79 now, Your

16      Honor, are statements from both prosecution

17      histories that say that the composition is not

18      limited.  They're not formula limited.  And they

19      come right out and say that the composition or

20      the method is accomplished irrespective of

21      whether a hydrophobic component is mixed or not.

22                   Now, the question I think before

23      Your Honor is would these statements -- would

24      these statements, some very clear statements

1     that the point that is being made is that no

2     hydrophobic component is required, is there a

3     clear and unequivocal disclaimer?

4                    And the answer is there is a

5     burden here.  If the burden is clear and

6     unequivocal disclaimer, someone needs to show

7     it's clear.  Someone needs to show it's

8     unequivocal.  And there's a reason for that.

9                    The reason is, as I said earlier,

10    because the file histories are extensive as some

11    of these are.  They span lots of periods of time

12    and they have particular contexts, as we do

13    here, which is an interference.

14                   Now, on the '848 patent, which I

15    think Your Honor identified as possibly another

16    subset, let me just say this:  Mr. Murphy talked

17    about the title.  He forgot to tell you one

18    thing.

19                   We recognize that the title was in

20    error.  We went back and changed it.

21                   The change was accepted.  Now, as

22    a matter of administrative correction, it hasn't

23    occurred.  But in the file history at JA2998 and

24    JA3004, you will find that Abbott went back and

1    corrected the title because it was in error.

2    And the Patent Office accepted the error.

3              Now, two other points, and I think

4    they go to the overall claim interpretations

5    that are being offered to you.  This concept

6    that independent claims can sort of freely be

7    interpreted differently than dependent claims or

8    that you can interpret them consistently is not

9    a principle of law that the Federal Circuit

10   applies.

11             You find in the one case they cite

12   to you that there were huge problems with the

13   dependent claims.  This is their effort to

14   suggest to you that my hypothetical, which is

15   asking you to interpret a claim term that says a

16   car that has wheels as a car that has no wheels

17   that has wheels.

18             They have to make that argument to

19   you.  And I suggest respectfully that an

20   interpretation that makes independent claims

21   inconsistent with the dependent claims when the

22   examiner, had they been confronted with the

23   entire file history, has allowed them is not the

24   correct result.

1              Last point, Your Honor, is this:

2    If you listen to their argument, their argument

3    is that our invention is narrower than because

4    we're saying exclude a hydrophobic component.

5    The file history is all about our saying we're

6    broader.

7              It's all about -- the

8    specification is about our being broader.  The

9    file history is about our being broader.

10             The entire extrinsic record is

11   about our discovery, that if you don't hit this

12   sweet spot, you're putting your patients at

13   substantial risk.

14             The argument they're offering you

15   now, which is actually -- this is potentially

16   narrower, makes no sense.  And it specifically

17   makes no sense giving those quotes that I have

18   on the slide right now, which says we're

19   broader.

20             I think Ms. Ferrera has just a

21   couple more points to make on the --

22             THE COURT:  Well, I also have some

23   questions on the intermediate release term.  I

24   don't know which of you that goes to.

1          MR. LEE:  She's going to do it.

2          THE COURT:  That's Ms. Ferrera.

3    Okay.

4          MR. LEE:  Your Honor, I can do

5    that one very quickly.

6          THE COURT:  Okay.

7          MR. LEE:  And if we could have --

8    can I have Slide 46?  Do you have their Slide

9    46?

10         Your Honor, I think this is akin

11   to the issue we discussed about an example

12   disclosed and their broader descriptions.  This

13   is their Slide 46, which has two portions of the

14   specification.

15         As I understand the argument, it

16   is that the first time it's referred to there as

17   a reference to one to 24 hours to encapsulate

18   it.  And the second time, they must be referring

19   back.

20         I don't think that's a fair

21   reading of the specification.  They do refer to

22   it once in a specific example in the one to two

23   hours and the 10 to 22 hours.  But there is a

24   second time where they refer to it broadly with

 1    no specific limitation.

 2              This, I think, goes to a place

 3    where we just have a fundamental disagreement

 4    between us which is:  Is this patent just about

 5    the specific composition of Niaspan, the way it

 6    operates or is it something broader than that?

 7              And we suggest that the claim

 8    terms in the spec make it broader than that.

 9              THE COURT:  Also, if you could put

10    up the 46 again.  I know -- the defendant's 46.

11              MR. LEE:  Yes.

12              THE COURT:  I'm wondering on the

13    left-hand side, it's very clear that there's a

14    reference to in vivo or in vitro.  On the

15    right-hand side, it refers to administer the

16    patient to be treated.

17              I'm wondering if I should leave

18    that portion of the specification as limited to

19    only in vivo.  And does that have anything to do

20    with, you know, the difference between the

21    parties here?

22              MR. LEE:  Your Honor, I don't

23    think critically so, but I think the fact that

24    the left-hand side gives you something in vivo,

1    in vitro.  The right-hand side is just talking

2    about patients broadly.  It's an indication to

3    you that they're not talking about identically

4    the same thing.

5                    THE COURT:  Okay.  Thank you.

6                    MS. FERRERA:  Your Honor, I'd like

7    to start briefly with the treatment-limiting

8    terms, and if we could go to Abbott's Slide

9    Number 107.

10                   Now, Your Honor, there's no

11   question that Lupin's proposed constructions are

12   based on the reference ranges in the various

13   tables.  But Lupin showed you Table 4 that's in

14   all of the patents, I believe.

15                   But I think Table 7, which is up

16   on the screen right now, illustrates the problem

17   with relying on the reference ranges.  As you

18   can see in this table, there were at least four

19   different patients, and in the various studies

20   that were reported here that had results that

21   were outside the reference ranges.

22                   And none of these patients were

23   discontinued from the trials.  None of them were

24   withdrawn from treatment with the invention of

```
 1      Niaspan.
 2                  The claim terms require
 3      discontinuation of treatment when these
 4      elevations occur.  That didn't happen here, even
 5      though the patients had results that fell
 6      outside the reference ranges.  And that
 7      demonstrates the reference ranges cannot be
 8      dispositive.
 9                  And, in fact, as we looked at
10      earlier on Slide Number 109, if we can flip
11      quickly to that slide, the inventor, Mr. Bova
12      explains when he says the reference ranges
13      varied depending on this case on different
14      laboratories.  So the specification makes clear
15      that the reference ranges are not determinative
16      as does the prosecution history.
17                  THE COURT:  What about the
18      references in the prosecution history that the
19      defendants showed us that referred to FDA
20      approval?
21                  MS. FERRERA:  Your Honor, I think
22      that refers to -- that does.  There's no
23      question that they did refer to the FDA.
24                  As the various experts have
```

1    indicated, however, that those guidelines are

2    not hard and fast rules.  And those apply in the

3    context of clinical trials, not necessarily in

4    the context of everyday treatment of patients.

5                And so, as Dr. Wharton indicated,

6    depending on a particular patient's circumstance

7    and background, he would discontinue treatment

8    at 2.5 times the upper limit of normal, not

9    three times the upper limit of normal, which is

10   what the FDA guideline is.  And it is just that,

11   a guideline.

12               THE COURT:  And what about the

13   broader legal argument that all of that is just

14   not enough guidance to the public for this to be

15   patentable subject matter essentially?

16               MS. FERRERA:  Well, and I think,

17   Your Honor, that actually is an important point,

18   because here we're talking about treatment of

19   patients.  And the Courts have specifically

20   recognized that when you are talking about

21   pharmaceutical patents such as this, these terms

22   that may seem subjective and amorphous are

23   separate and do not render the patents

24   indefinite.

 1                    And if we could look at Slide 16

 2      for -- 116, for example.  The Court, the Federal

 3      Circuit, in fact, has said that terms such as

 4      effective amount or therapeutic effective

 5      amount, which seems to have this level of

 6      subjectivity about it as well is not -- is an

 7      acceptable term in pharmaceutical patents and is

 8      not ambiguous or indefinite and can be

 9      interpreted by a person of ordinary skill in the

10      art without having a specific reference to two

11      numbers in limitations.

12                    The Southern District of New York

13      also recognized that even though there may be

14      patient-specific aspects to these terms, that

15      that doesn't require more precision.  And it

16      doesn't require -- it doesn't render the patents

17      invalid.

18                    And finally, if we look at the

19      next slide, Slide 117, the Federal Circuit's

20      case from just about a month ago in Shure also

21      confirmed that claim terms such as readily are

22      not indefinite and that you don't need to have

23      mathematical precision in patents in order for

24      people to understand what they mean.

1    THE COURT:  Does your argument

2    include the term where you recommend clinically

3    significant?  Because that one does seem even

4    another degree more vague than some of the other

5    terms that you've argued for.

6    MS. FERRERA:  I think clinically

7    significant, Your Honor, falls into the same

8    category as therapeutically effective amount.  A

9    person of ordinary skill in the art, someone

10   who's familiar with Niacin who's familiar with

11   the use of Niacin to treat the patients

12   suffering from hypolipidemia would understand

13   what that means.

14   That you might start with the FDA

15   guidelines, but then you need to look at

16   patient's other circumstances.  Is there a

17   family history?  Are there other factors that we

18   need to take into account?

19   And using their experience and the

20   ordinary standard of care in these

21   circumstances, they will apply that term

22   appropriately.

23   THE COURT:  I had asked you

24   earlier about identifying claim terms that or

1    claim numbers that had specific numbers in them.

2    Do you have any of those?

3                    MS. FERRERA:  Yes, Your Honor.

4    And, in fact, if you look -- I'm not sure if we

5    have a slide, but the '967 patent, Claim 16

6    talks about an in vitro dissolution profile when

7    measured in a Type 1 dissolution apparatus

8    baskets, according to the U.S. Pharmacopeia 12.

9                    And it says at about 37 degrees C

10   and D by ionized water at about a hundred RPM.

11   But if you look back at the specification and

12   it's Column 9 of the '967 specification at Lines

13   38 to 41, it's more specific than that.

14                   It actually says -- it refers to

15   use of this apparatus at 37 degrees C at a

16   hundred RPMs.  So that's an instance where the

17   inventors were specific about what they

18   intended.

19                   Your Honor, the other -- the only

20   two other points that I want to make are with

21   respect to Lupin's claim differentiation

22   argument.  Mr. Murphy said that he didn't think

23   that was the law.

24                   But if I could direct -- if I

1          could call up Slide Number 126.  In the Kara

2      Technologies versus Stamps.com case that the

3      Federal Circuit decided in 2009, that's exactly

4      what they said.  That claim differentiation does

5      not apply to different terms in different

6      patents.  And that's the case that we have here.

7                  And lastly, Your Honor, Lupin did

8      refer to a patent application that has been

9      pending that Abbott made certain statements.

10     And as they pointed out, not only did Abbott

11     withdraw that application, they actually

12     corrected the statements before they did that.

13     So those statements, we think, have no

14     applicability in this case.

15                  Thank you, Your Honor.

16                  THE COURT:  Okay.  Thank you.

17                  MR. MURPHY:  Could we have your

18     Slide 79?

19                  Now, Your Honor, you've heard

20     about the O'Neill patent and the O'Neill patent

21     was an admixture.  It was formulation focused.

22                  It was designed to take an

23     internal hydrophobic component, and the internal

24     hydrophobic component was mixed into the Niacin.

1    And it gave that release rate that caused some

2    improved safety.  And that's what the O'Neill

3    patent says.

4              What we have here that Mr. Lee

5    relied upon was purportedly some statements of

6    the lawyer concerning the formulation that was

7    in Niaspan, which is the only example we have.

8              Again, if you don't mind, I'm just

9    going to approach.

10             THE COURT:  That's fine.

11             MR. MURPHY:  The laser pointer

12   doesn't work really well.  It's kind of absorbed

13   by this.

14             So you see on August 5th of 1996,

15   the inventor says the present inventor, that's

16   Bova, discovered that the time of administration

17   is critical, regardless of the exact date for

18   the composition.

19             Well, what's the support for that

20   statement?  This is coming from an attorney.  If

21   you look at the patent specification, there's no

22   support for that.

23             How do we know what that means,

24   the exact nature of the composition?  We've got

1    one composition that they worked with patients

2    before.  We've got one -- how is timing

3    critical?  You've got no basis for a comparison.

4              This is just verbiage on the part

5    of an attorney going to the Patent Office and

6    throwing up as many arguments as possible to

7    avoid O'Neill.

8              Same thing here.  Where currently

9    pending independent method claims are not

10   formulation limited, how do we know that?  We

11   have no idea that they're not formulation

12   limited.  They have given one example.

13             They've given one example and

14   tested it in patients.  That's all they have.

15             They have no basis for that

16   statement.  This is why they keep saying that

17   the internal hydrophobic component is not

18   supported.

19             It's not in the disclosure.

20   There's no basis to assess its efficacy or

21   improved safety.

22             If you go to -- you will see that

23   the comments there on the end that are relied

24   upon by Mr. Lee, they end in October 15th of

1    1999.  This is from Peter Manso who represented

2    the patentee at the time.

3                    Can we switch now, Chris, to our

4    slides?  Can you go --

5                    MR. NOYES:  Yes.

6                    MR. MURPHY:  Great.  Thanks.

7                    I am just going to dial down a

8    little bit.  So what we had on Slide 79 was the

9    last statement from Mr. Manso that was dated

10   October of 1999.

11                   But what we have here from the

12   '848 patent is his last word in December.  And

13   his last word was looking back through this '848

14   patent, which depends on the '930 for support,

15   that it was hydrophobic component free.  That's

16   his last word.

17                   He changed the title.  He changed

18   it deliberately.  And respectfully, I didn't

19   forget.

20                   They did change this title.  And I

21   mentioned it and I mentioned why.

22                   In 2004, they changed this title.

23   I believe it's 2003-2004.

24                   And Your Honor should know that it

1    was in the context of a litigation.  Kos was in

2    a litigation against a company like Lupin.  This

3    was Barr Laboratories.

4              And so they changed that title to

5    expand claim scope, perhaps to enhance their own

6    infringement case.  So there was a reason they

7    changed that title and it wasn't an

8    administrative reason.

9              THE COURT:  But the PTO did allow

10   to change the title; correct?

11             MR. MURPHY:  They did.  They did.

12             Let's take a look.  I'm going to

13   use the elmo now.

14             How do I do that?  Oh, can you

15   switch it?  Thanks, Chris.

16             Now, Ms. Ferrera talked about the

17   possibility that there are certain patients that

18   had elevations in uric acid and/or blood

19   glucose.  I think that the references were to

20   blood glucose.

21             And those elevations were repeated

22   elevations.  In some instances, I think two.

23   And there were certain instances where they went

24   over the reference ranges.  And thus, Abbott is

1    suggesting that Lupin's construction is

2    inconsistent with the specification.  Not so.

3                You see the specification talks

4    about certain improved safety profiles and they

5    talk about three of them.  Hepatoxicity, uric

6    acid and blood glucose.

7                Certain patients may have

8    treatment-limiting uric acid and blood glucose,

9    but not from treatment.  Hepatotoxicity, as you

10   can see, one of the unasserted claims is based

11   on that idea.

12               So if you look at Claim 57, Claim

13   57 is a daily method of treating hypolipidemia

14   once per day during the evening and night;

15   whereas the nicotinic acid is combined, a

16   pharmaceutical acceptable carrier that forms one

17   oral sustained release dosage form.  Said daily

18   dosage treatment causing little or no serious

19   damage to the liver.

20               No mention here -- no mention here

21   of uric acid.  No mention here of glucose.

22               Patients don't have to be

23   covered -- to be covered by a claim and be

24   supported by the specification.  You can have

1    certain patients that will elevate and match

2    some claims and not others.

3              With respect -- I'm not going to

4    pull up the slides again.  With respect to the

5    later Column 17, referring now to the

6    biopharmaceutics patents, this definition of

7    intermediate release nicotinic acid formulation.

8    The line buried after Column 16 that Abbott

9    relies upon saying that the Niaspan formulation

10   of the claim's compositions would be faster,

11   slower than in the immediate release Niacin, but

12   faster than in the sustained release Niacin.

13             Your Honor, reading those two in

14   connection with each other, the later version

15   simply references the kind of supra shorthand

16   reference to the other formulation.  And I think

17   that's consistent with the specification as it's

18   written.

19             Finally, with respect to

20   therapeutically effective, therapeutically

21   effective is a bit different than we're talking

22   about with treatment-limiting hepatotoxicity and

23   causing serious liver damage.

24             If it's going to differ from

1    physician to physician, that would be a serious

2    subject for the public.  They wouldn't have

3    noticed.

4             You know, therapeutically

5    effective refers to efficacy.  And efficacy can

6    be by self report, so that a doctor can simply

7    hear that a medication is effective for the

8    particular purpose.

9             Let's say it is reducing stomach

10   upset.  There's no need for a test for that.

11   And they can figure out what the therapeutically

12   effective dose is fairly quickly if that's the

13   person of skill in the art.

14            Whereas the formulator might base

15   it on what might have been test doses in the

16   past.  It's a bit different when you consider

17   the more problem of toxicity.

18            In short, Your Honor, to give the

19   public the metes and bounds of the invention is

20   what we've tried to do here.  To give Your Honor

21   a reading of these patents consistent with the

22   statements that were made by Kos and holding

23   Abbott to those statements after purchasing Kos,

24   Abbott is bound by those statements just as much

1    as Kos was.  Their application is not -- does

2    not support an internal hydrophobic component

3    and their claims don't reach that far.

4                    Thank you.

5                    THE COURT:  Okay.  All right.

6    Counsel, it's been very helpful.

7                    I think if I recall correctly, I

8    think there's a couple documents I've asked

9    defendants to submit.  You can get those into

10   me.

11                   MR. MURPHY:  We'll submit them on

12   Monday, Your Honor.

13                   THE COURT:  That's fine.

14                   MR. MURPHY:  Thank you.

15                   THE COURT:  Unless I've asked

16   plaintiffs to submit anything, which I don't

17   recall at this point, I'm not looking for any

18   further briefing or any additional submissions.

19   As was referenced, I've got quite a lot of

20   briefing here.  So no need to hit me with

21   anything further.

22                   Okay.  Thank you very much.

23                   MS. PASCALE:  Thank you, Your

24   Honor.

1                    THE CLERK:  All rise.

2                    (Court was recessed at 4:16 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    State of Delaware )
                      )
2    New Castle County )

3

4

5                    CERTIFICATE OF REPORTER

6

7          I, Heather M. Triozzi, Registered

8    Professional Reporter, Certified Shorthand Reporter,

9    and Notary Public, do hereby certify that the

10   foregoing record, Pages 1 to 167 inclusive, is a true

11   and accurate transcript of my stenographic notes

12   taken on May 21, 2010, in the above-captioned matter.

13

14         IN WITNESS WHEREOF, I have hereunto set my

15   hand and seal this 26th day of May, 2010, at

16   Wilmington.

17

18

19         _____

20         Heather M. Triozzi, RPR, CSR
           Cert. No. 184-PS
21

22

23

24